Alan Gura (Calif. Bar No. 178221)
Gura & Possessky, PLLC
101 N. Columbus St., Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

Donald E.J. Kilmer, Jr. (Calif. Bar No. 179986)
Law Offices of Donald Kilmer, A.P.C.
1645 Willow Street, Suite 150
San Jose, CA 95125
408.264.8489/Fax 408.264.8487

Jason A. Davis (Calif. Bar No. 224250)
Davis & Associates
27281 Las Ramblas, Suite 200
Mission Viejo, CA 92691
949.310.0817/Fax 949.288.6894

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Ivan Peña, et al., | ) | Case No. 2:09-CV-01185-FCD-KJM |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN SUPPORT OF |
| v. | ) | PLAINTIFFS' MOTION FOR SUMMARY |
| | ) | JUDGMENT [Fed. R. Civ. P. 56] |
| Wilfredo Cid, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

COME NOW the Plaintiffs, Ivan Peña, Roy Vargas, Doña Croston, Brett Thomas, the

Second Amendment Foundation, Inc. ("SAF"), and the Calguns Foundation, Inc. ("CGF"), by

and through undersigned counsel, and submit their Memorandum of Points and Authorities in

Support of their Motion for Summary Judgment.

Dated: September 1, 2009                  Respectfully submitted,

Alan Gura (Calif. Bar No. 178,221)        Jason A. Davis (Calif. Bar No. 224,250)
Gura & Possessky, PLLC                     Davis & Associates
101 N. Columbus St., Suite 405             27281 Las Ramblas, Suite 200
Alexandria, VA 22314                       Mission Viejo, CA 92691
703.835.9085/Fax 703.997.7665             949.310.0817/Fax 949.288.6894

                                           Donald E.J. Kilmer, Jr. (Calif. Bar No. 179,986)
                                           Law Offices of Donald Kilmer, A.P.C.
                                           1645 Willow Street, Suite 150
                                           San Jose, CA 95125
                                           408.264.8489/Fax 408.264.8487
                                           E-Mail: Don@DKLawOffice.com


                                 By:   /s/Donald E.J. Kilmer, Jr
                                       Donald E. J. Kilmer, Jr.

                                       Attorneys for Plaintiffs

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Defendant's Handgun Rostering Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Defendant's Enforcement of the "Handgun Roster" Program Against Plaintiffs . . . . . . . 8

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.    THE SECOND AMENDMENT PROTECTS THE POSSESSION
          OF ARMS IN COMMON USE FOR LAWFUL PURPOSES,
          INCLUDING HANDGUNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    II.   DEFENDANT'S HANDGUN ROSTERING PROGRAM
          VIOLATES THE SECOND AMENDMENT IN THAT IT BANS
          PROTECTED HANDGUNS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    III.  DEFENDANT'S HANDGUN ROSTERING PROGRAM
          VIOLATES THE FIFTH AMENDMENT AS IT DEPRIVES
          INDIVIDUALS OF DUE PROCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1

TABLE OF AUTHORITIES

2

CASES

3
4

*City of Chicago* v. *Morales*, 527 U.S. 41 (1999) ..................................... 20

5

*City of Cleburne* v. *Cleburne Living Center*, 473 U.S. 432 (1985) ...................... 16

6

*Harper* v. *Virginia Board of Elections*, 383 U.S. 663 (1966) ........................... 17

7
8

*Heller* v. *District of Columbia*, 128 S. Ct. 2783 (2008) ................................ 1

9

*Hussey* v. *City of Portland*, 64 F.3d 1260 (9th Cir. 1995) .............................. 17

10

*Murdock* v. *Pennsylvania*, 319 U.S. 105 (1943) .................................... 19

11

*Plyler* v. *Doe*, 457 U.S. 202 (1982) ............................................... 17

12
13

*United States* v. *Carolene Products Co.*, 304 U. S. 144 (1938) ........................ 17

14

*United States* v. *Darrington*, 351 F.3d 632 (5th Cir. 2003) ........................... 18

15

*United States* v. *Emerson*, 270 F.3d 203 (5th Cir. 2001) ............................. 18

16

*United States* v. *Everist*, 368 F.3d 517 (5th Cir. 2004) .............................. 18

17
18

*United States* v. *Miller*, 307 U. S. 174 (1939) ...................................... 12

19

*United States* v. *Patterson*, 431 F.3d 832 (5th Cir. 2005) ............................ 18

20

*Zobel* v. *Williams*, 457 U.S. 55 (1982) ............................................ 18

21

22

STATUTES AND REGULATIONS

23

27 C.F.R. § 478.11 ................................................................. 19

24

Cal. Penal Code § 12126(c) ...................................................... 4, 20

25

26

27 C.F.R. § 478.11 ................................................................. 15

27

28

OTHER AUTHORITIES

A New and Complete Law Dictionary (1771) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

J. Trusler, The Distinction Between Words Esteemed
    Synonymous in the English Language (1794) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Adam Winkler, *Fatal in Theory and Strict in Fact: An Empirical*
    *Analysis of Strict Scrutiny in the Federal Courts*,
    59 Vanderbilt L. Rev. 793 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Jon Vernick, et al., "'I Didn't Know the Gun Was Loaded':
    An Examination of Two Safety Devices That Can
    Reduce the Risk of Unintentional Firearm Injuries,"
    20 Journal of Public Health Policy No. 4 at 433 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . 4

N. Webster, American Dictionary of the English Language (1828) (reprinted 1989) . . . . . . . . 13

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

This case presents what is arguably the easiest Second Amendment question that might come before a federal court today, seeing as the question has just been answered by the Supreme Court barely over a year ago: May the government ban handguns of the kind in common use by Americans for ordinary lawful purposes?  The answer: no. *District of Columbia* v. *Heller*, 128 S. Ct. 2783 (2008).

