Alan Gura (Calif. Bar No. 178,221)
Gura & Possessky, PLLC
101 N. Columbus St., Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

Donald E.J. Kilmer, Jr. (Calif. Bar No. 179986)
Law Offices of Donald Kilmer, A.P.C.
1645 Willow Street, Suite 150
San Jose, CA 95125
408.264.8489/Fax 408.264.8487

Jason A. Davis (Calif. Bar No. 224250)
Davis & Associates
27281 Las Ramblas, Suite 200
Mission Viejo, CA 92691
949.310.0817/Fax 949.288.6894

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Ivan Peña, et al., | ) | Case No. 2:09-CV-01185-FCD-KJM |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN OPPOSITION TO |
| v. | ) | DEFENDANT'S MOTION TO DISMISS |
| | ) | [Fed. R. Civ. P. 56] |
| Wilfredo Cid, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS

COME NOW the Plaintiffs, Ivan Peña, Roy Vargas, Doña Croston, Brett Thomas, the

Second Amendment Foundation, Inc. ("SAF"), and the Calguns Foundation, Inc. ("CGF"), by and

through undersigned counsel, and submit their Memorandum of Points and Authorities in

Opposition to Defendant's Motion to Dismiss.

1

Dated: September 18, 2009              Respectfully submitted,

2

Alan Gura (Calif. Bar No. 178,221)        Jason A. Davis (Calif. Bar No. 224,250)

3

Gura & Possessky, PLLC                    Davis & Associates

101 N. Columbus St., Suite 405            27281 Las Ramblas, Suite 200

4

Alexandria, VA 22314                      Mission Viejo, CA 92691

5

703.835.9085/Fax 703.997.7665            949.310.0817/Fax 949.288.6894

6

                                          Donald E.J. Kilmer, Jr. (Calif. Bar No. 179,986)

7

                                          Law Offices of Donald Kilmer, A.P.C.

                                          1645 Willow Street, Suite 150

8

                                          San Jose, CA 95125

9

                                          408.264.8489/Fax 408.264.8487

                                          E-Mail: Don@DKLawOffice.com

10

11

                           By:    /Donald E.J. Kilmer, Jr.

12

                                  Donald E. J. Kilmer, Jr.

13

                                  Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.      THE RIGHT TO ARMS INCLUDES THE RIGHT
        TO ACQUIRE ARMS... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.     THE SECOND AMENDMENT PROTECTS THE
        ACQUISITION OF ARMS IN COMMON USE FOR
        LAWFUL PURPOSES, INCLUDING HANDGUNS
        BANNED BY DEFENDANT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.    THE AVAILABILITY OF ALTERNATIVE ARMS
        IS NOT A DEFENSE TO A SECOND AMENDMENT VIOLATION. . . . . . . 16

IV.     THE CHALLENGED PROVISIONS CLEARLY VIOLATE
        THE EQUAL PROTECTION CLAUSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

i

1

## TABLE OF AUTHORITIES

2

CASES

3

4

*Carey* v. *Population Servs. Int'l*, 431 U.S. 678 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

5

*City of Chicago* v. *Morales*, 527 U.S. 41 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

6

*City of Cleburne* v. *Cleburne Living Center*, 473 U.S. 432 (1985). . . . . . . . . . . . . . . . . . . . 18

7

8

*District of Columbia* v. *Heller*, 128 S. Ct. 2783 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . passim

9

*Griswold* v. *Connecticut*, 381 U.S. 479 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

10

*Harper* v. *Virginia Board of Elections*, 383 U.S. 663 (1966). . . . . . . . . . . . . . . . . . . . . . . . 18

11

*Hussey* v. *City of Portland*, 64 F.3d 1260 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . 18

12

13

*Lawrence* v. *Texas*, 539 U.S. 558 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

14

*Murdock* v. *Pennsylvania*, 319 U.S. 105 (1943). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

15

*Nordyke* v. *King*, 563 F.3d 439 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

16

*Nordyke* v. *King*, 575 F.3d 890 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

17

18

*Parker* v. *District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . 17

19

*Plyler* v. *Doe*, 457 U.S. 202 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

20

*Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . 11

21

*Richmond Newspapers* v. *Virginia*, 448 U.S. 555 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . 10

22

23

*United States* v. *Carolene Prods. Co.*, 304 U.S. 144 (1938). . . . . . . . . . . . . . . . . . . . . . . . 12

24

*United States* v. *Carolene Products Co.*, 304 U. S. 144 (1938). . . . . . . . . . . . . . . . . . . . . . 18

25

*United States* v. *Darrington*, 351 F.3d 632 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . 19

26

*United States* v. *Emerson*, 270 F.3d 203 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . 19

27

28

*United States* v. *Everist*, 368 F.3d 517 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States* v. *Miller*, 307 U. S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States* v. *Patterson*, 431 F.3d 832 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Virginia* v. *American Booksellers Ass'n*, 484 U.S. 383 (1988) . . . . . . . . . . . . . . . . . . . . . . . 10

*Washington Free Community, Inc.* v. *Wilson*, 334 F. Supp. 77 (D.D.C. 1971) . . . . . . . . . . . 11

*Wexler* v. *City of New Orleans*, 267 F. Supp. 2d 559 (E.D. La. 2005). . . . . . . . . . . . . . . . . . 10

*Williams* v. *Morgan*, 478 F.3d 1316 (11th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Zobel* v. *Williams*, 457 U.S. 55 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

