1   KAMALA D. HARRIS
    Attorney General of California
2   TAMAR PACHTER, State Bar No. 146083
    Supervising Deputy Attorney General
3   ANTHONY R. HAKL, State Bar No. 197335
    Deputy Attorney General
4     1300 I Street, Suite 125
      P.O. Box 944255
5     Sacramento, CA 94244-2550
      Telephone:  (916) 322-9041
6     Fax:  (916) 324-8835
      E-mail:  Anthony.Hakl@doj.ca.gov
7   *Attorneys for Defendant Stephen Lindley*

8

9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE EASTERN DISTRICT OF CALIFORNIA

12

13  **IVAN PEÑA, ROY VARGAS, DOÑA**          Case No. 2:09-CV-01185-KJM-CMK
    **CROSTON, BRETT THOMAS, SECOND**
14  **AMENDMENT FOUNDATION, INC. and**      **DEFENDANT STEPHEN LINDLEY'S**
    **THE CALGUNS FOUNDATION, INC.,**       **MEMORANDUM OF POINTS AND**
15                                          **AUTHORITIES IN SUPPORT OF**
                                            **MOTION FOR SUMMARY JUDGMENT,**
16                          Plaintiffs,     **OR IN THE ALTERNATIVE SUMMARY**
                                            **ADJUDICATION**
17          v.

18                                          Date:         November 22, 2013
    **STEPHEN LINDLEY,**                    Time:         10:00 a.m.
19                                          Dept.:        Courtroom 3, 15th floor
                            Defendant.      Judge:        The Honorable Kimberly J.
20                                                        Mueller
                                            Trial Date:   None at this time
21                                          Action Filed: May 1, 2009

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Factual and Legal Background ........................................................................................ 1

   I.     Procedural History ............................................................................... 1

   II.    California's Unsafe Handgun Act ........................................................ 2

         A.     Definition of "Unsafe Handgun" ............................................ 3

         B.     The Roster of Handguns Certified for Sale ............................. 5

   III.   Description of the Parties and Statement of Facts ............................... 5

         A.     Defendant Lindley ................................................................... 5

         B.     Plaintiffs ................................................................................. 5

               1.     Organizational plaintiffs ............................................ 5

               2.     Individual plaintiffs .................................................. 6

                       a.     Mr. Peña ......................................................... 6

                       b.     Mr. Vargas ...................................................... 6

                       c.     Ms. Croston ..................................................... 7

                       d.     Mr. Thomas ..................................................... 8

   IV.   Plaintiffs' Claims ............................................................................... 8

Argument ..................................................................................................................... 9

   I.     Legal Standards Applicable to Motions for Summary Judgment ......... 9

   II.    The Unsafe Handgun Act does not Violate the Second Amendment. ... 10

         A.     The Second Amendment and the Supreme Court's Decisions in *Heller* and *McDonald* ....................................................... 10

         B.     The Unsafe Handgun Act Passes the Substantial Burden Test. ...... 12

               1.     This Court should adopt the substantial burden test. ... 12

               2.     The substantial burden test is consistent with the ongoing development of Second Amendment jurisprudence in the Ninth Circuit. ............................................................. 14

               3.     The Unsafe Handgun Act does not substantially burden plaintiffs' rights .................................................... 15

   III.   The Unsafe Handgun Act does not Trigger Equal Protection Review, Much Less Violate Equal Protection. ................................................. 18

Conclusion .................................................................................................................. 20

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Anderson v. Liberty Lobby*
477 U.S. 242 (1986)......................................................................................... 9

*Burdick v. Takushi*
504 U.S. 428 (1992)......................................................................................... 14

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986)......................................................................................... 9

*City of Cleburne, Tex. v. Cleburne Living Center*
473 U.S. 432 (1985)......................................................................................... 20

*District of Columbia v. Heller*
554 U.S. 570 (2008)..................................................................................*passim*

*Ezell v. City of Chicago*
651 F.3d 684 (7th Cir. 2011)........................................................................... 13

*Fiscal v. City and County of San Francisco*
158 Cal. App. 4th 895 (Ct. App. 2008).......................................................*passim*

*Freeman v. City of Santa Ana*
68 F.3d 1180 (9th Cir. 1995).................................................................... 18, 19

*Heller v. District of Columbia*
670 F.3d 1244 (D.C. Cir. 2011) ...................................................................... 13

*Kachalsky v. County of Westchester*
701 F.3d 81 (2d Cir. 2012).............................................................................. 13

*Karlin v. Foust*
188 F.3d 446 (7th Cir. 1999)........................................................................... 14

*Kwong v. Bloomberg*
723 F.3d 160 (2d Cir. 2013)............................................................................ 13

*Louis v. McCormick & Schmick Restaurant Corp.*
460 F. Supp. 2d 1153 (C.D. Cal. 2006) .......................................................... 18

*McDonald v. City of Chicago*
—— U.S. ——, 130 S.Ct. 3020 (2010) ................................................. 2, 11, 12

*Merrifield v. Lockyer*
547 F.3d 978 (9th Cir. 2008)........................................................................... 17

ii

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Nordyke v. King*
   644 F.3d 776 (9th Cir. 2011) ................................................................. 2

4

*Nordyke v. King*
   681 F.3d 1041 (9th Cir. 2012) ............................................................... 2

5

6

*People of Territory of Guam v. Yang*
   800 F.2d 945 (9th Cir. 1986) ................................................................ 15

7

8

*Peruta v. County of San Diego*
   758 F. Supp. 2d 1106 (S.D. Cal. 2010) ......................................... 17, 18

9

*Planned Parenthood of Southeastern Pennsylvania v. Casey*
   505 U.S. 833 (1992) ............................................................................. 14

10

11

*Richards v. County of Yolo*
   821 F. Supp. 2d 1169 (E.D. Cal. 2011) ............................................... 15

12

13

*Robi v. Five Platters, Inc.*
   918 F.2d 1439 (9th Cir. 1990) ............................................................... 9

14

*Schall v. Martin*
   467 U.S. 253 (1984) ............................................................................. 17

15

16

*Scocca v. Smith*
   No. C–11–1318 EMC, 2012 WL 2375203 (N.D. Cal. Jun. 22, 2012) ................. 15

17

18

*Silveira v. Lockyer*
   312 F.3d 1052 (9th Cir. 2002) ........................................................ 14, 19

19

*Southern California Gas Co. v. Santa Ana*
   336 F.3d 885 (9th Cir. 2003) ................................................................. 9

20

21

*Teixeira v. County of Alameda*
   No. C 12–03288 SI, 2013 WL 707043 (N.D. Cal. 2013) ....................... 15

22

23

*Turner Broad. Sys., Inc. v. FCC*
   520 U.S. 180 (1997) ............................................................................. 18

24

25

*United States v. Call*
   874 F. Supp. 2d 969 (D. Nev. 2012) ................................................... 17

26

*United States v. DeCastro*
   682 F.3d 160 (2d Cir. 2012) ......................................................... *passim*

27

28

Defendant Stephen Lindley's Memorandum of Points and Authorities in Support of Motion for Summary Judgment,
or in the Alternative Summary Adjudication (2:09-CV-01185-KJM-CKD)

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Henry*
688 F.3d 637 (9th Cir. 2012)...........................................................................15