Several years ago, state lawmakers banned from private retail sale any handgun that does not appear on a special roster. In time, as this program evolved to become ever-more restrictive, it has become all but impossible to sell any newly-designed handguns in California, while many previously-approved handguns have become prohibited for non-substantive, administrative reasons. And of course, the attempt to enumerate every single handgun that might be legally sold has predictably proved too ambitious a task not to yield arbitrary and irrational results.

Whatever else one might say about California's pre-*Heller* handgun rostering program, it is clearly not constitutional. The program is founded on a theory specifically rejected in *Heller* as inconsistent with individual's Second Amendment rights – that common firearms might be banned merely owing to the government's assessment that their possession is not in the public interest. In *Heller*'s wake, the District of Columbia's City Council adopted California's roster as its own. But in the face of a constitutional challenge, the District almost immediately modified the law, explicitly recognizing that California's rostering scheme does not meet constitutional standards. Respectfully, this Court should reach the same conclusion.

As the legislative record demonstrates, the California law consciously sought to alter the choices made in the mass market for common guns – precisely the sort of conduct proscribed by

the Second Amendment. Yet some of the California law's most restrictive policies do not advance, and might even reduce, public safety.

*Heller* did not eliminate the government's ability to ban weapons that are outside the scope of Second Amendment protection. But as the four handguns at issue in this case demonstrate, California's scheme is intentionally designed to and does ban guns that easily pass the *Heller* test for protected Second Amendment arms. Indeed, the exact same model handgun at issue in *Heller* is banned in California and denied to plaintiff Brett Thomas because it has not been (and cannot be) placed on the "Roster of Handgun Certified for Sale." Ivan Pena is denied permission to own a handgun that had once been "rostered" and approved for sale, but which is now no longer legal to purchase in California because the gun's manufacturer will not pay an annual fee in perpetuity to keep it on the list. Roy Vargas, born with only a left arm, is denied access to a handgun with an ambidextrous magazine release, even though the state would allow him the identical model handgun with a right-handed magazine release he cannot operate. And Dona Croston is denied permission to own a handgun because, effectively, it is the wrong color.

Yet Plaintiffs could legally obtain these same handguns if they had out-of-state relatives willing to gift them, if Plaintiffs worked in the entertainment industry, or if they worked for law enforcement. Individuals residing in another state are also allowed to import these guns into California upon relocating here. And Plaintiffs could obtain these guns from other Californians who might already have them in their possession.

It is impossible to reconcile the roster of arms approved for sale in the Bill of Rights with that conjured by the operation of California law. The latter must yield.

////

**STATEMENT OF FACTS**

*The Handgun Rostering Program*

The facts of this case are not in dispute. California law provides that "any person in this state who manufactures or causes to be manufactured, imports into the state for sale, keeps for sale, offers or exposes for sale, gives, or lends any unsafe handgun shall be punished by imprisonment in a county jail not exceeding one year." Statement of Undisputed Facts ("SUF") 1. California law presumes that *all* handguns are "unsafe" and therefore, generally barred from importation and sale, unless those handguns have been placed on the state's special roster of handguns "determined not to be unsafe." SUF 2.

Since 2007, a center-fire[1] semi-automatic[2] handgun cannot make the roster if it does not have both a chamber loaded indicator and – if it has a detachable magazine – a magazine disconnect mechanism. SUF 3. Since 2006, a rimfire[3] semi-automatic handgun must have a magazine disconnect mechanism if it has a detachable magazine. SUF 4. However, handguns rostered prior to the effective dates of these requirements can remain rostered despite lacking these features. SUF 5.

A magazine disconnect mechanism is "a mechanism that prevents a semiautomatic pistol

---

[1] Most handguns use center-fire ammunition, which fires a bullet when the center of the cartridge is struck by the gun's firing pin, igniting the primer.

[2] A semi-automatic handgun is handgun that fires one bullet each time the trigger is pulled, with the firing of each bullet causing the next round to be loaded into the chamber from a magazine. Most handguns in the United States are semi-automatic. Almost all the rest are revolvers, which hold several rounds in a rotating cylinder and also fire one bullet with each pull of the trigger. Nothing in the challenged laws, or this litigation, relates to fully-automatic weapons (machine guns), which are the subject of other specific legislative enactments.