STATUTES AND REGULATIONS

11 Calif. Code of Regulations § 4059. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

11 Calif. Code of Regulations § 4070. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

11 Calif. Code of Regulations § 4072. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

24 DCMR 2323.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

24 DCMR 2323.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

24 DCMR 2323.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

24 DCMR 2325. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Cal. Penal Code § 12071. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Cal. Penal Code § 12088.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Cal. Penal Code § 12125. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 7, 11

Cal. Penal Code § 12126. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 21

Cal. Penal Code § 12130. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cal. Penal Code § 12131. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 6

Cal. Penal Code § 12132. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Cal. Penal Code § 12133. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Cal. Penal Code § 12800. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

27 C.F.R. § 478.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15


OTHER AUTHORITIES

56 D.C. Register 4782 (June 19, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

56 D.C. Register 5434 (July 3, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

A New and Complete Law Dictionary (1771). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Adam Winkler, *Fatal in Theory and Strict in Fact: An Empirical
      Analysis of Strict Scrutiny in the Federal Courts,*
      59 Vanderbilt L. Rev. 793 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Cal. Dept. of Justice, Study Guide for Handgun Safety Certificate,
      available at http://www.ag.ca.gov/firearms/forms/pdf/hscsg.pdf. . . . . . . . . . . . . . . 4, 5

J. Trusler, The Distinction Between Words Esteemed
      Synonymous in the English Language (1794). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Jon Vernick, et al., "'I Didn't Know the Gun Was Loaded':
      An Examination of Two Safety Devices That Can
      Reduce the Risk of Unintentional Firearm Injuries,"
      20 Journal of Public Health Policy No. 4 at 433 (1999). . . . . . . . . . . . . . . . . . . . . 3

N. Webster, American Dictionary of the English Language (1828) (reprinted 1989). . . . . . . . . . 13

iv

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS

PRELIMINARY STATEMENT

As the motion to dismiss covers largely the same ground as Plaintiffs' motion for summary judgment, there is a meaningful degree of overlap between this pleading and Plaintiffs' brief in support of their summary judgment motion.

Defendant accurately quotes the Complaint, but largely misses the point of this litigation, as well as some fairly plain controlling precedent. It is undeniable that Defendant administers and enforces a law banning most people from acquiring handguns not placed on a special roster. Plaintiffs note that many guns that are removed from the roster or cannot be placed on the roster are, in fact, protected by the Second Amendment. And since the acquisition of guns implicates a fundamental right, Defendant violates the Equal Protection Clause by enforcing bizarre classifications as to who may or may not obtain these guns, and under what circumstances.

A motion to dismiss the Complaint could be expected to argue that the guns being banned are not constitutionally protected under the test recently announced by the Supreme Court, and that the classifications serve some governmental interest under whatever standard of review may be applicable. Instead, Defendant raises a host of arguments that simply deny or ignore the constitutional landscape under which this case must be decided. The Complaint plainly states a valid claim for relief. Defendant's motion should be denied.

STATEMENT OF FACTS

Defendant's presentation of the facts is generally accurate, but incomplete. California law provides that "any person in this state who manufactures or causes to be manufactured, imports

1

into the state for sale, keeps for sale, offers or exposes for sale, gives, or lends any unsafe

handgun shall be punished by imprisonment in a county jail not exceeding one year." First Am.

Complaint ("FAC"), ¶ 12; Cal. Penal Code § 12125(a). California law presumes that *all* handguns

are "unsafe" and therefore, generally barred from importation and sale, unless those handguns

have been placed on the state's special roster of handguns "determined not to be unsafe." Cal.

Penal Code § 12126, et seq., 12131, et seq. Since 2007, a center-fire semi-automatic handgun

cannot make the roster if it does not have both a chamber load indicator and, if it has a detachable

magazine, a magazine disconnect mechanism. Cal. Penal Code §§ 12126(b)(5), 12130(d)(2).

Since 2006, a  rimfire semi-automatic handgun must have a magazine disconnect mechanism if it

has a detachable magazine. Cal. Penal Code §§ 12126(b)(6), 12130(d)(3). However, handguns

rostered prior to the effective dates of these requirements can remain rostered despite lacking

these features. Cal. Penal Code §§ 12126(b)(5), 12130(d)(2).

A magazine disconnect mechanism is "a mechanism that prevents a semiautomatic pistol

that has a detachable magazine from operating to strike the primer of ammunition in the firing

chamber when a detachable magazine is not inserted in the semiautomatic pistol." Cal. Penal Code

§ 12126(d). A chamber load indicator ("CLI") is "a device that plainly indicates that a cartridge is

in the firing chamber." Cal. Penal Code § 12126(c).

> [a] device satisfies this definition if it is readily visible, has incorporated or adjacent
> explanatory text or graphics, or both, and is designed and intended to indicate to a
> reasonably foreseeable adult user of the pistol, without requiring the user to refer to a
> user's manual or any other resource other than the pistol itself, whether a cartridge is in
> the firing chamber.

*Id.*.[1]

---

[1]In practice Defendant tests the sufficiency of CLIs by asking his employees if they
understand the CLI – and when the regulatory authority's employees allegedly fail to understand

2

Given the rarity of CLIs and magazine disconnect devices, handguns lacking these features are in common use today, comprising the overwhelming majority of handguns. FAC, ¶ 27. This much is obvious upon any cursory survey of firearms as to be within judicial notice, akin to observing that most American cars have power windows. There are, however, some precise statistics. According to one survey, CLIs and magazine disconnect devices are included on no more than 11% and 14% of handguns, respectively.  Jon Vernick, et al., "'I Didn't Know the Gun Was Loaded': An Examination of Two Safety Devices That Can Reduce the Risk of Unintentional Firearm Injuries," 20 Journal of Public Health Policy No. 4 at 433 (1999).