*United States v. Marzzarella*
614 F.3d 85 (3d Cir. 2010)..............................................................................13

*United States v. Masciandaro*
638 F.3d 458 (4th Cir. 2011)...........................................................................13

*United States v. Reese*
627 F.3d 792 (10th Cir. 2010).........................................................................13

*United States v. Tribunella*
749 F.2d 104 (2d Cir. 1984)..............................................................................4

*United States v. Vongxay*
594 F.3d 1111(9th Cir. 2010)....................................................................14, 15

*Wang Laboratories, Inc. v. Mitsubishi Electronics, America, Inc.*
860 F. Supp. 1448 (C.D. Cal. 1993)..................................................................9

*Zablocki v. Redhail*
434 U.S. 374 (1978)........................................................................................14

STATUTES

42 United States Code
§ 1983..................................................................................................................1

California Penal Code
§ 16380.................................................................................................................3
§ 16900.................................................................................................................3
§ 17140.................................................................................................................4
§ 31900.................................................................................................................3
§ 31905.................................................................................................................3
§ 31910.................................................................................................................3
§ 31910(a)(1)........................................................................................................3
§ 31910(b)(1)........................................................................................................3
§ 31910(b)(4)........................................................................................................3
§ 31910(b)(5)........................................................................................................3
§ 31910(b)(6)........................................................................................................4
§ 32000(a)........................................................................................................2, 3
§ 32000(b)............................................................................................................4
§ 32000(b)(3)........................................................................................................4
§ 32000(b)(4)........................................................................................................4
§ 32010.................................................................................................................5
§ 32015(a)............................................................................................................5
§ 32015(b)(1)........................................................................................................5

Defendant Stephen Lindley's Memorandum of Points and Authorities in Support of Motion for Summary Judgment, or in the Alternative Summary Adjudication (2:09-CV-01185-KJM-CKD)

# TABLE OF AUTHORITIES
### (continued)

Page

§ 32015(b)(2) ...................................................................................................... 5
§ 32030 ................................................................................................................. 5
§ 32100 ................................................................................................................. 4
§ 32105 ................................................................................................................. 4
§ 32110 ................................................................................................................. 4
§ 32110(a) ...................................................................................................... 4, 16
§ 32110(f) ............................................................................................................. 4
§ 31910(b)(5) ....................................................................................................... 3
§ 31910(b)(7)(A) .................................................................................................. 4

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Second Amendment ......................................................................................... *passim*
    Fourteenth Amendment ....................................................................... 9, 11, 14

**COURT RULES**

Federal Rules of Civil Procedure
    Rule 56(c) ........................................................................................................ 9

Federal Rules of Evidence
    Rule 201 .......................................................................................................... 18

**OTHER AUTHORITIES**

Allen Rostron, *High-Powered Controversy: Gun Control, Terrorism, and the Fight Over
    .50 Caliber Rifles*, 73 U. Cin. L. Rev. 1415, 1469 n. 12 (2005) ............................. 4

Senate Bill No. 489 (2002-2003 Reg. Sess.) ............................................................. 18

# INTRODUCTION

A group of individual plaintiffs and organizations promoting the right to bear arms have brought this action against Stephen Lindley, Chief of the Bureau of Firearms of the California Department of Justice, to invalidate California's Unsafe Handgun Act ("UHA" or "the Act"). They primarily assert a Second Amendment claim.  But the UHA does not substantially burden the Second Amendment right recognized in the landmark decision of *District of Columbia v. Heller*, 554 U.S. 570 (2008).  Moreover, the Act is the kind of law which *Heller* expressly indicated is presumptively lawful.

Handguns are widely available for purchase and possession in California.  Since this lawsuit was filed four years ago, there have been about 1.5 *million* legal handgun transactions in California.  Plaintiffs themselves admit that they already possess handguns suitable for self defense, and that they are able to purchase still additional handguns.  Contrary to plaintiffs' apparent assertion, there is no handgun "ban" in California.  And there is no constitutional right to purchase any handgun of one's choice from whomever one chooses.

Plaintiffs also assert an equal protection claim that has no merit.  The UHA does not treat similarly situated people differently, and it withstands rational basis review in any event.

Accordingly, the Court should grant Lindley' s motion for summary judgment, or in the alternative summary adjudication.

# FACTUAL AND LEGAL BACKGROUND

## I.  PROCEDURAL HISTORY

Plaintiffs initiated this action under 42 U.S.C. section 1983 by filing a complaint on April 30, 2009.  (Doc. no. 1.)  They filed an amended complaint on May 11, 2009.  (Doc. no. 6.)

Early in the case, Lindley filed a motion to dismiss (Doc. no. 8)[1], and plaintiffs filed a motion for summary judgment (Doc. no. 14).  Before either motion was resolved, the Honorable Frank C. Damrell, Jr. – the district judge assigned at the time – stayed the case in its entirety

---

[1] Wilfredo Cid was the named defendant when plaintiffs filed suit.  Lindley, who succeeded Cid as the Chief of the Bureau of Firearms, was substituted as a defendant in his official capacity only on September 6, 2012.  (Doc. no. 46.)

1

1   pending the Ninth Circuit's decision in the case *Nordyke v. King*, 07-15763.  (Doc. nos. 24 & 28.)

2   It was expected that the decision in *Nordyke* would "evaluate a firearms regulation in light of" the

3   recent Supreme Court decisions in *Heller* and *McDonald v. City of Chicago*, —— U.S. ——,

4   130 S.Ct. 3020 (2010), and that such evaluation would "provide crucial direction to the court in

5   its analysis of the firearms regulation in this case."  (Doc. no. 24 at 5.)

6       Following the resolution of *Nordyke*, which did not result in a controlling standard of

7   review for Second Amendment cases, the parties agreed the stay should be lifted, and the matter

8   having been reassigned from Judge Damrell, this Court lifted the stay on August 1, 2012.[2]  (Doc.

9   no. 42.)  The scheduling order issued on September 19, 2012.  Earlier this year, the parties

10  stipulated to the filing of a second amended complaint, and discovery and law and motion

11  deadlines were re-set accordingly.

12      In terms of discovery, defendant has served one set of interrogatories and one set of

13  requests for admissions on each of the individual plaintiffs, and plaintiffs have served responses.

14  Defendant has responded to two sets of interrogatories served by plaintiffs.[3]

15      As discussed at the status (pretrial scheduling) conference, and as agreed by the parties, this

16  matter is now before the Court on cross-motions for summary judgment regarding the

17  constitutionality of California's Unsafe Handgun Act (UHA).

18  **II.   CALIFORNIA'S UNSAFE HANDGUN ACT**

19      The UHA prohibits the manufacture or sale of any "unsafe handgun" in California, making

20  a violation punishable by imprisonment in a county jail for not more than one year.  Cal. Penal

21  Code § 32000(a).[4]   The California Legislature enacted the UHA in 1999 "in response to the

22      [2] The 2011 panel decision in *Nordyke* concluded that "heightened scrutiny does not apply
   unless a regulation substantially burdens the right to keep and to bear arms for self-defense."