[3] Rimfire ammunition, which is fired when struck on its rim by the gun's firing pin, is primarily used in the smallest calibers. For technical reasons, chamber load indicators are not feasible for rimfire ammunition.

that has a detachable magazine from operating to strike the primer of ammunition in the firing chamber when a detachable magazine is not inserted in the semiautomatic pistol." SUF 6. A chamber load indicator ("CLI") is "a device that plainly indicates that a cartridge is in the firing chamber." SUF 7. Not all CLIs satisfy the California requirement. Under California law,

> [a] device satisfies this definition if it is readily visible, has incorporated or adjacent explanatory text or graphics, or both, and is designed and intended to indicate to a reasonably foreseeable adult user of the pistol, without requiring the user to refer to a user's manual or any other resource other than the pistol itself, whether a cartridge is in the firing chamber.

SUF 8.

Although a CLI is sufficient if it is "designed and intended to indicate to a reasonable adult user" that the firearm is loaded, [Cal. Penal Code § 12126(c)] in practice the sufficiency of the CLI is determined by a different standard. Defendant tests the sufficiency of CLIs by asking his employees if they understand the CLI – and when the regulatory authority's employees allegedly fail to understand the CLI, regardless of what the CLI is "designed and intended to indicate to a reasonable adult," the CLI is ruled inadequate. SUF 9.

Given the rarity of CLIs and magazine disconnect devices, handguns lacking these features are in common use today, and comprise the overwhelming majority of handguns. SUF 10.

This much is obvious upon any cursory survey of firearms as to be within judicial notice, akin to observing that most American cars have power windows. There are, however, some precise statistics. According to one survey, CLIs and magazine disconnect devices are included on no more than 11% and 14% of handguns, respectively.  Jon Vernick, et al., "'I Didn't Know the Gun Was Loaded': An Examination of Two Safety Devices That Can Reduce the Risk of Unintentional Firearm Injuries," 20 Journal of Public Health Policy No. 4 at 433 (1999).

Indeed, the rarity of CLIs and magazine disconnect mechanisms was a fact specifically relied upon by the California Legislature in mandating these features as part of the rostering program. California legislators specifically considered that CLIs and magazine disconnects are available on only perhaps 11% and 14% of handguns, respectively, as proposed by the author of the bill mandating these features. SUF 11. Because CLIs and magazine disconnect mechanisms were viewed as beneficial, it was hoped that mandating these features would alter the firearms market. SUF 12. "[It] is arguable that a requirement in California would 'drive' the technology of chamber load indicators."  Exhibit B.  California Senate Public Safety Committee Report, p. 9. "It might also be assumed that a mandate in California would drive technology in the market for magazine disconnect devices." Id., p. 10.

Since both the magazine disconnect and CLI requirements came into effect on January 1, 2007, only *one* new model of semi-automatic handgun has been approved for placement on the California handgun roster. SUF 13.

Yet these "safety" features are not foolproof. A handgun safety mechanism may fail or be misused. SUF 14.  A chamber loaded indicator is a mechanical device that may fail or be misinterpreted by the user of a handgun. SUF 15. A magazine disconnect mechanism is a mechanical device that may fail. SUF 16. As the state advises handgun purchasers, "Any machine can malfunction. A firearm is no different." SUF 17.

In fact, to acquire any handgun in California, an individual must pass a written handgun safety test. SUF 18. The test requires knowledge of the basic rules of handgun safety, the first of which is: "Treat all guns as if they are loaded." SUF 19. The state's study guide for the handgun safety test further provides:

Always assume that a gun is loaded even if you think it is unloaded. Every time a gun is handled for any reason, check to see that it is unloaded [by following specific instructions

for unloading the gun]. If you are unable to check a gun to see if it is unloaded, leave it alone and seek help from someone more knowledgeable about guns.

SUF 20.

The state's specific instructions for unloading a semi-automatic handgun contained in its gun safety study guide provides that a mechanical safety

is not foolproof so do not rely on the safety to prevent an accidental discharge. A safety should only be used as an additional safety measure. Never pull the trigger on any firearm with the safety in the "safe" position because thereafter the firearm could fire at any time without the trigger ever being touched.

SUF 21.

Although the state's gun safety study guide does not discuss chamber load indicators or magazine disconnect devices, it teaches, in order to pass the mandatory safety test, rules that would have gun owners ignore such devices. The study guide specifically instructs that in order to verify a semi-automatic handgun is unloaded, one must remove the magazine and visually inspect the chamber to verify that it is empty. SUF 22.

In fact, in a large red box marked "CAUTION," the state's gun safety study guide provides:

You should NOT assume a semiautomatic pistol is unloaded just because the magazine is removed from the handgun.

Do not allow the slide to go forward UNLESS you have:

1. Checked again to be sure the chamber is empty, and
2. Checked again to be sure the magazine has been REMOVED.

If you pull the slide back ejecting the cartridge, check the chamber, let the slide go forward, and THEN remove the magazine, you have a loaded, dangerous firearm (a cartridge is in the chamber) even though you have removed the magazine. It is common and sometimes fatal to make this error.

ALWAYS REMOVE THE MAGAZINE FIRST!

SUF 23.

In order to purchase a handgun, the buyer must demonstrate that he or she knows how to safely operate the handgun, including following these instructions. SUF 24. Moreover, California law also generally requires that all newly purchased firearms either be accompanied by an approved gun lock or the purchaser's affidavit that she owns an adequate lock box or gun safe. SUF 25.