Indeed, the rarity of CLIs and magazine disconnect mechanisms was a fact specifically relied upon by the California Legislature in mandating these features as part of the rostering program. California legislators specifically considered that CLIs and magazine disconnects are available on only perhaps 11% and 14% of handguns, respectively, as proposed by the author of the bill mandating these features. *See* Legislative History Bill Files, Summary Judgment Mot. Exhs. C, D. Because CLIs and magazine disconnect mechanisms were viewed as beneficial, it was hoped that mandating these features would alter the firearms market. *Id.*

Yet these "safety" features are not foolproof. A handgun safety mechanism may fail or be misused by the user of a handgun, FAC, ¶ 28, while a chamber load indicator is a mechanical device that may fail or be misinterpreted by the user of a handgun. FAC ¶ 29. A magazine disconnect mechanism is a mechanical device that may fail. FAC ¶ 30. As the state advises handgun purchasers, "Any machine can malfunction. A firearm is no different." Cal. Dept. Of

the CLI, regardless of what the CLI is "designed and intended to indicate to a reasonable adult," the CLI is ruled inadequate. *See* Exh. A, Motion for Summary Judgment and Sep. Statement of Undisputed Facts at 9.

3

Justice, Study Guide for Handgun Safety Certificate ("Study Guide"), available at

http://www.ag.ca.gov/firearms/forms/pdf/hscsg.pdf, at 25.

In fact, to acquire any handgun in California, an individual must pass a written handgun

safety test. Cal. Penal Code §§ 12800-12808. The test requires knowledge of the basic rules of

handgun safety, the first of which is: "Treat all guns as if they are loaded." Study Guide, at 9. The

state's study guide for the handgun safety test further provides:

> Always assume that a gun is loaded even if you think it is unloaded. Every time a gun is
> handled for any reason, check to see that it is unloaded [by following specific instructions
> for unloading the gun]. If you are unable to check a gun to see if it is unloaded, leave it
> alone and seek help from someone more knowledgeable about guns.

*Id.*

The state's specific instructions for unloading a semi-automatic handgun contained in its

gun safety study guide provides that a mechanical safety

> is not foolproof so do not rely on the safety to prevent an accidental discharge. A safety
> should only be used as an additional safety measure. Never pull the trigger on any firearm
> with the safety in the "safe" position because thereafter the firearm could fire at any time
> without the trigger ever being touched.

Study Guide, at 20.

Although the state's gun safety study guide does not discuss chamber load indicators or

magazine disconnect devices, it teaches, in order to pass the mandatory safety test, rules that

would have gun owners ignore such devices. The study guide specifically instructs that in order to

verify a semi-automatic handgun is unloaded, one must remove the magazine and visually inspect

the chamber to verify that it is empty. Study Guide, at 45-47.

In fact, in a large red box marked "CAUTION," the state's gun safety study guide

provides:

4

You should NOT assume a semiautomatic pistol is unloaded just because the magazine is removed from the handgun.

Do not allow the slide to go forward UNLESS you have:

1. Checked again to be sure the chamber is empty, and
2. Checked again to be sure the magazine has been REMOVED.

If you pull the slide back ejecting the cartridge, check the chamber, let the slide go forward, and THEN remove the magazine, you have a loaded, dangerous firearm (a cartridge is in the chamber) even though you have removed the magazine. It is common and sometimes fatal to make this error.

ALWAYS REMOVE THE MAGAZINE FIRST!

Study Guide, at 22.

In order to purchase a handgun, the buyer must demonstrate that he or she knows how to safely operate the handgun, including following these instructions. Cal. Penal Code § 12071(b)(8), et seq. Moreover, California law also generally requires that all newly purchased firearms either be accompanied by an approved gun lock or the purchaser's affidavit that she owns an adequate lock box or gun safe. Cal. Penal Code § 12088.1, et seq.

Listings on the California handgun roster are valid for one year, and must be renewed annually, including payment of an annual fee, prior to expiration to remain valid. FAC, ¶ 19; 11 Calif. Code of Regulations § 4072(b). Defendant charges firearms manufacturers, importers, and dealers annual fees, ostensibly to operate the handgun roster program. Any handgun whose manufacturer fails to pay the required fees may be excluded from the roster for that reason alone. FAC, ¶ 20; Cal. Penal Code § 12131(a)(1), (a)(2). The initial and renewal annual listing fees for inclusion on the handgun roster are $200. FAC, ¶ 21; 11 Calif. Code of Regulations § 4072(b).

Other than the California DOJ, only the manufacturer/importer of a handgun model is

5

authorized to submit that handgun model to a DOJ-Certified Laboratory for testing. FAC, ¶ 22; 11 Calif. Code of Regulations § 4059(c). A handgun can remain on the roster if its manufacturer/importer goes out of business or discontinues the model, provided that the model is not being offered for sale to licensed dealers, and "a fully licensed wholesaler, distributor, or dealer submits a written request to continue the listing and agrees to pay the annual maintenance fee." FAC, ¶ 23; 11 Calif. Code of Regulations § 4070(d). So long as a handgun is sold to dealers outside of California, the handgun's manufacturer can cause the sale of that handgun to be forbidden inside California by failing to submit the gun for testing in that state or refusing to pay the annual $200 fee. FAC, ¶ 23; Cal. Penal Code § 12131; 11 Calif. Code of Regulations §§ 4059, 4070, 4072.

A manufacturer/importer or other responsible party may submit a written request to list a handgun model that was voluntarily discontinued or was removed for lack of payment of the annual maintenance fee. The request may be approved, and the handgun restored to the "safe gun" roster, provided the fee is paid. FAC, ¶ 24; 11 Calif. Code of Regulations § 4070(e).