23  *Nordyke v. King*, 644 F.3d 776, 783 (9th Cir. 2011).  That decision is the one which justified the
   lifting of the stay in this case.  Unfortunately, though, that panel decision is no longer binding

24  authority in light of the subsequent en banc decision, where the court did not explicitly state what
   standard of review was being applied or whether it adopted the substantial burden test.  *Nordyke*

25  *v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012).

26      [3] These discovery responses are attached to the declaration of the undersigned in support
   of this motion, which has been filed concurrently with these points and authorities.

27

28      [4] Further statutory references are to the California Penal Code unless otherwise indicated.

2

1   proliferation of local ordinances banning low cost, cheaply made handguns known as 'Saturday

2   Night Specials,' which called to the Legislature's attention the need to address the issue of

3   handguns sales in a more comprehensive manner." *Fiscal v. City and County of San Francisco*,

4   158 Cal. App. 4th 895, 912 (Ct. App. 2008) (citing Stricker, *Gun Control 2000: Reducing the*

5   *Firepower* (2000) 31 McGeorge L. Rev. 293, 313 (Gun Control 2000)).  According to its

6   legislative history, the Act was aimed at reducing handgun crime as well as promoting handgun

7   consumer safety.  *Id*. at 913-14.  The Act took effect on January 1, 2001.  § 32000(a).

8       **A.     Definition of "unsafe handgun"**

9       Under the Act, an unsafe handgun is "any pistol, revolver, or other firearm capable of being

10   concealed upon the person" which does not have a specified safety device, fails to meet certain

11   firing criteria, or does not meet drop safety requirements.  § 31910.  *See Fiscal*, 158 Cal. App. 4th

12   at 912 ("[T]he UHA requires that all models of handguns meet certain quality assurance tests and

13   other standards before being approved for sale in this state, including specified standards relating

14   to the safe firing of the handgun and the ability to drop the handgun without it firing

15   accidentally.").  The required safety devices for revolvers and pistols are specified at sections

16   31910(a)(1) and 31910(b)(1), respectively.  The firing requirements of the Act are set forth at

17   section 31905.  The drop safety requirements appear at sections 31900.

18       Additionally, as of January 1, 2006, an unsafe handgun includes a center fire semiautomatic

19   pistol not already listed on the California Department of Justice (DOJ) roster of approved

20   firearms, which is discussed below, that "does not have either a chamber load indicator, or a

21   magazine disconnect mechanism."[5]  § 31910(b)(4).  As of January 1, 2007, it includes a center

22   fire semiautomatic pistol not already listed on DOJ's roster that "does not have both a chamber

23   load indicator and if it has a detachable magazine, a magazine disconnect mechanism."

24   § 31910(b)(5).  As of January 1, 2006, an unsafe handgun includes a rimfire semiautomatic pistol

25       [5] A "chamber load indicator" is "a device that plainly indicates that a cartridge is in the
firing chamber."  § 16380.  A "magazine disconnect mechanism" is "a mechanism that prevents a
26   semiautomatic pistol that has a detachable magazine from operating to strike the primer of
ammunition in the firing chamber when a detachable magazine is not inserted in the
27   semiautomatic pistol."  § 16900.

28

3

1    not already on the roster that "does not have a magazine disconnect mechanism, if it has a

2    detachable magazine."  § 31910(b)(6).[6]

3         As of January 1, 2010, an unsafe handgun also includes "all semiautomatic pistols that are

4    not already listed on the roster . . . not designed and equipped with a microscopic array of

5    characters that identify the make, model, and serial number of the pistol, etched or otherwise

6    imprinted in two or more places on the interior surface or internal working parts of the pistol, and

7    that are transferred by imprinting on each cartridge case when the firearm is fired[.]"

8    § 31910(b)(7)(A).  As one court has explained, "[t]his new technology, identified as micro-

9    stamping, will provide important investigative leads in solving gun-related crimes by allowing

10   law enforcement personnel to quickly identify information about the handgun from spent

11   cartridge casings found at the crime scene."  *Fiscal*, 158 Cal. App. 4th at 914.  Similar to the

12   original provisions of the UHA, the micro-stamping amendment "deals with crime prevention and

13   criminal apprehension."  *Id.*

14        Finally, there are exceptions to the definition of an unsafe handgun.  *See* §§ 32000(b),

15   32105, 32110, 32100.  For example, firearms sold to law enforcement officials and certain curios

16   or relics are exempt.  § 32000(b)(3) & (4).  Pistols used in Olympic target shooting are exempt,

17   *see* § 32105, as are certain single action revolvers and single shot pistols, *see* § 32100.  Other

18   exemptions include the transfer of firearms between private parties, § 32110(a), and firearms

19   delivered for consignment sale or as collateral for a pawnbroker loan, § 32110(f).

20   / / /

21   / / /

22   _____

23        [6] A "semiautomatic pistol" is defined as "a pistol . . . the operating mode of which uses the
     energy of the explosive in a fixed cartridge to extract a fired cartridge and chamber a fresh
24   cartridge with each single pull of the trigger."  § 17140.  With respect to the "center-fire" and
     "rimfire" distinction, in center-fire ammunition, the primer that ignites the gunpowder and causes
25   the cartridge to fire is located in the center of the base of the cartridge.  In rimfire ammunition, the
     primer is located inside a soft outer rim around the edge at the base of the cartridge.  Center-fire
26   firearms are generally more powerful since center-fire cartridges are stronger and can withstand
     higher pressures than rimfire cartridges.  *See generally United States v. Tribunella*, 749 F.2d 104,
27   107 (2d Cir. 1984) (describing center fire weapons); Allen Rostron, *High-Powered Controversy:*
     *Gun Control, Terrorism, and the Fight Over .50 Caliber Rifles*, 73 U. Cin. L. Rev. 1415, 1469
28   n.12 (2005)(explaining rimfire and center fire design).

**B.    The Roster of Handguns Certified for Sale**

The UHA directs that DOJ "shall compile, publish, and thereafter maintain a roster listing all of the pistols, revolvers, and other firearms capable of being concealed upon the person that have been tested by a certified testing laboratory, have been determined not to be unsafe handguns, and may be sold in this state pursuant to this title." § 32015(a).  *See Fiscal*, 158 Cal. App. 4th at 912; § 32010 (mandatory testing of handguns to determine if they meet safety device, firing, and drop safety standards).

The Act also allows DOJ to collect an annual fee from manufacturers or sellers to cover the costs of maintaining the roster and other costs necessary to implement the Act.  § 32015(b)(1). DOJ may exclude a firearm from the roster if the manufacturer or seller fails to pay the annual fee.  § 32015(b)(2).

Under the Act, a firearm shall be deemed to satisfy the roster requirements if a similar firearm is already listed.  Specifically, a firearm shall satisfy the requirements if another firearm made by the same manufacturer is already listed and the unlisted firearm differs from the listed firearm only in one or more of the following features:  (1) finish; (2) the material from which the grips are made; (3) the shape or texture of the grips, so long as the difference "does not in any way alter the dimensions, material, linkage, or functioning of the magazine well, the barrel, the chamber, or any of the components of the firing mechanism of the firearm"; and (4) "[a]ny other purely cosmetic feature" that does not result in such an alteration.  § 32030.