Listings on the California handgun roster are valid for one year, and must be renewed annually, including payment of an annual fee, prior to expiration to remain valid. SUF 26. Defendant charges firearms manufacturers, importers, and dealers annual fees, ostensibly to operate the handgun roster program. Any handgun whose manufacturer fails to pay the required fees may be excluded from the roster for that reason alone. SUF 27. The initial and renewal annual listing fees for inclusion on the handgun roster are $200. SUF 28.

Other than the California DOJ, only the manufacturer/importer of a handgun model is authorized to submit that handgun model to a DOJ-Certified Laboratory for testing. SUF 29. A handgun can remain on the roster if its manufacturer/importer goes out of business or discontinues the model, provided that the model is not being offered for sale to licensed dealers, and "a fully licensed wholesaler, distributor, or dealer submits a written request to continue the listing and agrees to pay the annual maintenance fee." SUF 30. So long as a handgun is sold to dealers outside of California, the handgun's manufacturer can cause the sale of that handgun to be forbidden inside California by failing to submit the gun for testing in that state or refusing to pay the annual $200 fee. SUF 31.

A manufacturer/importer or other responsible party may submit a written request to list a handgun model that was voluntarily discontinued or was removed for lack of payment of the annual maintenance fee. The request may be approved, and the handgun restored to the "safe

gun" roster, provided the fee is paid. SUF 32.

The following firearms and transactions are exempted from the handgun rostering requirement: (1) Firearms defined as curios or relics under federal law; (2) The purchase of any firearm by any law enforcement officer – State or Federal; (3) Pistols that are designed expressly for use in Olympic target shooting events, as defined by rule; (4) Certain single-action revolvers, as defined by rule; and (5) The sale, loan, or transfer of any firearm that is to be used solely as a prop during the course of a motion picture, television, or video production by authorized people related to the production. SUF 33.

It is also not illegal in California to import an unrostered handgun when moving into the state without the intention of selling it, nor is it illegal in California to possess or use an unrostered handgun that is otherwise lawful to possess or use. SUF 34. California also exempts private party transfers, intra-familial transfers including gifts and bequests, various loans, and various single-action revolvers. SUF 35.[4]

*Defendant's Enforcement of the "Handgun Roster" Program Against Plaintiffs*

Plaintiff Ivan Peña has sought to purchase a Para USA (Para Ordnance) P1345SR / Stainless Steel .45 ACP 4.25", and has identified a willing seller who stands ready to deliver said handgun to him. SUF 36. The Para USA P1345SR that Peña's wants to buy was listed on California's Handgun Roster until December 31, 2005, when it was discontinued and its listing not renewed. SUF 37.

---

[4]"Single" or "double" action refers to the gun's trigger function, one "action" being the effect of drawing back the hammer, another "action" being the effect of dropping the hammer. Guns can be designed to operate in single-action, double-action, or effectively both (if a gun has a hammer that might be retracted either manually or by pulling the trigger).

Peña cannot lawfully purchase and take possession of the handgun as that handgun is not on the California Handgun Roster. SUF 38. Peña fears arrest, prosecution, fine and incarceration if he completes this handgun purchase. SUF 39.

Plaintiff Roy Vargas has sought to purchase a Glock 21 SF with an ambidextrous magazine release, and has identified a willing seller who stands ready to deliver said handgun to Plaintiff. SUF 40. However, Vargas cannot lawfully purchase and take possession of the handgun as that handgun is not listed on the California Handgun Roster. SUF 41. Vargas fears arrest, prosecution, fine and incarceration if he completes this handgun purchase. SUF 42.

Vargas was born without an arm below the right elbow. SUF 43. The Glock 21 SF-STD with a standard magazine release is listed on the California Handgun Roster. SUF 44. However, the Glock 21 SF with ambidextrous magazine release is superior for left-handed shooters such as Mr. Vargas, as opposed to the approved version of the Glock 21. SUF 45. Glock's efforts to add the Glock 21 SF with ambidextrous magazine release to the California Roster have failed. SUF 46.

However, Defendant permits Glock customers to have their Glock 21 SF-STD handguns fitted with an ambidextrous release at the Glock factory. SUF 47. As state officials wrote Glock in response to the gunmaker's pleas to include the ambidextrous Glock 21 SF on the roster:

> A California owner of a Glock handgun model with a standard magazine release who wishes to have his or her handgun model retrofitted with an ambidextrous magazine release may send the firearm to Glock. Glock could then retrofit the handgun and return it to its owner. No further testing of the retrofitted handgun would be required.

Exhibit H. In other words, California permits the sale of a Glock 21 SF-STD, and the alteration of that handgun by Glock to add an ambidextrous magazine release, but will not allow consumers to purchase new Glock 21 SFs with an ambidextrous magazine release in the first place.

Plaintiff Doña Croston has sought to purchase a Springfield Armory XD-45 Tactical 5"

Bi-Tone stainless steel/black handgun in .45 ACP, model number XD9623, and has identified a willing seller who stands ready to deliver said handgun to her. SUF 48. Croston cannot lawfully purchase and take possession of the handgun as that handgun is not on the California Handgun Roster. SUF 49. Croston fears arrest, prosecution, fine and incarceration if she completes this handgun purchase. SUF 50.