The following firearms and transactions are exempted from the handgun rostering requirement: (1) Firearms defined as curios or relics under federal law; (2) The purchase of any firearm by any law enforcement officer; (3) Pistols that are designed expressly for use in Olympic target shooting events; (4) Certain single-action revolvers; and (5) The sale, loan, or transfer of any firearm that is to be used solely as a prop during the course of a motion picture, television, or video production by authorized people related to the production. FAC, ¶¶ 32, 33, 35; Cal. Penal Code §§ 12125, 12132, 12133.

It is also not illegal in California to import an unrostered handgun when moving into the state without the intention of selling it, nor is it illegal in California to possess or use an unrostered handgun that is otherwise lawful to possess or use. FAC, ¶ 34; Cal. Penal Code § 12125(a). California also exempts private party transfers, intra-familial transfers including gifts and bequests, various loans, and various single-action revolvers. FAC, ¶ 35; Cal. Penal Code §§ 12132, 12133.

Plaintiff Ivan Peña has sought to purchase a Para USA (Para Ordnance) P1345SR / Stainless Steel .45 ACP 4.25", and has identified a willing seller who stands ready to deliver said handgun to him, but cannot lawfully purchase and take possession of the handgun as that handgun is not listed on the California Handgun Roster. FAC, ¶ 37. Peña's Para USA P1345SR was listed on California's Handgun Roster until December 31, 2005, when it was discontinued and its listing not renewed. FAC, ¶ 38.

Plaintiff Roy Vargas has sought to purchase a Glock 21 SF with an ambidextrous magazine release, and has identified a willing seller who stands ready to deliver said handgun to Plaintiff. However, Vargas cannot lawfully purchase and take possession of the handgun as that handgun is not listed on the California Handgun Roster. FAC, ¶ 39.

Vargas was born without an arm below the right elbow. FAC, ¶ 40. The Glock 21 SF with a standard magazine release is listed on the California Handgun Roster. FAC, ¶ 41. However, the Glock-21 SF with ambidextrous magazine release is better suitable for left-handed shooters such as Mr. Vargas, as opposed to the approved version of the Glock 21. FAC, ¶ 42. Glock's efforts to add the Glock 21 SF with ambidextrous magazine release to the California Roster have failed.

FAC, ¶ 43. However, Defendant permits Glock customers to have their Glock 21 SF-STD handguns fitted with an ambidextrous release at the Glock factory. FAC, ¶ 44.

Plaintiff Doña Croston has sought to purchase a Springfield Armory XD-45 Tactical 5" Bi-Tone stainless steel/black handgun in .45 ACP, model number XD9623, and has identified a willing seller who stands ready to deliver said handgun to her. But Croston cannot lawfully purchase and take possession of the handgun as that handgun is not on the California Handgun Roster. FAC, ¶ 45.

Other models of this identical gun – but in different colors – are listed on the handgun roster and are thus available to Ms. Croston: the XD-45 Tactical 5" .45 ACP in black (model XD9621), the XD-45 Tactical 5" .45 ACP in OD Green (model XD9622), and the XD-45 Tactical 5" .45 ACP in Dark Earth (XD9162). FAC, ¶ 46. However, the particular Bi-Tone XD-45 that Ms. Croston would possess was not released until after California required newly-listed guns to have a chamber load indicator and magazine disconnect device. Springfield Armory could not get the XD-45 in .45 ACP and Bi-Tone finish registered given the new listing requirements. FAC, ¶ 48. The XD-45 Bi-Tone in .45 has a loaded chamber indicator, but the California Department of Justice has decided it does not qualify under Penal Code § 12126(c). FAC, ¶ 49.

The handgun at issue in *District of Columbia* v. *Heller*, 128 S. Ct. 2783 (2008), was a High Standard 9-shot revolver in .22 with a 9.5" Buntline-style[2] barrel. FAC, ¶ 51. Plaintiff Brett Thomas has sought to purchase an identical High Standard 9-shot revolver in .22 with a 9.5" Butline-style barrel, and has identified a willing seller who stands ready to deliver said handgun to

---

[2]A "Buntline" is a Western-style extra-long barrel revolver, named for 19th-century novelist Ned Buntline who was said to commission such guns for famous personalities of the day.

Thomas. FAC, ¶ 50. Thomas cannot lawfully purchase and take possession of the handgun as that handgun is not on the California Handgun Roster. FAC, ¶ 50.

Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. FAC, ¶ 5. SAF has over 650,000 members and supporters nationwide, including many in California. FAC, ¶ 5. The purposes of SAF include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control. FAC, ¶ 5.

Plaintiff The Calguns Foundation, Inc. is a non-profit organization incorporated under the laws of California with its principal place of business in Redwood City, California. FAC, ¶ 6. The purposes of Calguns include supporting the California firearms community by promoting education for all stakeholders about firearm laws, rights and privileges, and securing the civil rights of California gun owners, who are among its members and supporters. FAC, ¶ 6.

## SUMMARY OF ARGUMENT

The main argument offered by Defendant is that while there exists a right to "keep" a handgun, there is no right to acquire one. The conclusion is reached by viewing the core of the right to arms in an impossible vacuum, while misreading dicta allowing for appropriate regulations as a license for any and all regulations. This is simply wrong.

Defendant next repeats an argument specifically rejected by the Supreme Court only last year – that so long as some constitutionally protected arms are permitted, other arms might be banned, regardless of whether they, too, are protected. This is simply not the law. The question in evaluating the constitutionality of a gun ban is whether the gun being banned is protected, under

9

the tests laid out for determining that question. If the gun is not protected, it may be banned; if the gun is protected, it may not be banned, regardless of whatever other appropriate regulations may be attached to its possession and use and regardless of whether and what kind of other arms, not at issue, are "allowed." Defendant's failure to mention, much less discuss the test for distinguishing protected from unprotected guns dooms his motion.