**III.    DESCRIPTION OF THE PARTIES AND STATEMENT OF FACTS**

**A.    Defendant Lindley**

As Chief of the California Department of Justice Bureau of Firearms, Lindley is the sole defendant in this case.  (Second Am. Compl. ¶ 7.)  He is sued in his official capacity only.  (*Id*.)

**B.    Plaintiffs**

**1.    Organizational Plaintiffs**

The plaintiffs include two gun rights advocacy groups.  One is the Second Amendment Foundation, Inc., a Washington non-profit corporation.  (Second Am. Compl. ¶ 5.)  The other is The Calguns Foundation, Inc., a California non-profit.  (*Id*. ¶ 6.)

5

1         **2.    Individual Plaintiffs**

2        There are four individual plaintiffs: Ivan Peña, Roy Vargas, Doña Croston, and Brett

3    Thomas.  (Second Am. Compl. ¶¶ 1-4.)  Each is a member of Second Amendment Foundation.

4    (*Id.*)  Peña and Thomas are Calguns board members.  (*Id.* ¶¶ 1 & 4.)  Vargas and Croston are

5    Calguns supporters.  (*Id.* ¶¶ 2 & 3.)

6          **a.    Mr. Peña**

7        Peña is suing Lindley because he cannot purchase a particular handgun described as a

8    "Para USA (Para Ordnance) P1345SR/ Stainless Steel .45 ACP 4.25" because, while the handgun

9    was listed on California's Handgun Roster until December 31, 2005, "it was discontinued and its

10   listing not renewed."  (Second Am. Compl. ¶¶ 41-42.)

11       As plaintiffs' description of the gun suggests, it is a semiautomatic pistol manufactured by

12   Para Ordnance that is chambered for .45 caliber Automatic Colt Pistol (ACP), or ".45 Auto,"

13   ammunition.  (Pl. Ivan Peña's Resp. to Def. Stephen Lindley's First Set of Interrogs. at 2.)  Its

14   barrel length is 4.25 inches.  (*Id.* at 3.)  The gun Peña wants is used, as opposed to new, and is

15   currently owned by an individual in Washington, but is being offered for sale by PRK Arms, a

16   firearms dealer in Fresno.  (*Id.* at 2-3.)

17       While Peña currently desires the Para .45, he admits that he already owns "at least one fully

18   functional handgun" that is suitable for self defense.  (Pl. Ivan Peña's Resp. to Def. Stephen

19   Lindley's First Set of Reqs. for Admis. at 2.)  He does attempt to qualify that the handgun(s) he

20   already owns "*may* be suitable for self-defense purposes in certain circumstances, but *may not* be

21   suitable for self-defense purposes in other circumstances."  (*Id.*, italics added.)  In any event, Peña

22   admits, without qualification, that he is "able to purchase an operable handgun that is suitable for

23   self-defense."  (*Id.*)

24         **b.    Mr. Vargas**

25       Vargas wants to buy a different type of handgun – a "Glock 21 SF with an ambidextrous

26   magazine release" – but he cannot because the handgun is not on the roster.  (Second Am. Compl.

27   ¶ 43.)  The "Glock 21 SF-STD is listed on the California Handgun Roster," but Vargas claims

28   that the Glock 21 SF with an ambidextrous magazine release "is better suitable" for left-handed

6

1   shooters like Mr. Vargas, who "was born without an arm below the right elbow." (*Id.* ¶¶ 44-46.)

2   While the roster does not list the Glock 21 SF with an ambidextrous magazine release, Vargas

3   claims that Glock allows customers "to have their SF21-STD handguns fitted with an

4   ambidextrous release at the Glock factory." (*Id.* ¶ 48.)

5   　　　The handgun at issue with respect to Vargas is a semiautomatic pistol manufactured by

6   Glock that uses .45 caliber ammunition. (Pl. Roy Vargas's Resp. to Def. Stephen Lindley's First

7   Set of Interrogs. at 2.) It has a 4.6-inch barrel and a short frame, hence the "SF" designation, and

8   is in new condition. (*Id.* at 3.) PRK Arms in Fresno apparently is ready to sell Vargas the desired

9   Glock, assuming it can acquire one from a distributor. (*Id.* at 2-3.)

10   　　　Like Peña, Vargas admits that he already owns "at least one fully functional handgun" that

11   is suitable for self defense. (Pl. Roy Vargas's Resp. to Def. Stephen Lindley's First Set of Reqs.

12   for Admis. at 2.) He also attempts to qualify that the handgun(s) he already owns "may be

13   suitable for self-defense purposes in certain circumstances, but may not be suitable for self-

14   defense purposes in other circumstances." (*Id.*) But he also admits without qualification that he

15   is "able to purchase an operable handgun that is suitable for self-defense." (*Id.*)

16   　　　　　　　　**c.   Ms. Croston**

17   　　　Croston wants to buy a "Springfield Armory XD-45 Tactical 5" Bi-Tone stainless

18   steel/black handgun in .45 ACP, model number XD9623" but cannot because it is not on the

19   roster. (Second Am. Compl. ¶ 49.) She claims that "[o]ther models of this identical gun - but in

20   different colors - are listed on the handgun roster and are thus available to Ms. Croston[.]"

21   (*Id.* ¶ 50.) The stainless steel and black one "was not released until after California required

22   newly-listed guns to have a chamber load indicator and magazine disconnect device. While the

23   identical handguns with a different finish were grandfathered, Springfield Armory could not get

24   the XD-45 in .45 ACP and Bi-Tone finish registered given the new listing requirements."

25   (*Id.* ¶ 52.)

26   　　　The Springfield Armory handgun Croston desires is also a semiautomatic pistol chambered

27   for .45 ACP. (Pl. Doña Croston's Resp. to Def. Stephen Lindley's First Set of Interrogs. at 2.)

28

7

Defendant Stephen Lindley's Memorandum of Points and Authorities in Support of Motion for Summary Judgment,
or in the Alternative Summary Adjudication (2:09-CV-01185-KJM-CKD)

1    It has a 5-inch barrel and is in new condition.  (*Id.* at 3.)  And as with Vargas, PRK Arms is ready

2    to sell her one, assuming it can acquire one from a distributor.  (*Id.* at 2-3.)

3         Like the other individual plaintiffs, Croston admits that she already owns "at least one fully

4    functional handgun" that is suitable for self defense, depending on the circumstances.  (Pl. Doña

5    Croston's Resp. to Def. Stephen Lindley's First Set of Reqs. for Admis. at 2.)  And she admits

6    without qualification that she is nonetheless "able to purchase an operable handgun that is

7    suitable for self-defense."  (*Id.*)

8              **d.    Mr. Thomas**

9         Thomas wishes to purchase a "High Standard Buntline style revolver" but cannot because it

10   is not on the roster.  (Second Am. Compl. ¶¶ 54-55.)[7] The revolver is chambered for .22 long rifle

11   ammunition.  (Pl. Brett Thomas's Resp. to Def. Stephen Lindley's First Set of Interrogs. at 2.)  Its

12   barrel length is 9.5 inches.  (*Id.* at 3.)  It is a used gun, and is currently owned by an individual in

13   Georgia, but is being offered for sale by PRK Arms.  (*Id.* at 2-3.)

14        Finally, Thomas also owns "at least one fully functional handgun" that is suitable for self

15   defense, depending on the circumstances, and he also admits that he is "able to purchase an