Other models of this identical gun – but in different colors – are listed on the handgun roster and are thus available to Ms. Croston: the XD-45 Tactical 5" .45 ACP in black (model XD9621), the XD-45 Tactical 5" .45 ACP in OD Green (model XD9622), and the XD-45 Tactical 5" .45 ACP in Dark Earth (XD9162). SUF 51. However, the particular Bi-Tone XD-45 that Ms. Croston would possess was not released until after California required newly-listed guns to have a chamber load indicator and magazine disconnect device. SUF 52. Springfield Armory could not get the XD-45 in .45 ACP and Bi-Tone finish registered given the new listing requirements. SUF 53. The XD-45 Bi-Tone in .45 has a loaded chamber indicator, but the California Department of Justice has decided it does not qualify under Penal Code § 12126(c). SUF 54. The XD-45 also lacks a magazine disconnect device. SUF 55.

The handgun at issue in *District of Columbia* v. *Heller*, 128 S. Ct. 2783 (2008), was a High Standard 9-shot revolver in .22 with a 9.5" Buntline-style[5] barrel. SUF 56. Plaintiff Brett Thomas has sought to purchase an identical High Standard 9-shot revolver in .22 with a 9.5" Butline-style barrel, and has identified a willing seller who stands ready to deliver said handgun to Thomas. SUF 57. Thomas cannot lawfully purchase and take possession of the handgun as that handgun is not on the California Handgun Roster. SUF 58. Thomas fears arrest, prosecution, fine

---

[5] A "Buntline" is a Western-style extra-long barrel revolver, named for 19th-century novelist Ned Buntline who was said to commission such guns for famous personalities of the day.

and incarceration if he completes this handgun purchase. SUF 59.

Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SUF 60. SAF has over 650,000 members and supporters nationwide, including many in California. SUF 61. The purposes of SAF include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control. SUF 62.

Plaintiff The Calguns Foundation, Inc. is a non-profit organization incorporated under the laws of California with its principal place of business in Redwood City, California. SUF 63. The purposes of Calguns include supporting the California firearms community by promoting education for all stakeholders about firearm laws, rights and privileges, and securing the civil rights of California gun owners, who are among its members and supporters. SUF 64.

SAF and Calguns expend their resources encouraging exercise of the right to bear arms, and advising and educating their members, supporters, and the general public about the legality of particular firearms. The issues raised by, and consequences of, Defendant's policies, are of great interest to SAF and Calguns' constituencies. Defendant's policies regularly cause the expenditure of resources by SAF and Calguns as people turn to these organizations for advice and information. SUF 65, 66. Defendant's policies bar the members and supporters of SAF and Calguns, living in California, from obtaining numerous, if not most, handguns. SUF 67

## SUMMARY OF ARGUMENT

This case begins and ends with the fact that California will not roster handguns lacking certain features which are missing from many, if not the vast majority, of handguns of the kind in

common use throughout the United States. That it has become impossible to market any new

handguns in California is telling. The challenged laws constitute a massive ban on handguns

whose possession and use is secured by the Second Amendment.

In unsuccessfully defending its blanket handgun ban, the District of Columbia argued that

it could unilaterally determine which arms were too dangerous to be allowed ordinary citizens,

and that handguns as a class of weapons failed to meet its criteria. This argument was rejected

both by the D.C. Circuit and the Supreme Court. The government's disdain for particular arms

does not enable it to ban them if their possession is protected by the Second Amendment. The

test is whether the arms at issue are of the kind that would be in common use for lawful purposes.

Defendant's handgun rostering program also violates basic principles of equal protection,

in that it arbitrarily makes distinctions between otherwise identical firearms, inherently making

arbitrary distinctions among the people who would possess them, and bars some classes of

people from possessing handguns that are perfectly permissible to others. These practices cannot

survive Fourteenth Amendment scrutiny.


**ARGUMENT**

I.    THE SECOND AMENDMENT PROTECTS THE POSSESSION OF ARMS IN
      COMMON USE FOR LAWFUL PURPOSES, INCLUDING HANDGUNS.

"[T]he sorts of weapons protected [by the Second Amendment are] those 'in common use

at the time.'" *Heller*, 128 S. Ct. at 2817 (quoting *United States* v. *Miller*, 307 U. S. 174, 179

(1939)). "[T]he Second Amendment does not protect those weapons not typically possessed by

law-abiding citizens for lawful purposes." *Heller*, 128 S. Ct. at 2815-16. Handguns plainly satisfy

this test. "It is enough to note, as we have observed, that the American people have considered

the handgun to be the quintessential self-defense weapon . . . Whatever the reason, handguns are

the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition on their use is invalid." *Heller*, 128 S. Ct. at 2818.

There is little question that Defendant, as a state actor, is bound by Second Amendment rights by operation of the Fourteenth Amendment. As of this writing, the question of the Second Amendment's incorporation is one of first impression before this Court, though it is squarely raised in several cases pending before the Ninth Circuit and the Supreme Court. While it cannot be taken for granted that the higher courts will opine on the matter any time soon, helpfully, the State of California has filed an amicus brief with the Supreme Court arguing that the Second Amendment is, indeed, incorporated and urging the Court to grant certiorari to clarify that fact. Br. of State of California, Supreme Court Nos. 08-1497, 08-1521. A comprehensive argument for incorporation appears in Plaintiffs' Motion for Summary Judgment, *Sykes* v. *McGinness*, E.D. Cal. 09-01235, at pp. 9-14. As the parties are apparently in agreement on this point, it does not require further elucidation here.