Defendant's response to the equal protection claims is also unavailing. Defendant urges the Court to consider the claims under the rational basis test, notwithstanding the Supreme Court's explicit holding that rational basis is an improper means of scrutinizing Second Amendment violations. Fundamental rights are entitled to greater care. Yet Defendant's classifications are highly arbitrary and serve no useful purpose.

ARGUMENT

I.      THE RIGHT TO ARMS INCLUDES THE RIGHT TO ACQUIRE ARMS.

The proposition that when one has the right to something, one also enjoys the right to acquire it, is obvious. "[T]he Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees . . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers* v. *Virginia*, 448 U.S. 555, 579-80 (1980) (collecting cases, and holding First Amendment rights of speech and press secure right to attend criminal trials).

For example, there is, in this country, a right to read books protected by the First Amendment. Consequently, there is a right to *purchase* books. *See, e.g. Virginia* v. *American Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (booksellers have standing to assert First Amendment rights of bookbuyers); *see also Wexler* v. *City of New Orleans*, 267 F. Supp. 2d 559

10

(E.D. La. 2005) (enjoining ban on sidewalk book sales); *Washington Free Community, Inc*. v.

*Wilson*, 334 F. Supp. 77 (D.D.C. 1971) (enjoining ban on newspaper sales in parks).

There also exists a right to make personal family planning decisions; therefore, there is a

right to purchase contraceptives. *Carey* v. *Population Servs. Int'l*, 431 U.S. 678 (1977); *Griswold*

v. *Connecticut*, 381 U.S. 479 (1965). And along these lines, the right to engage in consensual

intimate relationships, *Lawrence* v. *Texas*, 539 U.S. 558 (2008), informs a right to purchase sex

toys. *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738 (5th Cir. 2008); *but see Williams* v.

*Morgan*, 478 F.3d 1316 (11th Cir. 2007).

As Defendant acknowledges, the Second Amendment guarantees a right to have

functional firearms. *District of Columbia* v. *Heller*, 128 S. Ct. 2783 (2008). Without deciding on

the full scope of that right in every circumstance, a necessary pre-requisite to exercising the right

to arms is, as with the right to books, contraceptives, religious articles, or any other item of

property imbued with constitutional protection, the right to *acquire* arms.[3]

The challenged law prescribes jail time for "any person in this state who manufactures or

causes to be manufactured, imports into the state for sale, keeps for sale, offers or exposes for

sale, gives, or lends" guns that do not appear on a special roster. Cal. Penal Code § 12125(a). If

unrostered guns are protected by the Second Amendment, then this language is as

unconstitutional as it would be were it made applicable to books or contraceptives. This is not a

law "imposing conditions and qualifications on the commercial sale of arms" that may be

---

[3]Defendant finds support for a contrary position in *Nordyke* v. *King*, 563 F.3d 439 (2009). Plaintiffs would strongly disagree with this interpretation of *Nordyke*, but at this point, can only point out that the case is being re-heard *en banc* and thus, the panel opinion "shall not be cited as precedent by or to any court of the Ninth Circuit." *Nordyke* v. *King*, 575 F.3d 890 (9th Cir. 2009).

"presumptively lawful." *Heller*, 128 S. Ct. at 2817 & n.26, such as a law requiring a criminal background check or training as a condition of purchasing firearms. This is an out-and-out gun ban that extends well beyond commercial sales. If unrostered guns are constitutionally protected, it must be enjoined.

Defendants' reliance on *Heller*'s dicta with respect to regulation of the commercial sale of arms is excessive. Even if this case challenged such commercial restrictions and qualifications (e.g. a criminal background check, or training requirement), *Heller* makes clear that such laws are only "presumptively" lawful. *Heller*, 128 S. Ct. at 2817 n.26. That presumption can be overcome in appropriate cases. In any event, it is absurd to read the allowance of regulation as swallowing the entire right, such that the mere fact that some commercial restrictions and qualifications are acceptable means the government can outright ban the manufacture, import, sale, offer or exposition for sale, giving or loan of most constitutionally-protected arms.

Notably, while *Heller*'s dicta allowed for regulation of commercial arms transactions – an unremarkable observation in and of itself – *Heller*'s definition of the right to arms was consistent with that of other enumerated rights. *Heller*, 128 S. Ct. at 2818 n.27 (*citing United States* v. *Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)).

In any event, because the challenged laws effect a gun prohibition rather than mere regulation, the proper analysis is not one that imposes a standard of review. Rather, the proper Second Amendment analysis to be applied is *Heller*'s common use test for protected arms.

///

///

///

II.    THE SECOND AMENDMENT PROTECTS THE ACQUISITION OF ARMS IN COMMON USE FOR LAWFUL PURPOSES, INCLUDING HANDGUNS BANNED BY DEFENDANT.

"[T]he sorts of weapons protected [by the Second Amendment are] those 'in common use at the time.'" *Heller*, 128 S. Ct. at 2817 (quoting *United States* v. *Miller*, 307 U. S. 174, 179 (1939)). "[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 128 S. Ct. at 2815-16. Handguns plainly satisfy this test. "It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon . . . Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition on their use is invalid." *Heller*, 128 S. Ct. at 2818.