16   operable handgun that is suitable for self-defense" irrespective of the circumstances.  (Pl. Brett

17   Thomas's Resp. to Def. Stephen Lindley's First Set of Reqs. for Admis. at 2.)

18   **IV.   PLAINTIFFS' CLAIMS**

19        The second amended complaint contains two causes of action.  The first alleges that each of

20   the particular firearms the individual plaintiffs want to purchase is "an arm whose possession is

21   protected by the Second Amendment."  (Second Am. Compl. ¶¶ 58-61.)  Further, plaintiffs claim

22   that "[a]rms of the kind in common use today in the United States for traditional lawful purposes,

23   _____

24        [7] Plaintiffs appear to have chosen this gun for its symbolic value.  They claim the revolver
     is "identical" to a gun owned by Dick Heller, the plaintiff in the landmark *Heller* case.  (Second
25   Am. Compl. ¶ 55.)  The second amended complaint essentially asserts that in *Heller* the Supreme
     Court held that a "High Standard Buntline style revolver" is protected under the Second
26   Amendment and not subject to regulation.  (*Id.*)  That is a mischaracterization of *Heller*, the
     issues, analysis and holding of which had nothing to do with a High Standard Buntline style
27   revolver.  That Mr. Heller may have owned such a gun as he litigated his case to the Supreme
     Court was irrelevant to the Supreme Court's decision – indeed, the Court makes no mention of
28   the make and model of Mr. Heller's gun in the decision – and it is irrelevant here.

1   and protected by the Second Amendment, include handguns lacking chamber loaded indicators,

2   magazine disconnect devices, and microstamping technology." (*Id.* ¶ 62.) Thus, as plaintiffs put

3   it, by "banning access" to such handguns, defendant is violating the Second Amendment. (*Id.*)

4         The second cause of action alleges that the "handgun roster program" violates plaintiffs'

5   equal protection rights under the Fourteenth Amendment, in that defendant "allows some people

6   access to handguns barred to plaintiffs, and otherwise make arbitrary, capricious, irrational, and

7   otherwise unjustifiable distinctions among the handguns that Defendant deigns to allow Plaintiffs

8   in their exercise of fundamental Second Amendment rights." (Second Am. Compl. ¶ 65.) Thus,

9   plaintiffs claim, defendant is violating the Fourteenth Amendment. (*Id.*)

10        The prayer for relief is straightforward, although sweeping. It seeks an order permanently

11  enjoining defendant from enforcing the UHA in its entirety. (Second Am. Compl. at 11.)

12                                    **ARGUMENT**

13  **I.    LEGAL STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT**

14        The legal standards for summary judgment are well known. Summary judgment is

15  appropriate if the record, read in the light most favorable to the nonmoving party, demonstrates

16  no genuine issue of material fact and that the moving party is entitled to judgment as a matter of

17  law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c). Material

18  facts are those necessary to the proof or defense of a claim, and are determined by reference to the

19  substantive law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). The party with the

20  burden of persuasion at trial, the plaintiffs in this case, "must establish 'beyond controversy every

21  essential element of it's . . . claim." *Southern California Gas Co. v. Santa Ana*, 336 F.3d 885,

22  887 (9th Cir. 2003).

23        At the summary judgment stage the question before the court is whether there are genuine

24  issues for trial, or whether the matter can be decided as a matter of law. *Southern California Gas*,

25  336 F.3d at 887. Upon a showing that there is no genuine issue of material fact as to a particular

26  claim, the court may grant summary judgment in the party's favor, "upon all or any part thereof."

27  *Wang Laboratories, Inc. v. Mitsubishi Electronics, America, Inc.*, 860 F. Supp. 1448, 1450

28  (C.D. Cal. 1993); *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1441 (9th Cir. 1990).

                                          9

1    **II.    THE UNSAFE HANDGUN ACT DOES NOT VIOLATE THE SECOND AMENDMENT.[8]**

2        **A.    The Second Amendment and the Supreme Court's decisions in *Heller* and**
         ***McDonald***

3

4        The Second Amendment provides: "A well regulated Militia, being necessary to the

5    security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

6    U.S. Const. amend. II.

7        In *Heller*, the Supreme Court undertook a thorough analysis of the Second Amendment.  In

8    that case, a District of Columbia special police officer sued to invalidate a District law completely

9    banning the possession of a handgun in the home and requiring that any other lawfully owned

10   firearm in the home, such as a registered long gun, be disassembled or otherwise rendered

11   inoperable for immediate use.  554 U.S. at 574.

12       The Court held that the Second Amendment protects an individual right, not a collective

13   one: "There seems to us no doubt, on the basis of both text and history, that the Second

14   Amendment conferred an individual right to keep and bear arms."  *Heller*, 554 U.S. at 595.  But

15   critically, in what has become well-known and often-cited language, the Court further held that

16   "[l]ike most rights, the right secured by the Second Amendment is not unlimited.  From

17   Blackstone through the 19th-century cases, commentators and courts routinely explained that the

18   right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for

19   whatever purpose."  *Id*. at 626 (citations omitted).  Thus, while *Heller* did uphold the invalidation

20   of a very strict law of the District of Columbia that generally prohibited the possession of

21   handguns, *id*. at 576, 636, *Heller* took care to provide an expressly non-exhaustive list of

22   "presumptively lawful regulatory measures," *id*. at 627 n.26 — "a variety of tools" that "the

23   Constitution leaves . . . for combating" the problem of firearm violence in the United States.

24   *Id*. at 636.  That list includes prohibitions on the possession of "weapons not typically possessed

25   by law-abiding citizens for lawful purposes, such as short-barreled shotguns," *id*. at 625, and

26   _____

27       [8] The complaint alleges Second Amendment and equal protection claims both "facially
     and as applied against the individual plaintiffs."  (Second Am. Compl. ¶¶ 62 & 65.)  But
     plaintiffs' "facial" and "as applied" challenges are indistinguishable.

28

"M-16 rifles and the like," *id*. at 627, as well as "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626-27. Likewise, *Heller* indicated that gunpowder-storage laws "do not remotely burden the right of self-defense … ." *Id*. at 632. "Nor … does our analysis suggest the invalidity of laws regulating the storage of firearms to prevent accidents." *Id*.

Key to *Heller*'s analysis of the District's regulations was the observation that "the law totally bans handgun possession in the home. It also requires that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." *Heller*, 554 U.S. at 628. In finding the total ban on handguns unconstitutional, the Court explained:

> [T]he inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of "arms" that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," would fail constitutional muster.

*Id*. at 628-29 (footnote and citation omitted). Addressing the requirement that firearms in the home be rendered and kept inoperable at all times, the Court similarly explained that the requirement was unconstitutional because "[t]his makes it impossible for citizens to use them for the core lawful purpose of self-defense[.]" *Id*. at 630.

Because the District's law was unconstitutional under any level of constitutional scrutiny, *Heller* declined to indicate precisely what standard of review would apply to Second Amendment challenges. *Id*. at 628 n.27. Nor did *Heller* reach the issue of whether the Second Amendment is incorporated by the Fourteenth Amendment and therefore applicable to the States, *id*. at 620 n.23, although the Court would later address that issue in *McDonald v. City of Chicago*.