Defendant is still free to ban "dangerous and unusual weapons," *Heller*, 128 S. Ct. at 2817, including "sophisticated arms that are highly unusual in society at large." *Id.* And Defendant can ban those weapons which do not meet the historic legal definition of "arms" as used in the Second Amendment – "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 128 S. Ct. at 2791 (citing 1 A New and Complete Law Dictionary (1771); N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)).[6] But handguns have been held to pass the common use test by the Supreme Court. They are protected Second Amendment arms that cannot be banned – even if the

---

[6] "[A]ll firearms constituted 'arms.'" *Heller*, 128 S. Ct. at 2791 (citing 1 J. Trusler, The Distinction Between Words Esteemed Synonymous in the English Language 37 (1794)).

state believes they are excessively dangerous.

II.    DEFENDANT'S HANDGUN ROSTERING PROGRAM VIOLATES THE SECOND AMENDMENT IN THAT IT BANS PROTECTED HANDGUNS.

The handguns banned by Defendant's rostering program – including guns without CLIs and/or magazine disconnect mechanisms, guns that have not been (and cannot be) submitted by their manufacturer for government testing, and guns that would be perfectly acceptable by the government but for lack of an annual listing fee – are all nonetheless handguns of the kind in common use protected by the Second Amendment. None of these characteristics render a firearm "dangerous or unusual" or establish that it is not of the kind in common use for lawful purposes.

The CLIs and magazine disconnect mechanisms required for rostering are rare features, found on perhaps only 11% and 14% of all handguns in the marketplace. Considering California's particularly harsh and entirely arbitrary enforcement of its CLI requirement, that number of qualified CLI's is surely lower than even 11% of the market.

Many guns are still protected by the Second Amendment even if they have not been manufactured for many years prior to the advent of the California Handgun Roster, or have been manufactured by a company that does not wish to sell its products in one particular state. And plainly, a gun model deemed "not unsafe" does not somehow alter its characteristics and become "unsafe" simply because a check has not been cashed in Sacramento within the year.

The four handguns denied Plaintiffs by operation of Defendant's handgun rostering program are plainly within the Second Amendment's protection. That the handgun roster law is incompatible with Supreme Court precedent is illustrated by the roster's operative banning of Brett Thomas's High Standard revolver – the exact same gun the Supreme Court ordered Washington, D.C. not to ban barely over a year ago. This gun might not appear on the state's list of approved handguns, but according to the Supreme Court, it appears in the Second

Amendment.

The handguns denied Ivan Pena and Dona Croston are likewise plainly within the Second Amendment's protection. They cannot be considered "dangerous and unusual" by any stretch of imagination. Croston's gun appears on Defendant's approved list, albeit in different colors, but is unavailable in the black/stainless finish because it was not made available for testing in that particular color before the CLI and magazine disconnect requirements came into effect. It is not as though Croston's gun failed any safety testing; California regulators refuse to test the gun because it does not contain features missing from the overwhelming majority of American handguns – as acknowledged by the California Legislature in enacting the requirements. Ivan Pena's gun was once deemed safe enough for sale, but is only unavailable because its listing was not renewed. The gun did not suddenly become dangerous on January 1, 2006, when its listing expired because the manufacturer would not pay a fee and fill out a piece of paper.

The situation with respect to Roy Vargas's is absurd. Physically handicapped individuals enjoy no lesser interest in self-defense and the Second Amendment right to arms that serves it. However, such individuals are disproportionately hurt by artificial, unconstitutional limitations on the range of handgun available to them. It makes no sense that Vargas cannot simply purchase a Glock 21 SF with an ambidextrous magazine release, but that he can purchase the right-handed version of this exact same gun, and undergo the additional burden and expense of having the Glock factory make a custom modification for him – resulting in the exact same handgun that Defendant will not place on the roster.

There is also no escaping the fact that the magazine disconnect and CLI requirements contravene the state's own policies with respect to gun safety. The state mandates that all handgun purchasers pass a handgun safety test that specifically teaches people not to rely on

gimmicks like magazine disconnects and CLIs. The state makes it absolutely clear that all guns must be treated as loaded, that the absence of a magazine is not to be interpreted as a sign that the gun is unloaded, that the only way to know guns are unloaded is to physically inspect the chamber. Even then, treating all guns as loaded promotes safe handling practices. And on top of the mandatory instruction on such practices, and the requirement that handgun purchasers demonstrate safe handling techniques, the state mandates that each handgun sale be accompanied by the sale of a lock or a guarantee that room exists in a safe for the gun.

The state's instructions with respect to safe gun handling and unloading are unassailable. Whatever the merits of the state's safe storage requirements, they do not ban a single gun, while making the magazine disconnect and CLI requirements redundant. It is irresponsible to rely on magazine disconnects and CLIs for gun safety, which is perhaps why the market has obviously rejected these features, and why the Defendant has such a difficult time agreeing to a standard of what actually constitutes a CLI.