Defendant is still free to ban "dangerous and unusual weapons," *Heller*, 128 S. Ct. at 2817, including "sophisticated arms that are highly unusual in society at large." *Id.* And Defendant can ban those weapons which do not meet the historic legal definition of "arms" as used in the Second Amendment – "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 128 S. Ct. at 2791 (citing 1 A New and Complete Law Dictionary (1771); N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)).[4] But handguns have been held to pass the common use test by the Supreme Court. They are protected Second Amendment arms that cannot be banned – even if the state believes they are excessively dangerous.

Defendant correctly points out that California's handgun ban is not as sweeping as the

---

[4] "[A]ll firearms constituted 'arms.'" *Heller*, 128 S. Ct. at 2791 (citing 1 J. Trusler, The Distinction Between Words Esteemed Synonymous in the English Language 37 (1794)).

District of Columbia's late ban. But this is irrelevant. The common use test must still be applied to the prohibition at hand. Similarly, if Defendant banned only some books instead of all books, it might be said that the constitutional violation is less sweeping, but the First Amendment analysis would be unchanged.

And indeed, as the Complaint makes clear, Defendant's rostering scheme bans many guns that are constitutionally-protected, including the four specific guns sought by the individual Plaintiffs. Brett Thomas's gun is the identical make and model gun that the Supreme Court held to be constitutionally-protected in *Heller*. Ivan Peña's gun was removed from Defendant's roster, and banned to him, only for lack of an annual fee paid by the gun's manufacturer. Doña Croston's gun, as well as Roy Vargas's gun, are off the roster because they were not submitted for rostering before Defendant imposed new requirements that guns have rare features to qualify.

There can be little doubt that Defendant's rostering scheme is unconstitutional. The handguns banned by Defendant's rostering program – including guns without CLIs and/or magazine disconnect mechanisms, guns that have not been (and cannot be) submitted by their manufacturer for government testing, and guns that would be perfectly acceptable by the government but for lack of an annual listing fee – are all nonetheless handguns of the kind in common use protected by the Second Amendment. None of these characteristics render a firearm "dangerous or unusual" or establish that it is not of the kind in common use for lawful purposes.

The CLIs and magazine disconnect mechanisms required for rostering are rare features, found on perhaps only 11% and 14% of all handguns in the marketplace. Considering California's particularly harsh and entirely arbitrary enforcement of its CLI requirement, that number of qualified CLI's is surely lower than even 11% of the market.

14

Many guns are still protected by the Second Amendment even if they have not been manufactured for many years prior to the advent of the California Handgun Roster, or have been manufactured by a company that does not wish to sell its products in one particular state. And plainly, a gun model deemed "not unsafe" does not somehow alter its characteristics and become "unsafe" simply because a check has not been cashed in Sacramento within the year.

There is also no escaping the fact that the magazine disconnect and CLI requirements contravene the state's own policies with respect to gun safety. The state mandates that all handgun purchasers pass a handgun safety test that specifically teaches people not to rely on gimmicks like magazine disconnects and CLIs. The state makes it absolutely clear that all guns must be treated as loaded, that the absence of a magazine is not to be interpreted as a sign that the gun is unloaded, that the only way to know guns are unloaded is to physically inspect the chamber. Even then, treating all guns as loaded promotes safe handling practices. And on top of the mandatory instruction on such practices, and the requirement that handgun purchasers demonstrate safe handling techniques, the state mandates that each handgun sale be accompanied by the sale of a lock or a guarantee that room exists in a safe for the gun.

The state's instructions with respect to safe gun handling and unloading are unassailable. Whatever the merits of the state's safe storage requirements, they do not ban a single gun, while making the magazine disconnect and CLI requirements redundant. It is irresponsible to rely on magazine disconnects and CLIs for gun safety, which is perhaps why the market has obviously rejected these features, and why the Defendant has such a difficult time agreeing to a standard of what actually constitutes a CLI.

California's legislature, operating in a pre-*Heller* environment, approached the handgun issue backwards from a constitutional, post-*Heller* perspective. The legislature sought to declare almost all handguns "unsafe" for failing to conform to its design preferences, or for the manufacturer's inability or unwillingness to pay for and participate in the state's regulatory scheme. Consciously, the state sought to "drive" the market towards its preferred outcomes. But *Heller* stands for the proposition that it is the regulatory environment that must accommodate itself to the choices made by the lawful, constitutionally-protected market for arms, and not the other way around.

III.    THE AVAILABILITY OF ALTERNATIVE ARMS IS NOT A DEFENSE TO A SECOND AMENDMENT VIOLATION.

Defendant claims that "there is no constitutional right to purchase in the marketplace any handgun of one's choosing," Def. Mot., at 11, and notes that the fact that the roster contains over 1,300 handguns means it is not "impossible" to obtain at least some kind of handgun. Def. Mot., at 10. This sort of argument was made strenuously by the District of Columbia in *Heller*, and it was emphatically rejected first by the D.C. Circuit, and then by the Supreme Court.

The only limitation on the right "to purchase in the marketplace a handgun of one's choosing" is *Heller*'s common-use test. It is not usually for the government to dictate to people how they are to exercise their fundamental rights. The state could not defend a roster of approved books on the theory that someone wishing to buy a banned book has other reading alternatives. A religion cannot be banned simply because the state permits others which are said to satisfy spiritual needs.

16

In *Heller*, the city sought to justify its handgun ban by claiming it allowed the possession of (non-functional) rifles and shotguns. The D.C. Circuit labeled the argument "frivolous." *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom Heller*, *supra*, 128 S. Ct. 2783. "It could be similarly contended that all firearms may be banned so long as sabers were permitted. Once it is determined – as we have done – that handguns are 'Arms' referred to in the Second Amendment, it is not open to the District to ban them." *Id.* (citation omitted).