In *McDonald*, the Supreme Court held that the Second Amendment is fully incorporated against the States via the Fourteenth Amendment. 130 S.Ct. at 3042. Yet the Court explained

1    that "incorporation does not imperil every law regulating firearms." *Id.* at 3047.  In doing so, the

2    Court was careful to re-state the critical language from *Heller*:

3          It is important to keep in mind that *Heller*, while striking down a law that
           prohibited the possession of handguns in the home, recognized that the right to
4          keep and bear arms is not "a right to keep and carry any weapon whatsoever in any
           manner whatsoever and for whatever purpose."  [Citation.]  We made it clear in
5          *Heller* that our holding did not cast doubt on such longstanding regulatory
           measures as "prohibitions on the possession of firearms by felons and the mentally
6          ill," "laws forbidding the carrying of firearms in sensitive places such as schools
           and government buildings, or laws imposing conditions and qualifications on the
7          commercial sale of arms." [Citation.] *We repeat those assurances here.*

8

9    *Id.* (italics added).  In *McDonald*, the Court also declined to address the applicable standard of

10   review, leaving the lower courts to grapple with the question of the standard to apply to laws that

11   arguably implicate the Second Amendment.

12          **B.     The Unsafe Handgun Act Passes the Substantial Burden Test.**

13          **1.     This Court Should Adopt the Substantial Burden Test.**

14          Unlike some circuits during the years since *Heller* and *McDonald*, the Ninth Circuit has not

15   clearly defined the level of scrutiny that applies to laws regulating conduct arguably within the

16   Second Amendment's scope.  Thus, the level of scrutiny remains an open question in the instant

17   case.  This Court should answer that question by adopting and applying the "substantial burden"

18   test articulated in *United States v. DeCastro*, 682 F.3d 160 (2d Cir. 2012).

19          In *DeCastro*, the Second Circuit upheld the federal statute making it illegal to transport into

20   one's state of residence firearms acquired in another state.  682 F.3d at 161.  The Court held that

21   "heightened scrutiny is appropriate only as to those regulations that substantially burden the

22   Second Amendment," and because the statute at issue "only minimally affect[ed] the ability to

23   acquire a firearm, it [was] not subject to any form of heightened scrutiny."  *Id.* at 164.

24          In settling on the substantial burden test, the *DeCastro* Court emphasized that "[t]hroughout,

25   *Heller* identifies the constitutional infirmity in the District of Columbia laws in terms of the

26   burden on the ability of D.C. residents to possess firearms for self-defense."  682 F.3d at 165.

27   Thus, *Heller* did not "mandate that any marginal, incremental or even appreciable restraint on the

28

                                                  12

1   right to keep and bear arms be subject to heightened scrutiny.  Rather, heightened scrutiny is

2   triggered only by those restrictions that . . . operate as a substantial burden on the ability of law-

3   abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)."  *Id.*

4   at 166.

5          *DeCastro* also emphasized that its approach is consistent with that of other circuit courts,

6   which have endorsed applying varying degrees of scrutiny based not only on the degree to which

7   the law burdens the Second Amendment right but also on the extent to which the regulation

8   impinges on the "core" of the right.  *Id.*; *see, e.g., Heller v. District of Columbia*, 670 F.3d 1244,

9   1261, 1252 (D.C. Cir. 2011) (*Heller II*) ("[W]e determine the appropriate standard of review by

10  assessing how severely the prohibitions burden the Second Amendment right"); *United States v.*

11  *Reese*, 627 F.3d 792, 801 (10th Cir. 2010) (under two-pronged approach, court first asks whether

12  challenged law imposes burden on conduct falling within the scope of Second Amendment's

13  guarantee); *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011) ("[T]he rigor of this

14  judicial review will depend on how close the law comes to the core of the Second Amendment

15  right and the severity of the law's burden on the right"); *United States v. Masciandaro*, 638 F.3d

16  458, 470 (4th Cir. 2011) (to determine standard of review, "we would take into account the nature

17  of a person's Second Amendment interest, the extent to which those interests are burdened by

18  government regulation, and the strength of the government's justifications for the regulation");

19  *United States v. Marzzarella*, 614 F.3d 85, 95–96 (3d Cir. 2010) (courts should first determine

20  whether regulation burdens any Second Amendment rights).[9]

21         In justifying the substantial burden standard*, DeCastro* also explained that a similar

22  threshold showing is needed to trigger heightened scrutiny of laws alleged to infringe other

23  fundamental constitutional rights.  682 F.3d at 167.  For example, the right to marry is

24  fundamental, but "reasonable regulations that do not significantly interfere with decisions to enter

25         [9] The circuits that have most closely followed *DeCastro* in applying the substantial burden
     test are the D.C. Circuit, in *Heller II*, 670 F.3d at 1256–57, and the Fourth Circuit, in
26  *Masciandaro*, 638 F.3d at 470–71.  Since *DeCastro*, the Second Circuit has applied the test in
     *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012) (upholding New York's licensing
27  scheme for full-carry handgun permits) and *Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013)
     (upholding residential handgun licensing fee).

28

                                              13

1  into the marital relationship" are not subject to the "rigorous scrutiny" that is applied to laws that

2  "interfere directly and substantially with the right to marry." *Zablocki v. Redhail*, 434 U.S. 374,

3  386-87 (1978).  The right to vote is fundamental, but "the rigorousness of our inquiry into the

4  propriety of a state election law depends upon the extent to which a challenged regulation burdens

5  First and Fourteenth Amendment rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also*

6  *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 873-74 (1992) ("[N]ot

7  every ballot access limitation amounts to an infringement of the right to vote. Rather, the States

8  are granted substantial flexibility in establishing the framework within which voters choose the

9  candidates for whom they wish to vote;" holding that fact that law which serves valid purpose has

10  incidental effect of making it more difficult to exercise a right cannot be enough to invalidate

11  law); *Karlin v. Foust*, 188 F.3d 446, 481 (7th Cir. 1999) ("[I]nconvenience, even severe

12  inconvenience, is not an undue burden").

13       Finally, in the absence of a substantial burden, *DeCastro* counsels that the relatively lenient

14  rational basis review applies.  *DeCastro*, 682 F.3d at 166-67.  Under rational basis review, a

15  legislative classification will be upheld if it is rationally related to a legitimate government

16  interest.[10]  *Silveira v. Lockyer*, 312 F.3d 1052, 1088 (9th Cir. 2002), *abrogated on other grounds*

17  *by Heller*, 554 U.S. 570.

18       The substantial burden test as articulated in *DeCastro* faithfully adheres to *Heller's*

19  indications of the appropriate test.  It should therefore be adopted by this Court.

20            **2.    The Substantial Burden Test Is Consistent With the Ongoing**
21            **Development of Second Amendment Jurisprudence In The Ninth**
              **Circuit.**

22       This Court should also adopt the substantial burden test because it is consistent with current

23  developments in Second Amendment jurisprudence in the Ninth Circuit, even though the court of

24  appeals has yet to clearly define an applicable standard of review.  For example, In *United States*

25            [10] Although plaintiffs are likely to argue as much, applying rational basis in this way is *not*
26  inconsistent with language in *Heller* rejecting rational basis review for laws that infringe Second
    Amendment rights.  *See Heller*, 554 U.S. at 628 n. 27.  As the *DeCastro* court explained: "In
27  *Heller*, the Court was faced with restrictions that undoubtedly did impose a significant burden on
    core Second Amendment rights.  It had no occasion to consider the appropriate standard of
    review for laws that only minimally impact such rights."  682 F.3d 167 n.5.