California's legislature, operating in a pre-*Heller* environment, approached the handgun issue backwards from a constitutional, post-*Heller* perspective. The legislature sought to declare almost all handguns "unsafe" for failing to conform to its design preferences, or for the manufacturer's inability or unwillingness to pay for and participate in the state's regulatory scheme. Consciously, the state sought to "drive" the market towards its preferred outcomes. But *Heller* stands for the proposition that it is the regulatory environment that must accommodate itself to the choices made by the lawful, constitutionally-protected market for arms, and not the other way around.

III.    DEFENDANT'S HANDGUN ROSTERING PROGRAM VIOLATES THE FOURTEENTH AMENDMENT GUARANTEE OF EQUAL PROTECTION.

The Equal Protection Clause "is essentially a direction that all person similarly situated

should be treated alike." *City of Cleburne* v. *Cleburne Living Center*, 473 U.S. 432, 439 (1985) (citation omitted). Strict scrutiny applies to government classifications that "impinge on personal rights protected by the Constitution." *Id.*, 473 U.S. at 440 (citations omitted). "Where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized." *Hussey* v. *City of Portland*, 64 F.3d 1260, 1265 (9th Cir. 1995) (quoting *Harper* v. *Virginia Board of Elections*, 383 U.S. 663, 670 (1966)). Indeed, "classifications . . . that impinge upon the exercise of a 'fundamental' right" are presumptively unconstitutional unless the government can demonstrate that the law satisfies strict scrutiny.  *Plyler* v. *Doe*, 457 U.S. 202, 216-17 (1982) (footnote omitted).

     Although *Heller* did not announce a specific standard of review for cases raising Second Amendment concerns, the Supreme Court did conclude that "[b]y the time of the founding, the right to have arms had become fundamental for English subjects." *Heller*, 128 S. Ct. at 2798 (citation omitted). The Supreme Court thus specifically rejected rational basis as the standard of review for Second Amendment claims, and strongly suggested that the standard of review would be a rigorous one:

> Obviously, [rational basis] could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms.

*Heller*, 128 S. Ct. at 2818 n. 27 (citing *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152, n. 4 (1938)).

     Requiring strict scrutiny in evaluating Second Amendment questions does not spell the end of all gun laws because the government will often have a compelling state interest in the area, that may be constitutionally addressed. Strict scrutiny is context-sensitive and is "far from the inevitably deadly test imagined by the Gunther myth." Adam Winkler, *Fatal in Theory and*

*Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts*, 59 Vanderbilt L. Rev. 793, 795 (2006). The Fifth Circuit has long employed a version of strict scrutiny in Second Amendment cases, allowing those laws that are

> limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country,...

*United States* v. *Emerson*, 270 F.3d 203, 261 (5th Cir. 2001). Under that standard, that court has upheld the more basic federal gun laws. *See*, *e.g. Emerson* (upholding gun prohibition for people covered by restraining orders); *United States* v. *Patterson*, 431 F.3d 832, 835 (5th Cir. 2005) (drug addicts); *United States* v. *Everist*, 368 F.3d 517, 519 (5th Cir. 2004) (felons); *United States* v. *Darrington*, 351 F.3d 632, 635 (5th Cir. 2003) (felons). "[I]t remains certain that the federal government may not restrain the freedom to bear arms based on mere whimsy or convenience." *United States* v. *Everist*, 368 F.3d 517, 519 n.1 (5th Cir. 2004). However, where a classification plainly fails rational basis review, the Court's analysis need go no further. *Zobel* v. *Williams*, 457 U.S. 55, 60-61 (1982).

The sort of classifications created by the handgun roster are unacceptable under any sort of scrutiny reserved for enumerated rights. First, there are the classifications among different guns. Why is the Springfield Armory XD-45 acceptable in almost any finish, but will not even be considered for testing in Bi-Tone? If guns failing to include CLIs and magazine disconnects are unacceptably dangerous, why permit the continued manufacture and introduction of old, allegedly "unsafe" models? Croston is being denied the gun of her choice not because of any intrinsic quality it possesses, but because Croston prefers to have the gun in a particular color.

The requirement that an annual fee be paid by a manufacturer to keep a gun rostered is similarly problematic. Pena's access to his preferred handgun is cut-off simply because the model

is discontinued or at least, no longer the subject of an annual tribute. But "[a] state may not impose a charge for the enjoyment of a right granted by the Federal Constitution." *Murdock* v. *Pennsylvania*, 319 U.S. 105 (1943).

In California, unrostered guns are permitted by private importation or as intra-family gifts, just not as retail purchases. The roster thus privileges people who move into the state, or who have family out-of-state. Yet all people, not just relatives, may transfer unrostered handguns inside the state. These classifications make no sense. Any of the Plaintiffs might live next door to individuals who lawfully obtained the same handguns denied by the roster law, prior to moving to the state, or as a gift from an out-of-state relative.

California's wide exemptions for law enforcement personnel, allowing them to purchase unrostered guns for personal use, is completely irrational. If a gun is unacceptably dangerous, it is odd to allow it to those perhaps most likely to use it. And if the harm to be ameliorated is the unauthorized use of guns by people not knowledgeable in their use, police weapons, including those owned privately by police officers, are no less likely to be stolen or mishandled by unauthorized users.