The Supreme Court likewise rejected the alternative arms argument.

> It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon.

*Heller*, 128 S. Ct. at 2818.

The principle here remains the same. The availability of other arms is irrelevant. The question is whether the Plaintiffs have the right to the arms at issue, and the answer to that question lies in the fact that the handguns banned by Defendant – those that happen not to be currently in production, those that lack CLIs and magazine disconnects, those for which a fee has not been paid – are nonetheless still handguns of the kind in common use for traditional lawful purposes.

IV.    THE CHALLENGED PROVISIONS CLEARLY VIOLATE THE EQUAL PROTECTION CLAUSE.

Defendant claims that the roster law's various classifications do not treat similarly-situated people differently, and that in any event, the Second Amendment is to be analyzed under mere rational basis review in an equal protection context. Both claims are plainly wrong.

17

The Equal Protection Clause "is essentially a direction that all person similarly situated should be treated alike." *City of Cleburne* v. *Cleburne Living Center*, 473 U.S. 432, 439 (1985) (citation omitted). Strict scrutiny applies to government classifications that "impinge on personal rights protected by the Constitution." *Id.*, 473 U.S. at 440 (citations omitted). "Where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized." *Hussey* v. *City of Portland*, 64 F.3d 1260, 1265 (9th Cir. 1995) (quoting *Harper* v. *Virginia Board of Elections*, 383 U.S. 663, 670 (1966)). Indeed, "classifications . . . that impinge upon the exercise of a 'fundamental' right" are presumptively unconstitutional unless the government can demonstrate that the law satisfies strict scrutiny. *Plyler* v. *Doe*, 457 U.S. 202, 216-17 (1982) (footnote omitted).

Although *Heller* did not announce a specific standard of review for cases raising Second Amendment concerns, the Supreme Court did conclude that "[b]y the time of the founding, the right to have arms had become fundamental for English subjects." *Heller*, 128 S. Ct. at 2798 (citation omitted). It bears emphasizing that the Supreme Court thus specifically rejected rational basis as the standard of review for Second Amendment claims, and strongly suggested that the standard of review would be a rigorous one:

> JUSTICE BREYER correctly notes that this law, like almost all laws, would pass rational-basis scrutiny. But rational-basis scrutiny is a mode of analysis we have used when evaluating laws under constitutional commands that are themselves prohibitions on irrational laws. In those cases, "rational basis" is not just the standard of scrutiny, but the very substance of the constitutional guarantee. Obviously, the same test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms.

*Heller*, 128 S. Ct. at 2818 n. 27 (citing *United States* v. *Carolene Products Co.*, 304 U. S. 144,

18

152, n. 4 (1938) (other citations omitted).

Requiring strict scrutiny in evaluating Second Amendment questions does not spell the end of all gun laws because the government will often have a compelling state interest in the area, that may be constitutionally addressed. Strict scrutiny is context-sensitive and is "far from the inevitably deadly test imagined by the Gunther myth." Adam Winkler, *Fatal in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts*, 59 Vanderbilt L. Rev. 793, 795 (2006). The Fifth Circuit has long employed a version of strict scrutiny in Second Amendment cases, allowing those laws that are

> limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country,

*United States* v. *Emerson*, 270 F.3d 203, 261 (5th Cir. 2001). Under that standard, that court has upheld the more basic federal gun laws. *See, e.g. Emerson* (upholding gun prohibition for people covered by restraining orders); *United States* v. *Patterson*, 431 F.3d 832, 835 (5th Cir. 2005) (drug addicts); *United States* v. *Everist*, 368 F.3d 517, 519 (5th Cir. 2004) (felons); *United States* v. *Darrington*, 351 F.3d 632, 635 (5th Cir. 2003) (felons)."[I]t remains certain that the federal government may not restrain the freedom to bear arms based on mere whimsy or convenience." *Everist*, 368 F.3d at 519 n.1. However, where a classification plainly fails rational basis review, the Court's analysis need go no further. *Zobel* v. *Williams*, 457 U.S. 55, 60-61 (1982).

Whatever standard of review is employed by the Court, two things are clear: first, Defendant's invocation of rational-basis review is foreclosed by *Heller*; second, the classifications fail any level of review.

The sort of classifications created by the handgun roster are unacceptable under any sort

of scrutiny reserved for enumerated rights. First, there are the classifications among different guns. Why is the Springfield Armory XD-45 acceptable in almost any finish, but will not even be considered for testing in Bi-Tone? If guns failing to include CLIs and magazine disconnects are unacceptably dangerous, why permit the continued manufacture and introduction of old, allegedly "unsafe" models? Croston is being denied the gun of her choice not because of any intrinsic quality it possesses, but because Croston prefers to have the gun in a particular color.

The requirement that an annual fee be paid by a manufacturer to keep a gun rostered is similarly problematic. Peña's access to his preferred handgun is cut-off simply because the model is discontinued or at least, no longer the subject of an annual tribute. But "[a] state may not impose a charge for the enjoyment of a right granted by the Federal Constitution." *Murdock* v. *Pennsylvania*, 319 U.S. 105 (1943).

In California, unrostered guns are permitted by private importation or as intra-family gifts, just not as retail purchases. The roster thus privileges people who move into the state, or who have family out-of-state. Yet all people, not just relatives, may transfer unrostered handguns inside the state. These classifications make no sense. Any of the Plaintiffs might live next door to individuals who lawfully obtained the same handguns denied by the roster law, prior to moving to the state, or as a gift from an out-of-state relative.