28

14

1  *v. Vongxay* (9th Cir. 2010) 594 F.3d 1111, the court upheld the federal felon-in-possession statute

2  against a Second Amendment challenge in light of *Heller*'s holding that prohibitions on

3  possession of weapons by felons are "presumptively lawful."  594 F.3d at 1115.  Also following

4  the indications in *Heller* regarding the kinds of regulations that do not burden the Second

5  Amendment right, the Ninth Circuit has held that "the Second Amendment does not apply to

6  machine guns."  *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012).

7     Even more instructive, one district court in California has recognized that "*Heller*

8  envisioned a process where courts first examine whether the regulation is presumptively valid and

9  therefore excepted from Second Amendment coverage—a presumption that may be overcome by

10  a showing that the regulation nonetheless places a substantial burden [on] the 'core protection of

11  the Second Amendment,' which is the ability to defend 'hearth and home.'"  *Teixeira v. County of*

12  *Alameda*, No. C 12–03288 SI, 2013 WL 707043 at *5 (N.D. Cal. 2013) (quoting *Marzzarella*,

13  614 F.3d at 94) (upholding zoning ordinance prohibiting gun sales).  Another district court has

14  recognized that "[a] firearm law or regulation imposes a substantial burden on Second

15  Amendment rights if the law or regulation bans law-abiding people from owning firearms or

16  leaves them without adequate alternatives for acquiring firearms for self-defense."  *Scocca v.*

17  *Smith*, No. C–11–1318 EMC, 2012 WL 2375203 at *7 (N.D. Cal. Jun. 22, 2012).  Yet another

18  court – one in this district – upheld a concealed carry licensing process because it did not

19  substantially burden protected conduct.  *Richards v. County of Yolo*, 821 F. Supp. 2d 1169, 1172,

20  1174–77, (E.D. Cal. 2011).  The decisions of these district courts applying the substantial burden

21  test, whether published or unpublished, are persuasive authority.  *See People of Territory of*

22  *Guam v. Yang*, 800 F.2d 945, 949 (9th Cir. 1986).

23     For all of these reasons, in this case the Court should adopt and apply a substantial burden

24  test like the one used in *DeCastro*.

25  **3.    The Unsafe Handgun Act Does Not Substantially Burden Plaintiffs'**

26  **Rights**

27     The UHA does not substantially burden the right to keep and to bear arms for self-defense.

28  The burden, if any, is minimal.

15

The gist of plaintiffs' claim is that the Unsafe Handgun Act is unconstitutional in light of *Heller*. But the UHA is completely distinguishable from the sweeping ban at issue in *Heller*. The UHA does not totally ban an entire class of weapons. *See Heller*, 554 U.S. at 628. It is not aimed at possession of handguns in the home, or the possession of handguns anywhere. *See id*. The UHA is not even a total ban on the sale or purchase of handguns, a right the Supreme Court has yet to recognize. Indeed, under the private-party transfer exception of the UHA, each of the individual plaintiffs could lawfully purchase his or her desired firearm from a private party in California. § 32110(a). The UHA does not impede in any fashion a person's ability to defend himself or herself in the home, the "central component" of the Second Amendment. *Id*. at 599.

In fact, the UHA is one of the "presumptively lawful" regulations envisioned by *Heller*. By establishing a protocol for the sale of handguns in California, it is a law "imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626-27 & n.26. By regulating access to certain handguns with unsafe, dangerous features, it is also akin to the kinds of safety laws that *Heller* expressly endorsed, such as gunpowder-storage laws designed to prevent fires and laws regulating the storage of firearms to prevent accidents. *Id*. at 632. Nothing in the Second Amendment guarantees the right to purchase whatever kind of handgun one desires from whomever he or she desires.

Moreover, there is no evidence that the UHA burdens, even slightly, the core right to possess a handgun "for the core lawful purpose of self defense[.]" *Heller*, 128 S.Ct. at 2817. In fact, the evidence is that there are currently more than 1,200 different kinds of handguns listed on California's roster of approved handguns. (*See* Decl. of Stephen Lindley In Supp. of Def.'s Mot. for Summ. J. ¶ 3.) Those are handguns that are available to plaintiffs for purchase. Many more are available by way of private-party transactions. Additionally, the evidence shows that since this lawsuit was filed, there have been approximately 1.5 million handgun transactions in California. (*Id*. ¶ 4.) Since 2009, there have been hundreds of thousands of handgun transactions per year, and those figures are increasing. (*Id*.) Furthermore, as summarized above, each of the plaintiffs admits in discovery responses that he or she currently owns a handgun that is suitable for self-defense, depending on the circumstances. And each plaintiff admits that he or she

16

1    remains free to buy a handgun that is suitable for self-defense regardless of the circumstances.

2    Facts like these are hardly indicative of a substantially burdened Second Amendment right in

3    California.[11]

4         Given that the UHA imposes only a minimal burden, if any, on the Second Amendment

5    right, as explained above about *DeCastro*, 682 F.3d at 166-67, the Court should apply rational

6    basis review to the law.  The UHA easily passes rational basis review.

7         Improving public safety by reducing firearm violence is an indisputably legitimate—indeed,

8    substantial and compelling—government interest.  *See United States v. Call*, 874 F. Supp. 2d 969,

9    976-77 (D. Nev. 2012) (citing several cases classifying government interest in public safety via

10   reducing gun violence as satisfying not just rational-basis standard but intermediate-scrutiny

11   standard).  Consumer safety is another legitimate state interest.  *See Merrifield v. Lockyer*, 547

12   F.3d 978, 986 (9th Cir. 2008) ("government's interests in public health and safety and consumer

13   protection" easily satisfied first aspect of rational basis test).  So is the reduction of crime.  *See*

14   *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in

15   protecting the community from crime cannot be doubted."); *Peruta v. County of San Diego*, 758 F.

16   Supp. 2d 1106, 1117 (S.D. Cal. 2010) ("In this case, Defendant has an important and substantial

17   interest in public safety and in reducing the rate of gun use in crime").

18        The UHA's specification of safety devices, firing requirements, and drop safety

19   requirements, as well as chamber load indicator, magazine disconnect mechanism, and

20   microstamping features, are rationally related to these interests.  One California court has

21   acknowledged that, in enacting the UHA, the California Legislature had in mind the connection

22   between cheaply made, unsafe handguns and injuries to firearms operators and crime.  *See Fiscal*,

23   158 Cal. App. 4th at 913.  The court took judicial notice of legislative history "showing that one

24   of the goals of the UHA included curbing handgun crime, as well as promoting gun safety."  *Id*.

25   The same court found that microstamping "will provide important investigative leads in solving

26   gun-related crimes by allowing law enforcement personnel to quickly identify information about

27        _____

     [11] Nor does this evidence support the notion that the UHA is a handgun "ban," as the
     plaintiffs have hyperbolically asserted throughout this case.  (*See*, *e.g.*, Second Am. Compl. ¶ 63.)