The exceptions for curios and relics seems particularly egregious. Brett Thomas's High Standard revolver is not quite old enough to be exempt from the rostering law as a curio or relic, though in perhaps ten years, it would qualify. Ironically, Mr. Heller's particular gun might qualify today based on the fact of its involvement in an historic Supreme Court case. 27 C.F.R. § 478.11. But then, if Thomas prevails here, his gun, too, by that virtue, might also be transformed into an exempted curio or relic.

Then there are the exceptions for movie and television production, which are not merely irrational, but also underscore the fact that unrostered handguns are so common in American

culture such that audiences would not expect to see in realistic depiction of American life only those guns approved by Defendant.

The distinctions between different guns on the basis of whether they have an acceptable chamber loaded indicator are also unconstitutional given the wholly arbitrary manner in which California regulators determine whether a CLI is sufficient – asking around at the office whether random regulatory employees understand the CLI's message. While the California Legislature might have established "minimal guidelines," *City of Chicago* v. *Morales*, 527 U.S. 41, 60 (1999) defining a CLI based on design intent and characteristics, Cal. Penal Code § 12126(c), the regulatory practice is untethered from the legislative standard and in the end amounts to "because we said so." Of course, since the government does not ban revolvers or exceedingly popular rimfire rounds such as the .22, CLIs will always be missing from significant numbers of handguns.

These and other senseless distinctions are inevitable considering the audacious mission of the handgun roster law: to make a complete list of all lawful handguns, and substitute the design and feature preferences of legislators and regulators for that of a market comprising hundreds of millions of people over the course of generations. That this project intrudes into the exercise of a fundamental right calls for its abandonment.

The D.C. City Council reluctantly came to the same conclusion. Having adopted the California roster as their own, with all the usual public assurances that their law was constitutional, District officials re-considered upon being served with a very similar motion for summary judgment. On June 17, 2009, in United State District Court for the District of Columbia, the District gave notice that it was adopting an emergency regulation, abandoning its reliance on the California roster, by creating a "District roster" that, while still unconstitutional,

eliminated many of the burdens associated with the laws challenged in that (and this) action.  The

District based its emergency rule-making, in part, on the following findings:

> 1) recognition that California permits sale of firearms that have superficial differences to
> those firearms on its roster; 2) recognition that some handguns that have been placed on
> the California roster as safe handguns have been removed for administrative reasons not
> related to the handguns' safety; and 3) review of similar safe gun rosters maintained by
> Maryland and Massachusetts.

Exhibit L .

The new "District Roster" consists not only of the California and Massachusetts rosters,

but also that of Maryland. 24 DCMR 2323.1. The addition of the Maryland roster is significant,

as that state allows anyone to petition for additions to the roster, it does not require an annual

maintenance fee for guns to remain rostered, and it does not require handguns to have either a

magazine disconnect device nor CLI.  Not surprisingly, the Maryland roster contains

approximately twice the number of handguns as does the California roster.  Exhibit M.

Moreover, the new District roster expressly includes models removed from the California

roster for lack of payment, as well as guns that have only minor cosmetic differences from those

listed. 24 DCMR 2323.2,  2323.3.  Exhibit M.

On June 25,  2009, the District imported another critical piece of Maryland's law into its

own: an exemption from rostering requirements of all handguns manufactured prior to 1985.

Exhibit N & Exhibit O.

All of these improvements made by Washington, D.C. to address its adoption of the

California roster have resulted in a bloated regulatory regime that, in the end, does not actually

ban very many handguns – and would allow all of the handguns at issue in this case to sold in

California.[7] It appears unlikely that the California Legislature will be able to avoid summary judgment by timely repealing or significantly modifying its roster law.

**CONCLUSION**

The facts in this case are well-established, as are the controlling legal principles: the State of California cannot ban handguns of the kind in common use for lawful purposes, regardless of its policy preferences. Nor are the design requirements here consistent with other California laws aimed at improving gun safety, which condition the public to ignore these mandatory features in the name of safety. Finally, the classifications riddling the rostering scheme are irrational and beyond defense.  The Court should enter summary judgment for Plaintiffs.

Respectfully Submitted on Sept. 1, 2009.

Alan Gura (Calif. Bar No. 178221)          Jason A. Davis (Calif. Bar No. 224250)
Gura & Possessky, PLLC                      Davis & Associates
101 N. Columbus St., Suite 405             27281 Las Ramblas, Suite 200
Alexandria, VA 22314                        Mission Viejo, CA 92691
703.835.9085/Fax 703.997.7665              949.310.0817/Fax 949.288.6894

                                            Donald E.J. Kilmer, Jr. (Calif. Bar No. 179986)
                                            Law Offices of Donald Kilmer, A.P.C.
                                            1645 Willow Street, Suite 150
                                            San Jose, CA 95125
                                            408.264.8489/Fax 408.264.8487

                                    By:    /s/ Donald E.J. Kilmer, Jr.
                                           Donald E. J. Kilmer, Jr., Attorney for Plaintiffs

---

[7] Under its earlier interpretation of the California handgun roster, the D.C. Police allowed registration of a Glock 21 SF with ambidextrous magazine release.