California's wide exemptions for law enforcement personnel, allowing them to purchase unrostered guns for personal use, is completely irrational. If a gun is unacceptably dangerous, it is odd to allow it to those perhaps most likely to use it. And if the harm to be ameliorated is the unauthorized use of guns by people not knowledgeable in their use, police weapons, including

20

those owned privately by police officers, are no less likely to be stolen or mishandled by no more proficient unauthorized users.

The exceptions for curios and relics seems particularly egregious. Brett Thomas's High Standard revolver is not quite old enough to be exempt from the rostering law as a curio or relic, though in perhaps ten years, it would qualify. Ironically, Mr. Heller's particular gun might qualify today based on the fact of its involvement in an historic Supreme Court case. 27 C.F.R. § 478.11. But then, if Thomas prevails here, his gun, too, by that virtue, might also be transformed into an exempted curio or relic.

Then there are the exceptions for movie and television production, which are not merely irrational, but also underscore the fact that unrostered handguns are so common in American culture such that audiences would not expect to see in realistic depiction of American life only those guns approved by Defendant.

The distinctions between different guns on the basis of whether they have an acceptable chamber load indicator are also unconstitutional given the wholly arbitrary manner in which California regulators determine whether a CLI is sufficient – asking around at the office whether random regulatory employees understand the CLI's message. While the California Legislature might have established "minimal guidelines," *City of Chicago* v. *Morales*, 527 U.S. 41, 60 (1999) defining a CLI based on design intent and characteristics, Cal. Penal Code § 12126(c), the regulatory practice is untethered from the legislative standard and in the end amounts to "because we said so." Of course, since the government does not ban revolvers or exceedingly popular rimfire rounds such as the .22, CLIs will always be missing from significant numbers of handguns.

These and other senseless distinctions are inevitable considering the audacious mission of

21

the handgun roster law: to make a complete list of all lawful handguns, and substitute the design

and feature preferences of legislators and regulators for that of a market comprising hundreds of

millions of people over the course of generations. That this project intrudes into the exercise of a

fundamental right calls for its abandonment.

The D.C. City Council reluctantly came to the same conclusion. Having adopted the

California roster as their own, with all the usual public assurances that their law was

constitutional, District officials re-considered upon being served with a very similar motion for

summary judgment. On June 17, 2009, the District adopted an emergency regulation abandoning

its reliance on the California roster by creating a "District roster" that, while still unconstitutional,

eliminated all the burdens associated with the laws challenged in this action. 56 D.C. Register

4782 (June 19, 2009).

The District based its emergency rule-making, in part, on the following finding:

> 1) recognition that California permits sale of firearms that have superficial differences to
> those firearms on its roster; 2) recognition that some handguns that have been placed on
> the California roster as safe handguns have been removed for administrative reasons not
> related to the handguns' safety; and 3) review of similar safe gun rosters maintained by
> Maryland and Massachusetts.

*Id.*

The new "District Roster" consists not only of the California and Massachusetts rosters,

but also that of Maryland. 24 DCMR 2323.1. The addition of the Maryland roster is significant –

that state allows anyone to petition for additions to the roster, does not require an annual

maintenance fee for guns to remain rostered, and does not require handguns contain either a

magazine disconnect device nor CLI. Not surprisingly, the Maryland roster contains

approximately twice the number of handguns as does the California roster.

22

Moreover, the new District roster expressly includes models removed from the California roster for lack of payment, as well as guns that have only minor cosmetic differences from those listed. 24 DCMR 2323.2, 2323.3. On June 25, 2009, the District imported another critical piece of Maryland's law into its own: an exemption from rostering requirements of all handguns manufactured prior to 1985. 24 DCMR 2325. *See* 56 D.C. Register 5434 (July 3, 2009). All of these improvements made by Washington, D.C. to address its adoption of the California roster have resulted in a bloated regulatory regime that, in the end, does not actually ban very many handguns – and would allow all of the handguns at issue in this case to sold in California.[5]

CONCLUSION

Defendant's various arguments in support of the rostering scheme – that there is no right to purchase arms, that the state's failure to enact more comprehensive Second Amendment violations allows the banning of constitutionally protected arms, that the right to arms is not fundamental or that its classifications serve some legitimate state interests – simply lack merit.

More critically, the motion fails to explain how the rostering scheme comports with the Supreme Court's common use test for determining which arms are constitutionally protected. Plainly, the rostering scheme fails to comport with the common use test because it was consciously designed, in a pre-*Heller* environment, to alter rather than respect the American people's choices in this arena. The Complaint accurately identifies this constitutional violation, and the motion to dismiss must therefore be denied.

---

[5]Under its earlier interpretation of the California handgun roster, the D.C. Police allowed registration of a Glock 21 SF with ambidextrous magazine release.

23

Dated: September 18, 2009          Respectfully submitted,

Alan Gura (Calif. Bar No. 178,221)       Jason A. Davis (Calif. Bar No. 224,250)
Gura & Possessky, PLLC                    Davis & Associates
101 N. Columbus St., Suite 405            27281 Las Ramblas, Suite 200
Alexandria, VA 22314                      Mission Viejo, CA 92691
703.835.9085/Fax 703.997.7665            949.310.0817/Fax 949.288.6894

                                          Donald E.J. Kilmer, Jr. (Calif. Bar No. 179,986)
                                          Law Offices of Donald Kilmer, A.P.C.
                                          1645 Willow Street, Suite 150
                                          San Jose, CA 95125
                                          408.264.8489/Fax 408.264.8487
                                          E-Mail: Don@DKLawOffice.com


                              By:    /Donald E.J. Kilmer, Jr.
                                     Donald E. J. Kilmer, Jr.

                                     Attorneys for Plaintiffs

24