28
17

Defendant Stephen Lindley's Memorandum of Points and Authorities in Support of Motion for Summary Judgment,
or in the Alternative Summary Adjudication (2:09-CV-01185-KJM-CKD)

1   the handgun from spent cartridge casings found at the crime scene." *Id.* at 914.  Additional

2   legislative history shows that the California Legislature determined that a chamber load indicator

3   is a safety feature that assists in alerting the user of a handgun, and those near or around the user,

4   that there is a live round in the chamber.  *See* Assem. Com. on Appropriations, Analysis of Senate

5   Bill No. 489 (2002-2003 Reg. Sess.) August 20, 2003; Assem. Com. on Public Safety, Analysis

6   of Senate Bill No. 489 (2002-2003 Reg. Sess.) July 1, 2003.[12]  Similarly, magazine disconnect

7   mechanisms make a handgun incapable of firing without its magazine, and therefore prevent an

8   accidental discharge if the magazine is removed and someone – whether it be the user or anyone

9   else who might happen upon the gun, for example – does not know that a live round has been

10  chambered.  *See id.*  "When reviewing the constitutionality of statutes, courts 'accord substantial

11  deference to the [legislature's] predictive judgments.'"  *Turner Broad. Sys., Inc. v. FCC*, 520 U.S.

12  180, 195 (1997).

13        In conclusion, the UHA passes the substantial burden test and rational basis review.  It does

14  not infringe the Second Amendment.  The Court should therefore grant the Lindley's motion for

15  summary judgment as to the Second Amended Complaint.[13]

16  **III.   THE UNSAFE HANDGUN ACT DOES NOT TRIGGER EQUAL PROTECTION REVIEW,
         MUCH LESS VIOLATE EQUAL PROTECTION.**

17

18        Plaintiffs' equal protection claim has no merit.  "'The first step in equal protection analysis

19  is to identify the [defendant's] classification of groups.'"  *Freeman v. City of Santa Ana*, 68 F.3d

20  1180, 1187 (9th Cir. 1995) (quoting *Country Classic Dairies, Inc. v. State of Montana, Dep't of*

21

22        [12] This legislative history is attached to the declaration of Joel Tochterman filed in support
    of this motion.  "Under Rule 201 of the Federal Rules of Evidence, the court may take judicial

23  notice of the records of state courts [and] the legislative history of state statutes." *Louis v.
    McCormick & Schmick Restaurant Corp.*, 460 F. Supp. 2d 1153, 1155, n.4 (C.D. Cal. 2006).

24  Lindley requests that this Court do so.

25        [13] The Ninth Circuit has *not* adopted an "intermediate scrutiny" standard in Second
    Amendment cases.  But even if this Court were to determine that intermediate scrutiny is the

26  appropriate standard of review here, the UHA would survive that heightened level of scrutiny.
    "[I]ntermediate scrutiny requires [1] the asserted governmental end to be more than just

27  legitimate; it must be either 'significant,' 'substantial,' or 'important,' and it requires [2] the 'fit
    between the challenged regulation and the asserted objective be reasonable, [but] not perfect.'"

28  *Peruta*, 758 F. Supp. 2d at 1117 (quoting *Marzzarella*, 614 F.3d at 98)).

18

1  *Commerce Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988)). "Once the plaintiff

2  establishes governmental classification, it is necessary to identify a 'similarly situated' class

3  against which the plaintiff's class can be compared. . . . 'The goal of identifying a similarly

4  situated class . . . is to isolate the factor allegedly subject to impermissible discrimination.  The

5  similarly situated group is the control group.'"  *Freeman*, 68 F.3d at 1187 (citations omitted).

6      Here, plaintiffs have not alleged a governmental classification.  They have also failed to

7  allege, nor could they allege, a similarly situated class that the Act treats differently.  The closest

8  they come is the allegation that Lindley "allows some people access to handguns barred to

9  plaintiffs[.]"  (Second Am. Compl. ¶ 65.)  But at any given point in time, the roster of handguns

10  certified for sale either makes a particular handgun available for purchase, or it does not.  For

11  example, Peña desires to purchase a "Para USA (Para Ordnance) P1345SR / Stainless Steel .45

12  ACP 4.25," but he cannot because, while it was listed on the roster until December 31, 2005, its

13  listing was not renewed.  (*Id*. ¶¶ 41-42)  Yet Peña has not shown that someone else in a similar

14  situation is currently able to purchase that handgun.  No one similar to Peña can currently

15  purchase the .45 in question.  Up until December 31, 2005, any otherwise qualified purchaser,

16  including Peña, could have purchased the handgun.  The same can be said with respect to the

17  handgun with an ambidextrous magazine release desired by Vargas, the bi-tonal firearm Croston

18  wants to buy, and the revolver desired by Thomas.  A handgun is available for purchase if it is on

19  the roster, or if it is subject to one of the exceptions, or it is not.  Because the UHA treats

20  similarly situated people the same, it fails to trigger equal protection review at all.

21      Moreover, even assuming a classification by the government and different treatment of

22  similarly situated individuals, the UHA survives equal protection review.  "[I]f a legislative act

23  neither affects the exercise of a fundamental right, nor classifies persons based on protected

24  characteristics, then that statute will be upheld 'if the classification drawn by the statute is

25  rationally related to a legitimate state interest.'"  *Silveira*, 312 F.3d at 1088 (quoting *Schweiker v.*

26  *Wilson*, 450 U.S. 221, 230 (1981)).  There is no allegation or even suggestion that the UHA

27  discriminates on the basis of a suspect class.  And as shown above, the UHA does not even

28  infringe on the Second Amendment right recognized in *Heller*, which concerned the possession of

19

1   a handgun in the home for self-defense.  Rather, the Act simply involves the regulation of

2   commercial handgun sales.  *See City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432,

3   440 (1985) ("When social or economic legislation is at issue, the Equal Protection Clause allows

4   the States wide latitude[.]")

5        For purposes of rational basis review, as discussed above, public safety, consumer safety

6   and reducing crime are clearly legitimate state interests.  And the UHA's requirement that

7   handguns be equipped with certain safety features is rationally related to those interests.

8   Therefore, even assuming a governmental classification and different treatment of a similarly

9   situated class, the Act withstands rational basis review and does not run afoul of equal protection.

10       The UHA does not violate equal protection.  The Court should therefore grant the Lindley's

11  motion for summary judgment as to the equal protection claim.

12                                    **CONCLUSION**

13       Handguns are widely available for purchase to law-abiding people in California.  The UHA

14  is a set of reasonable regulations that in no way burdens plaintiffs' Second Amendment rights.

15  Nor does the Act violate equal protection.  For the reasons set forth above, Lindley respectfully

16  requests that this Court grant his motion for summary judgment in its entirety.

17  Dated:  October 25, 2013                          Respectfully Submitted,

18                                                    KAMALA D. HARRIS
                                                      Attorney General of California
19                                                    TAMAR PACHTER
                                                      Supervising Deputy Attorney General
20
                                                      /S/ ANTHONY R. HAKL
21
22                                                    ANTHONY R. HAKL
                                                      Deputy Attorney General
                                                      *Attorneys for Defendant Stephen Lindley*
23  SA2009310413
    11202172.doc
24

25

26

27

28
                                    20