1  Alan Gura, Calif. Bar No.: 178221
2  Gura & Possessky, PLLC
   101 N. Columbus St., Suite 405
3  Alexandria, VA 22314
   703.835.9085/Fax 703.997.7665
4
5  Donald E.J. Kilmer, Jr., Calif. Bar No.:  179986
   Law Offices of Donald Kilmer, A.P.C.
6  1645 Willow Street, Suite 150
   San Jose, CA 95125
7  408.264.8489/Fax 408.264.8487
8
   Jason A. Davis, Calif. Bar No.: 224250
9  Davis & Associates
   27201 Puerta Real, Suite 300
10 Mission Viejo, CA 92691
   949.310.0817/Fax 949.288.6894
11

12             IN THE UNITED STATES DISTRICT COURT
13          FOR THE EASTERN DISTRICT OF CALIFORNIA

14 Ivan Peña, et al.,                    )   Case No. 2:09-CV-01185-KJM-CKD
                                         )
15          Plaintiffs,                  )   PLAINTIFFS' MEMORANDUM OF
                                         )   POINTS AND AUTHORITIES IN
16      v.                               )   SUPPORT OF PLAINTIFFS'
                                         )   MOTION FOR SUMMARY
17 Stephen Lindley                       )   JUDGMENT [Fed. R. Civ. P. 56]
                                         )
18                                       )
            Defendant.                   )
19                                       )
   _____      )
20

21      Come now Plaintiffs Ivan Peña, Roy Vargas, Doña Croston, Brett Thomas,

22 the Second Amendment Foundation, Inc., and the Calguns Foundation, Inc., by and

23 through undersigned counsel, and submit their Memorandum of Points and

24 Authorities in Support of their Motion for Summary Judgment.

25

26

27

28

1          Dated: October 25, 2013          Respectfully submitted,

2    Alan Gura, Cal. Bar No.: 178221     Donald E.J. Kilmer, Jr., Cal. Bar No. 179986
3    Gura & Possessky, PLLC              Law Offices of Donald Kilmer, A.P.C.
     101 N. Columbus St., Suite 405      1645 Willow Street, Suite 150
4    Alexandria, VA 22314               San Jose, CA 95125
5    703.835.9085/Fax 703.997.7665       408.264.8489/Fax 408.264.8487
     alan@gurapossessky.com              Don @DKLawOffice.com

6
     /s/ Alan Gura                      /s/ Donald E.J. Kilmer, Jr.
7    Alan Gura                          Donald E.J. Kilmer, Jr.

8    Jason A. Davis, Cal. Bar No.: 224250
9    Davis & Associates
     27201 Puerta Real, Suite 300
10   Mission Viejo, CA 92691
11   949.310.0817/Fax 949.288.6894      Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      1.   *The Handgun Rostering Program*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

              a.   Chamber Loaded Indicators and Magazine
                   Disconnect Mechanisms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

              b.   Microstamping. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

              c.   Maintenance Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

              d.   Exemptions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      2.   *Defendant's Enforcement of the "Handgun Roster" Program*
          *Against Plaintiffs*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    I.   The Second Amendment Protects the Acquisition of Arms
        of the Kind in Common Use for Traditional Lawful Purposes. . . . . . 15

    II.   Defendant's Handgun Rostering Program Violates the Second
        Amendment By Restricting Access to Handguns of the Kind in
        Common Use for Traditional Lawful Purposes. . . . . . . . . . . . . . . . . . 19

    III.   Defendant's Handgun Rostering Program Violates the Fourteenth
        Amendment's Equal Protection Clause. . . . . . . . . . . . . . . . . . . . . . . . 24

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

TABLE OF AUTHORITIES

Cases

*Andrews* v. *State*,
     50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Carey* v. *Pop. Serv. Int'l*,
     431 U.S. 678 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*City of Chicago* v. *Morales*,
     527 U.S. 41 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*City of Cleburne* v. *Cleburne Living Center*,
     473 U.S. 432 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*District of Columbia* v. *Heller*,
     554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Ezell* v. *City of Chicago*,
     651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Griswold* v. *Connecticut*,
     381 U.S. 479 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Harper* v. *Virginia Board of Elections*,
     383 U.S. 663 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hussey* v. *City of Portland*,
     64 F.3d 1260 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*McDonald* v. *City of Chicago*,
     130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 25

*Parker* v. *District of Columbia*,
     478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Reliable Consultants, Inc.* v. *Earle*,
     517 F.3d 738 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Richmond Newspapers* v. *Virginia*,
     448 U.S. 555 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States* v. *Carolene Products Co.*,
     304 U.S. 144 (1938). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States* v. *Chester,*
     628 F.3d 673 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States* v. *Marzzarella,*
     614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States* v. *Masciandaro,*
     638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*United States* v. *Miller,*
     307 U. S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*Virginia* v. *Am. Booksellers Ass'n,*
     484 U.S. 383 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Williams* v. *Morgan,*
     478 F.3d 1316 (11th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Wilson* v. *County of Cook,*
     2012 IL 112026. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

Statutes, Rules and Regulations

15 U.S.C. § 7901. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15 U.S.C. § 7901(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15 U.S.C. § 7901(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15 U.S.C. §7901(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

24 DCMR § 2323.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

24 DCMR § 2323.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

24 DCMR § 2323.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

27 C.F.R. § 478.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Cal. Penal Code § 16380. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Cal. Penal Code § 16380(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Cal. Penal Code § 31910(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Other Authorities

A New and Complete Law Dictionary (1771).. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Bureau of Alcohol, Tobacco, Firearms & Explosives,
*Annual Firearms Manufacturing and Export Report*,
available at http://www.atf.gov/files/statistics/download/
afmer/2011-final-firearms-manufacturing-export-
report.pdf (last visited Oct. 24, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

California Law Revision Commission, *Nonsubstantive
Reorganization of Deadly Weapons Statutes:
Disposition of Existing Law*, available at
http://www.clrc.ca.gov/pub/Misc-Report/M300-
Tables/UpdatedDispoTable.pdf (last visited
October 24, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

N. Webster, American Dictionary of the
English Language (1828) (reprinted 1989). . . . . . . . . . . . . . . . . . . . . . . . 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

INTRODUCTION

May the State of California demand that handguns contain unusual or even unavailable technologies as a condition of their lawful sale, or effectively prohibit gun sales based on arbitrary classifications, such as a gun's finish or color? Because the Second Amendment prohibits the state from banning firearms of the kind in common use for traditional lawful purposes, the answer to this question must be "no." *District of Columbia* v. *Heller*, 554 U.S. 570 (2008).

Plaintiffs do not begrudge the state prohibiting truly dangerous and unusual firearms not suited to traditional lawful uses, nor do Plaintiffs challenge the state's authority to require that firearms function in a safe manner, that is, reliably, in the manner that reasonably knowledgeable firearms users would expect. But the Second Amendment's guarantee that individuals have access to the traditional tools of self-defense means little if the state can dictate rare or even hypothetical features into firearm designs, or prohibit firearms for arbitrary reasons having nothing to do with their design or actual function.

Several years ago, state lawmakers banned from retail sale any handgun that does not appear on a special roster. Originally, lawmakers aimed the rostering program at arguably "unsafe" handguns, barring the sale of handguns prone to misfunction, or misfire when dropped. In time, however, the character of the roster program changed, crossing the line from a means of excluding poorly manufactured guns to demanding positive and specific changes to handgun designs. As this program evolved to become ever-more restrictive, it has become impossible to sell

any newly-designed semiautomatic handguns—the overwhelming majority of handguns in the United States—in California, while many previously-approved handguns have become prohibited for non-substantive, administrative reasons. And of course, the attempt to enumerate every single handgun that might be legally sold has predictably proved too ambitious a task not to yield arbitrary and irrational results.

Whatever else one might say about California's pre-*Heller* handgun rostering program, it is clearly not constitutional today. The program is founded on a theory specifically rejected in *Heller* as inconsistent with an individual's Second Amendment rights – that common firearms might be banned merely owing to the government's assessment that their possession is not in the public interest. In *Heller*'s wake, the District of Columbia's City Council adopted California's roster as its own. But in the face of a constitutional challenge, the District almost immediately modified the law, explicitly recognizing that California's rostering scheme does not meet constitutional standards. Respectfully, this Court should reach the same conclusion.

STATEMENT OF FACTS

This case's essential facts are not in dispute.

1.   *The Handgun Rostering Program*

California law provides that

> any person in this state who manufactures or causes to be manufactured, imports into the state for sale, keeps for sale, offers or exposes for sale, gives, or lends any unsafe handgun shall be punished by imprisonment in a county jail not exceeding one year.

Statement of Undisputed Facts ("SUF") 4. California law presumes that all

handguns are "unsafe" and therefore, generally barred from importation and sale, unless those handguns have been placed on the state's special roster of handguns "determined not to be unsafe." SUF 5.

         a.      Chamber Loaded Indicators and Magazine
                 Disconnect Mechanisms

Since 2007, a center-fire[1] semi-automatic[2] handgun cannot make the roster if it does not have both a chamber loaded indicator ("CLI") and, if it has a detachable magazine, a magazine disconnect mechanism. SUF 6. Since 2006, a rimfire[3] semi-automatic handgun must have a magazine disconnect mechanism if it has a detachable magazine. SUF 7. However, handguns rostered prior to the effective dates of these requirements can remain rostered despite lacking these features. SUF 8.

A magazine disconnect mechanism is "a mechanism that prevents a semiautomatic pistol that has a detachable magazine from operating to strike the

---

[1]Most handguns use center-fire ammunition, which fires a bullet when the primer at the bottom-center of the cartridge case is struck and thus ignited by the gun's firing pin.

[2]A semiautomatic handgun is a handgun that fires only one bullet each time the trigger is pulled, with the energy of the just-fired bullet causing the ejection of the spent case and loading of the next cartridge into the firing chamber. Most handguns sold in the United States today are semiautomatic. See Bureau of Alcohol, Tobacco, Firearms & Explosives, *Annual Firearms Manufacturing and Export Report* ("ATF Report"), available at http://www.atf.gov/files/statistics/download/afmer/2011-final-firearms-manufacturing-export-report.pdf (last visited Oct. 24, 2013). Almost all the rest are revolvers, *id.*, which hold several rounds in a rotating cylinder and also fire only one bullet each time the trigger is pulled. This suit does not address fully automatic firearms, also known as machine guns.

[3]Rimfire ammunition incorporates the primer into the bottom rim of the case which ignites the gun powder upon striking that rim. Rimfire ammunition is primarily used in small caliber firearms. For technical reasons, CLIs are not feasible for integration in firearms using rimfire ammunition.

primer of ammunition in the firing chamber when a detachable magazine is not inserted in the semiautomatic pistol." SUF 9. A chamber load indicator ("CLI") is "a device that plainly indicates that a cartridge is in the firing chamber." SUF 10.

Not all CLIs satisfy California's requirement.

A device satisfies this definition if it is readily visible, has incorporated or adjacent explanatory text or graphics, or both, and is designed and intended to indicate to a reasonably foreseeable adult user of the pistol, without requiring the user to refer to a user's manual or any other resource other than the pistol itself, whether a cartridge is in the firing chamber.

SUF 11. Although a CLI is sufficient if it is "designed and intended to indicate to a reasonable adult user" that the firearm is loaded, Cal. Penal Code § 16380, in practice the sufficiency of the CLI is determined by a different standard. Defendant tests the sufficiency of CLIs by asking his employees if they understand the CLI – and when the regulatory authority's employees allegedly fail to understand the CLI, regardless of what the CLI is "designed and intended to indicate to a reasonable adult," the CLI is ruled inadequate. SUF 12.[4]

Given the rarity of CLIs and magazine disconnect devices, handguns lacking these features are in common use today, and comprise the overwhelming majority of handguns currently for sale in other states. SUF 13.

---

[4] During the pendency of this case, California reorganized and renumbered its Penal Code. This memo and the SUF cite the law under its current renumbered scheme, while some of the evidentiary material submitted will refer to the older code sections. See California Law Revision Commission, *Nonsubstantive Reorganization of Deadly Weapons Statutes: Disposition of Existing Law*, available at: http://www.clrc.ca.gov/pub/Misc-Report/M300-Tables/UpdatedDispoTable.pdf (last visited October 24, 2013). A copy is provided in the concurrently filed Request for Judicial Notice.

Indeed, the rarity of CLIs and magazine disconnect mechanisms was a fact specifically relied upon by the California Legislature in mandating these features as part of the rostering program. California legislators considered that CLIs and magazine disconnects are available on only perhaps 11% and 14% of handguns, respectively, as proposed by the author of the bill mandating these features. SUF 14. Because CLIs and magazine disconnect mechanisms were viewed as beneficial, it was hoped that mandating these features would alter the firearms market. SUF 15. "[It] is arguable that a requirement in California would 'drive' the technology of chamber load indicators." Exhibit B, California Senate Public Safety Committee Report, at 9. "It might also be assumed that a mandate in California would drive technology in the market for magazine disconnect devices." *Id.* at 10.

Yet these "safety" features are not foolproof. A handgun safety mechanism may fail or be misused. SUF 16. A chamber loaded indicator is a mechanical device that may fail or be misinterpreted by the user of a handgun. SUF 17. A magazine disconnect mechanism is a mechanical device that may fail. SUF 18. As the state advises handgun purchasers, "Any machine can malfunction. A firearm is no different." SUF 19.

In fact, to acquire any handgun in California, an individual must pass a written handgun safety test. SUF 20. The test requires knowledge of the basic rules of handgun safety, the first of which is: "Treat all guns as if they are loaded." SUF 21. The state's study guide for the handgun safety test further provides:

> Always assume that a gun is loaded even if you think it is unloaded. Every time a gun is handled for any reason, check to see that it is unloaded [by following specific instructions for unloading the gun]. If you are unable to

check a gun to see if it is unloaded, leave it alone and seek help from someone more knowledgeable about guns.

SUF 22.

The state's specific instructions for unloading a semi-automatic handgun contained in its gun safety study guide provides that a mechanical safety

> [I]s not foolproof so do not rely on the safety to prevent an accidental discharge. A safety should only be used as an additional safety measure. Never pull the trigger on any firearm with the safety in the "safe" position because thereafter the firearm could fire at any time without the trigger ever being touched.

SUF 23.

The state's gun safety study guide does not discuss chamber load indicators or magazine disconnect devices. Yet it teaches, in order to pass the mandatory safety test, rules that would have gun owners ignore such devices. The study guide specifically instructs that in order to verify a semi-automatic handgun is unloaded, one must remove the magazine and visually inspect the chamber to verify that it is empty. SUF 24.

In fact, in a large red box marked "CAUTION," the state's gun safety study guide provides:

> You should NOT assume a semiautomatic pistol is unloaded just because the magazine is removed from the handgun.

> Do not allow the slide to go forward UNLESS you have:

> 1. Checked again to be sure the chamber is empty, and

> 2. Checked again to be sure the magazine has been REMOVED

> If you pull the slide back ejecting the cartridge, check the chamber, let the slide go forward, and THEN remove the magazine, you have a loaded, dangerous firearm (a cartridge is in the chamber) even though you have removed the magazine. It is common and sometimes fatal to make this error.

ALWAYS REMOVE THE MAGAZINE FIRST!

SUF 25.

In order to purchase a handgun, the buyer must demonstrate that he or she knows how to safely operate the handgun, including following these instructions. SUF 26. Moreover, California law also generally requires that all newly purchased firearms either be accompanied by an approved gun lock or the purchaser's affidavit that she owns an adequate lock box or gun safe. SUF 27.

        b.     Microstamping

As of May 17, 2013, all semi-automatic handguns not already rostered cannot be submitted for roster listing unless they employ so-called "microstamping technology." To comply, handguns must be:

> designed and equipped with a microscopic array of characters that identify the make, model, and serial number of the pistol, etched or otherwise imprinted in two or more places on the interior surface or internal working parts of the pistol, and that are transferred by imprinting on each cartridge case when the firearm is fired, provided that the Department of Justice certifies that the technology used to create the imprint is available to more than one manufacturer unencumbered by any patent restrictions.

SUF 28.

"The Attorney General may also approve a method of equal or greater reliability and effectiveness in identifying the specific serial number of a firearm from spent cartridge casings discharged by that firearm than that which is set forth in this paragraph . . ." SUF 29.

The microstamping requirement of Cal. Penal Code § 31910(b)(7) became effective on May 17, 2013 because on that date, the California Department of

Justice issued Information Bulletin No.: 2013-BOF-03, wherein Defendant Lindley announced that the Department had determined that the technology described in Cal. Penal Code § 31910(b)(7) is now available to more than one manufacturer unencumbered by any patent restrictions. SUF 30.

Defendant admits that no handguns for sale in the United States have the microstamping technology required by California's roster law. Exh. O, Response to Request for Admission No. 4. No firearms manufacturer has submitted any microstamping-compliant handguns, Exh. P, Response to Interrogatory Request No. 8, and Defendant has no information as to whether any manufacturer will ever produce microstamping handguns, Exh. O, Response to Request for Admission No. 5. Accordingly, the microstamping requirement imposes a *de facto* ban on the sale of all new semiautomatic handgun models in California. SUF 31.

            c.      Maintenance Fees

Listings on the California handgun roster are valid for one year, and must be renewed annually, including payment of an annual fee, prior to expiration to remain valid. SUF 32. Defendant charges firearms manufacturers, importers, and dealers annual fees, ostensibly to operate the handgun roster program. Any handgun whose manufacturer fails to pay the required fees may be excluded from the roster for that reason alone. SUF 33. The initial and renewal annual listing fees for inclusion on the handgun roster are $200. SUF 34.

Other than the California DOJ, only the manufacturer/importer of a handgun model is authorized to submit that handgun model to a DOJ-Certified Laboratory for testing. SUF 35. A handgun can remain on the roster if its manufacturer/

importer goes out of business or discontinues the model, provided that the model is not being offered for sale to licensed dealers, and "a fully licensed wholesaler, distributor, or dealer submits a written request to continue the listing and agrees to pay the annual maintenance fee." SUF 36. So long as a handgun is sold to dealers outside of California, the handgun's manufacturer can cause the sale of that handgun to be forbidden inside California by failing to submit the gun for testing in that state or refusing to pay the annual $200 fee. SUF 37.

A manufacturer/importer or other responsible party may submit a written request to list a handgun model that was voluntarily discontinued or was removed for lack of payment of the annual maintenance fee. The request may be approved, and the handgun restored to the "safe gun" roster, provided the fee is paid. SUF 38.

d.      Exemptions

The following firearms and transactions are exempted from the handgun rostering requirement: (1) firearms defined as curios or relics under federal law; (2) the purchase of any firearm by any law enforcement officer – state or federal; (3) pistols that are designed expressly for use in Olympic target shooting events, as defined by rule; (4) certain single-action revolvers, as defined by rule; and (5) the sale, loan, or transfer of any firearm that is to be used solely as a prop during the course of a motion picture, television, or video production by authorized people related to the production. SUF 39.

It is also not illegal in California to import an unrostered handgun when moving into the state without the intention of selling it, nor is it illegal in California to possess or use an unrostered handgun that is otherwise lawful to possess or use.

SUF 40. California also exempts private party transfers, intra-familial transfers including gifts and bequests, and various loans.  SUF 41.[5]

2.   *Defendant's Enforcement of the "Handgun Roster" Program Against Plaintiffs*

Plaintiff Ivan Peña sought to purchase a Para USA (Para Ordnance) P1345SR / Stainless Steel .45 ACP 4.25", and has identified a willing seller who stands ready to deliver said handgun to him. SUF 42. The Para USA P1345SR that Peña wants to buy was listed on California's Handgun Roster until December 31, 2005, when it was discontinued and its listing not renewed. SUF 43.

Peña cannot lawfully purchase and take possession of the handgun as that handgun is not on the California Handgun Roster. SUF 44. Peña fears arrest, prosecution, fine and incarceration if he completes this handgun purchase. SUF 45.

Plaintiff Roy Vargas has sought to purchase a Glock 21 SF with an ambidextrous magazine release, and has identified a willing seller who stands ready to deliver said handgun to Plaintiff. SUF 46. However, Vargas cannot lawfully purchase and take possession of the handgun as that handgun is not listed on the California Handgun Roster. SUF 47. Vargas fears arrest, prosecution, fine and incarceration if he completes this handgun purchase. SUF 48.

Vargas was born without an arm below the right elbow. SUF 49. The Glock 21 SF-STD with a standard magazine release is listed on the California Handgun Roster. SUF 50. However, the Glock 21 SF with ambidextrous magazine release is

---

[5]"Single" or "Double" action refers to the gun's trigger function.  If the trigger only drops the hammer (with the firing pin) after it is cocked, then the firearms is considered a "Single" action.  If the trigger can also draw back the hammer and release it, the firearm is considered a "Double" action.

superior for left-handed shooters such as Mr. Vargas, as opposed to the approved

version of the Glock 21. SUF 51. Glock's efforts to add the Glock 21 SF with

ambidextrous magazine release to the California Roster have failed. SUF 52.

However, Defendant permits Glock customers to have their Glock 21 SF-STD

handguns fitted with an ambidextrous release at the Glock factory. SUF 53. As

state officials wrote Glock in response to the gunmaker's pleas to include the

ambidextrous Glock 21 SF on the roster:

> A California owner of a Glock handgun model with a standard magazine
> release who wishes to have his or her handgun model retrofitted with an
> ambidextrous magazine release may send the firearm to Glock. Glock could
> then retrofit the handgun and return it to its owner. No further testing of the
> retrofitted handgun would be required.

Exhibit F. In other words, California permits the sale of a Glock 21 SF-STD, and

the alteration of that handgun by Glock to add an ambidextrous magazine release,

but will not allow consumers to purchase new Glock 21 SFs with an ambidextrous

magazine release in the first place.

Plaintiff Doña Croston has sought to purchase a Springfield Armory XD-45

Tactical 5" Bi-Tone stainless steel/black handgun in .45 ACP, model number

XD9623, and has identified a willing seller who stands ready to deliver said

handgun to her. SUF 54. Croston cannot lawfully purchase and take possession of

the handgun as that handgun is not on the California Handgun Roster. SUF 55.

Croston fears arrest, prosecution, fine and incarceration if she completes this

handgun purchase. SUF 56.

Other models of this identical gun – but in different colors – are listed on the

handgun roster and are thus available to Ms. Croston: the XD-45 Tactical 5" .45

ACP in black (model XD9621), the XD-45 Tactical 5" .45 ACP in OD Green (model XD9622), and the XD-45 Tactical 5" .45 ACP in Dark Earth (XD9162). SUF 57. However, the particular Bi-Tone XD-45 that Ms. Croston would possess was not released until after California required newly-listed guns to have a chamber load indicator and magazine disconnect device. SUF 58. Springfield Armory could not get the XD-45 in .45 ACP and Bi-Tone finish registered given the new listing requirements. SUF 59. The XD-45 Bi-Tone in .45 has a loaded chamber indicator, but the California Department of Justice decided it does not qualify under Cal. Penal Code § 16380(c). SUF 60. The XD-45 also lacks a magazine disconnect device. SUF 61.

The handgun at issue in *Heller* was a High Standard 9-shot revolver in .22 with a 9.5" Buntline-style[6] barrel. SUF 62. Plaintiff Brett Thomas has sought to purchase an identical High Standard 9-shot revolver in .22 with a 9.5" Buntline-style barrel, and has identified a willing seller who stands ready to deliver said handgun to Thomas. SUF 63. Thomas cannot lawfully purchase and take possession of the handgun as that handgun is not on the California Handgun Roster. SUF 64. Thomas fears arrest, prosecution, fine and incarceration if he completes this handgun purchase. SUF 65.

Plaintiffs Ivan Peña and Brett Thomas are law-abiding citizens, shooting enthusiasts and gun collectors, as are other members and supporters of Plaintiffs Second Amendment Foundation, Inc. ("SAF") and Calguns Foundation, Inc.

---

[6] A "Buntline" style is a Western-style extra-long barreled revolver. It is named for the 19th Century novelist Ned Buntline who was said to commission such guns for famous personalities of the day.

("CGF"). Peña, Thomas, Croston, and other SAF and CGF members and supporters would acquire new semiautomatic handguns of the kind in common use throughout the United States, for traditional lawful purposes including self-defense, but cannot do so owing to the operation of California microstamping scheme. SUF 66.

Moreover, even if Plaintiffs could procure the handguns they intend to purchase consistent with California law, the handgun rostering scheme substantially limits commerce in (and therefore Plaintiffs' access to) these handguns, since no dealer can stock these firearms. This results in a significant loss of choice and price competition. SUF 67. Plaintiffs would also suffer increased costs in transporting and transferring their firearms from out-of-state dealers that they would not suffer if the firearms were available for sale in California. SUF 68.

SAF is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SUF 69. SAF has over 650,000 members and supporters nationwide, including many in California. SUF 70. The purposes of SAF include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control. SUF 71.

CGF is a non-profit organization incorporated under the laws of California with its principal place of business in San Carlos, California. SUF 72. The purposes of Calguns include supporting the California firearms community by promoting education for all stakeholders about firearm laws, rights and privileges, and securing the civil rights of California gun owners, who are among its members and supporters. SUF 73.

SAF and CGF expend their resources encouraging exercise of the right to bear arms, and advising and educating their members, supporters, and the general public about the legality of particular firearms. The issues raised by, and consequences of, Defendant's policies, are of great interest to SAF and Calguns' constituencies. Defendant's policies regularly cause the expenditure of resources by SAF and Calguns as people turn to these organizations for advice and information. SUF 74, 75. Defendant's policies bar the members and supporters of SAF and Calguns, living in California, from obtaining numerous, if not most, handguns. SUF 76. At a minimum, Defendants' policies make firearms less accessible to the public, reduce the opportunity for selection and purchase, lessen price competition, and impose additional expenses on the purchase of firearms. SUF 77.

## SUMMARY OF ARGUMENT

This case begins and ends with the fact that California will not roster handguns lacking features which are missing from many, if not the vast majority, of handguns of the kind in common use throughout the United States. Indeed, no new semiautomatic handgun models can be sold in California at all. The challenged requirements constitute a massive ban on handguns whose possession and use is secured by the Second Amendment.

In unsuccessfully defending its blanket handgun ban, the District of Columbia argued that it could unilaterally determine which arms were too dangerous to be allowed ordinary citizens, and that handguns as a class of weapons failed to meet its criteria. The Supreme Court rejected this argument. The government's disdain for particular arms does not enable it to ban them if their

possession is protected by the Second Amendment. The test is whether the arms at issue are of the kind that would be in common use for lawful purposes.

Defendant's handgun rostering program also violates basic principles of equal protection, in that it arbitrarily makes distinctions between otherwise identical firearms, inherently making arbitrary distinctions among the people who would possess them, and bars some classes of people from possessing handguns that are perfectly permissible to others. These practices cannot survive Fourteenth Amendment scrutiny.

ARGUMENT

I.   The Second Amendment Protects the Acquisition of Arms of the Kind in Common Use for Traditional Lawful Purposes.

"[T]he sorts of weapons protected [by the Second Amendment are] those 'in common use at the time,'" *Heller*, 554 U.S. at 627 (quoting *United States* v. *Miller*, 307 U. S. 174, 179 (1939)), "the sorts of lawful weapons that [citizens] possessed at home." *Id.* "[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. Handguns plainly satisfy this test:

> It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon . . . [H]andguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition on their use is invalid.

*Id.* at 629.

The Second Amendment is binding on state actors through the Fourteenth Amendment. *McDonald* v. *City of Chicago*, 130 S. Ct. 3020 (2010).

Because there is a right to keep and bear firearms, there is, necessarily, a right to acquire them. "[C]ertain unarticulated rights are implicit in enumerated guarantees . . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers* v. *Virginia*, 448 U.S. 555, 579-80 (1980). "The right to keep arms, necessarily involves the right to purchase them . . ." *Andrews* v. *State*, 50 Tenn. 165, 178 (1871). A complete ban on gun commerce would violate the Second Amendment right at its core. *United States* v. *Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010). The government can no more ban the sale of protected guns than it can ban the sale of protected books, *Virginia* v. *Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); contraceptives, *Carey* v. *Pop. Serv. Int'l*, 431 U.S. 678 (1977); *Griswold* v. *Connecticut*, 381 U.S. 479 (1965), or perhaps the sale of sex toys, *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738 (5th Cir. 2008); but see *Williams* v. *Morgan*, 478 F.3d 1316 (11th Cir. 2007).[7]

Of course, Defendant is still free to ban "arms" that are nonetheless "dangerous and unusual weapons," *Heller*, 554 U.S. at 627 (citations omitted), including "sophisticated arms that are highly unusual in society at large." *Id.* "Historically, weapons like machine guns, sawed-off shotguns, grenade launchers,

---

[7]Congress, too, has recognized that the Second Amendment extends to the acquisition of firearms. In enacting the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7901, et seq., Congress began by referencing the Second Amendment, 15 U.S.C. § 7901(a)(1), and thereafter declared among the Act's purposes "[t]o preserve a citizen's access to a supply of firearms and ammunition for all lawful purposes," and "[t]o guarantee a citizen's rights, privileges, and immunities, as applied to the States, under the Fourteenth Amendment to the United States Constitution," 15 U.S.C. §§ 7901(b)(2), (3).

and other high-powered weapons have fallen into this category due to their extreme nature." *Wilson* v. *County of Cook*, 2012 IL 112026, at ¶ 46.

And while "all firearms constituted 'arms,'" *Heller*, 554 U.S. at 581 (citation omitted), Defendant can ban those weapons which do not meet the historic legal definition of "arms" as used in the Second Amendment – "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* (citing 1 A New and Complete Law Dictionary (1771); N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)).

But the acquisition of handguns of the kind in common use for lawful purposes, the sort of handguns that law-abiding citizens would expect to keep, cannot be prohibited– even if the state would prefer people use different (or no) firearms. In making this point, the Supreme Court notably did not reference any "standard of review" or means-ends balancing test. "It is enough" that handguns, as a general class of arms, are in common use for traditional lawful purposes. *Heller*, 554 U.S. at 629.

Nor did the Supreme Court utilize such tests in resolving *Heller*'s challenge to Washington, D.C.'s bans on the possession of functional firearms in the home, and handgun carrying within the home. With respect to Washington's complete ban on the possession of functional firearms within the home, the Court simply offered that the ban "makes it impossible for citizens to use [guns] for the core lawful purpose of self-defense and is hence unconstitutional." *Id.* at 630. This same process, identifying whether a regulation conflicts with a "core protection" of the Amendment without resort to interest-balancing, resolved Heller's challenge to a

1   requirement that he obtain an unavailable permit to move a handgun inside his

2   home. The D.C. Circuit found the restriction violated the Second Amendment's core:

3

4   > It is sufficient for us to conclude that just as the District may not flatly ban
    > the keeping of a handgun in the home, obviously it may not prevent it from
    > being moved throughout one's house. Such a restriction would negate the
    > lawful use upon which the right was premised–i.e, self-defense.

5

6   *Parker* v. *District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom,*

7   *Heller.*[8] The Supreme Court affirmed using the same approach, concluding the city

8   had no discretion to refuse issuance of the permit: "Assuming that Heller is not

9   disqualified from the exercise of Second Amendment rights, the District must

10  permit him to register his handgun and must issue him a license to carry it in the

11  home." *Heller*, 554 U.S. at 635.

12

13         In its methodology, *Heller* repeatedly demonstrated a simple fact that is too-

14  often forgotten: not every constitutional question is answered with balancing tests.

15  Sometimes, interpretation is enough. At other times, categorical rules will apply.

16  Means-ends scrutiny can play a role, but not where the problem is fairly basic. Just

17  as some First Amendment cases turn on the question of whether something

18  constitutes protected speech, and some Fourth Amendment cases turn on whether

19  conduct constitutes a "search" or a "seizure," *Heller* demonstrates that in the Second

20  Amendment, categorical prohibitions on types of "arms" are resolved by the

21  common-use test, derived from *Miller*. Were balancing tests required to discern

22  whether handguns are protected "arms" under the Second Amendment, *Heller*

23  would have utilized them.

---

[8]Heller did not request a public-carry permit. *Id.*

Illinois' Supreme Court, considering a challenge to a so-called "assault weapons" ban, acknowledged the categorical nature of examining a prohibition on a class of arms. Remanding the case for further development, that court explained,

> it cannot be ascertained at this stage of the proceedings whether these arms with these particular attributes as defined in this Ordinance are well suited for self-defense or sport or would be outweighed completely by the collateral damage resulting from their use, making them "dangerous and unusual" as articulated in *Heller*.

*Wilson*, 2012 IL 112026, at ¶ 49.

This case addresses not so-called "assault weapons," a discrete if inconsistently-defined subset of firearms purportedly possessing uniquely dangerous functions, but handguns—which the Supreme Court has already held are categorically within the Second Amendment's protection. Indeed, the rostering scheme begins with the now-unconstitutional presumption that *all* handguns are "unsafe" until declared otherwise by the state, including *all* new semiautomatic handgun models (since none contain microstamping). The state's burden of showing that somehow, all handguns that do not fit the legislature's complex rostering requirements are outside the Second Amendment's protection as defined in *Heller* is impossible.

II.   **Defendant's Handgun Rostering Program Violates the Second Amendment By Restricting Access to Handguns of the Kind in Common Use for Traditional Lawful Purposes.**

The handguns banned by Defendant's rostering program – guns that do not microstamp (e.g., all new gun models for the foreseeable future if not forever), guns not incorporating CLIs and/or magazine disconnect mechanisms, guns that have not been (and cannot be) submitted by their manufacturer for government testing, and

guns that would be perfectly acceptable by the government but for lack of an annual listing fee – are all nonetheless handguns of the kind in common use protected by the Second Amendment. None of these characteristics render a firearm "dangerous or unusual" or militarily "sophisticated," or establish that it is not of the kind in common use for lawful purposes.

The Supreme Court required no particular evidence to discern that handguns are in common use for traditional lawful purposes – "that the American people have considered the handgun to be the quintessential self-defense weapon." *Heller*, 554 U.S. at 629. Looking further, the federal government's latest manufacturing report reveals that in 2011, the latest year for which numbers are available, the nation produced 3,170,990 handguns, of which 2,598,133—81.9%—were not revolvers, and thus, virtually all semi-automatic. See ATF Report, supra n.2. Of these, only 427,448 were chambered in calibers up to .22, which would be rimfire pistols. The remainder, 68.5% of all handguns manufactured in the United States in 2011, utilized center-fire ammunition calibers. *Id.* Thus, not only are handguns generally arms of the kind in common use for traditional lawful purposes. SUF 1. Semi-automatic handguns with detachable magazines, including those utilizing center-fire ammunition, are in common use for traditional lawful purposes. SUF 2, 3.

The CLIs and magazine disconnect mechanisms required for rostering are rare features, found on perhaps only 11% and 14% of all handguns in the marketplace. Considering California's particularly harsh and entirely arbitrary enforcement of its CLI requirement, that number of qualified CLI's is surely lower than even 11% of the market.

---

Furthermore, microstamping guns currently command exactly 0% of the market for handguns in the United States. As much as California's legislature would like for these guns to exist, they do not exist. Nor will they probably ever exist. Defendant, certainly, is not expecting them to show up any time soon. Likewise, many guns are still protected by the Second Amendment even if they have not been manufactured for many years prior to the advent of the California Handgun Roster, or have been manufactured by a company that does not wish to sell its products in one particular state. And plainly, a gun model deemed "not unsafe" does not somehow alter its characteristics and become "unsafe" simply because a check has not been cashed in Sacramento within the year.

The four specific handguns denied Plaintiffs are plainly within the Second Amendment's protection. New handguns manufactured and offered for sale in the other 49 states without microstamping technology are similarly protected. That the handgun roster law is incompatible with Supreme Court precedent is illustrated by the roster's banning of Brett Thomas's High Standard revolver. This is the exact same make and model gun the possession of which the Supreme Court ordered Washington, D.C. to allow Mr. Heller. This gun might not appear on the state's list of approved handguns, but according to the Supreme Court, it appears in the Second Amendment.

The handguns denied Ivan Peña and Doña Croston are likewise plainly within the Second Amendment's protection. They cannot be considered "dangerous and unusual" by any stretch of imagination. Croston's gun appears on Defendant's approved list, albeit in different colors, but is unavailable in the black/stainless

finish because it was not made available for testing in that particular color before the CLI and magazine disconnect requirements came into effect. It is not as though Croston's gun failed any safety testing; California regulators refuse to test the gun because it does not contain features missing from the overwhelming majority of American handguns – as acknowledged by the California Legislature in enacting the requirements. Ivan Peña's gun was once deemed safe enough for sale, but is only unavailable because its listing was not renewed. The gun did not suddenly become dangerous on January 1, 2006, when its listing expired because the manufacturer would not pay a fee and fill out a piece of paper.

The situation with respect to Roy Vargas's handgun is absurd. It makes no sense that Vargas cannot simply purchase a Glock 21 SF with an ambidextrous magazine release, but that he can purchase the right-handed version of this exact same gun, and undergo the additional burden and expense of having the Glock factory make him a custom modification– resulting in the exact same handgun that Defendant will not place on the roster.

The empirical evidence regarding handguns in common-use is conclusive, but it also bears noting that nothing about the lack of CLIs, magazine disconnect devices, or microstamping makes handguns "dangerous and unusual." Indeed, the magazine disconnect and CLI requirements contravene the state's own gun safety policies. The state mandates that all handgun purchasers pass a handgun safety test that specifically teaches people not to rely on gimmicks like magazine disconnects and CLIs. The state makes it absolutely clear that all guns must be treated as loaded, that the absence of a magazine is not to be interpreted as a sign

that the gun is unloaded, that the only way to know guns are unloaded is to physically inspect the chamber. Even then, treating all guns as loaded promotes safe handling practices. And on top of the mandatory instruction on such practices, and the requirement that handgun purchasers demonstrate safe handling techniques, the state mandates that each handgun sale be accompanied by the sale of a lock or a guarantee that room exists in a safe for the gun.

The state's instructions with respect to safe gun handling and unloading are unassailable. Whatever the merits of the state's safe storage requirements, they do not ban a single gun, while making the magazine disconnect and CLI requirements redundant. It is irresponsible to rely on magazine disconnects and CLIs for gun safety, which is perhaps why the market has obviously rejected these features, and why the Defendant has such a difficult time agreeing to a standard of what actually constitutes a CLI.

The application of these requirements leads to absurd results. Why is the Springfield Armory XD-45 acceptable in almost any finish, but will not even be considered for testing in Bi-Tone? If guns failing to include CLIs and magazine disconnects are unacceptably dangerous, why permit the continued manufacture and introduction of old, allegedly "unsafe" models? Croston is being denied the gun of her choice not because of any intrinsic quality it possesses, but because Croston prefers to have the gun in a particular color.

Since microstamping is, for all intents and purposes, more a piece of science fiction than commercial reality, it can hardly be said that guns *lacking* this concept are "dangerous and unusual." Microstamping may not be dangerous, but it is not

merely "unusual"—it is non-existent. And plainly, administrative failures—the lack of a fee to support a gun's continued listing, or the lack of a manufacturer to support the rostering of an historic firearm such as Heller's—have nothing to do with whether a gun is "dangerous and unusual."

California's legislature, operating in a pre-*Heller* environment, approached the handgun issue backwards from a constitutional, post-*Heller* perspective. The legislature sought to declare almost all handguns "unsafe" for failing to conform to its design preferences, or for the manufacturer's inability or unwillingness to pay for and participate in the state's regulatory scheme. Consciously, the state sought to "drive" the market towards its preferred outcomes. But *Heller* stands for the proposition that it is the regulatory environment that must accommodate itself to the choices made by the lawful, constitutionally-protected market for arms, and not the other way around.

III.   Defendant's Handgun Rostering Program Violates the Fourteenth Amendment's Equal Protection Clause.

The Equal Protection Clause "is essentially a direction that all person similarly situated should be treated alike." *City of Cleburne* v. *Cleburne Living Center*, 473 U.S. 432, 439 (1985) (citation omitted). Strict scrutiny usually applies to government classifications that "impinge on personal rights protected by the Constitution." *Id.*, 473 U.S. at 440 (citations omitted). "Where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized." *Hussey* v. *City of Portland*, 64 F.3d 1260, 1265 (9th Cir. 1995) (quoting *Harper* v. *Virginia Board of Elections*, 383 U.S. 663, 670 (1966)).

The Supreme Court rejected rational basis as a standard of review for Second Amendment claims, holding that the standard of review in Second Amendment cases is no less rigorous than for evaluating other enumerated rights:

> Obviously, [rational basis] could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms.

*Heller*, 554 U.S. at 629 n. 27 (citing *United States* v. *Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938)). Second Amendment rights are fundamental. *McDonald*, 130 S. Ct. at 3042.

That does not mean that there is a one-size-fits-all standard for Second Amendment claims, in those contexts where means-ends scrutiny is relevant (and it is not relevant to resolve, under the common-use test, Plaintiffs' primary claim, *supra*). "[A]s has been the experience under the First Amendment, we might expect that courts will employ different types of scrutiny in assessing burdens on Second Amendment rights, depending on the character of the Second Amendment question presented." *United States* v. *Masciandaro,* 638 F.3d 458, 470 (4th Cir. 2011).

"Borrowing from the Court's First Amendment doctrine, the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Ezell* v. *City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (citations omitted).

> Labels aside, we can distill this First Amendment doctrine and extrapolate a few general principles to the Second Amendment context. First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public- interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be

more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

*Id.*

Thus, while courts typically reduce the level of scrutiny given laws addressing criminal misconduct or irresponsibility, see, *e.g., United States* v. *Chester*, 628 F.3d 673 (4th Cir. 2010) (intermediate scrutiny for domestic abuser), or conduct that the court believes to fall outside the Second Amendment's "core" purpose, see, *e.g.*, *Masciandaro* (possessing handgun in park), courts employ higher levels of scrutiny where the conduct being impacted is closer to the Second Amendment's perceived "core," and/or exercised by responsible, law-abiding adults. "[W]e assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *Masciandaro*, 638 F.3d at 470; *Ezell*, 651 F.3d at 708 (greater than intermediate "if not quite strict scrutiny" for regulating traditional gun ranges).

To the extent Defendant's practices implicate equal protection concerns, the proper standard of review would be strict scrutiny. After all, at issue is the acquisition of handguns, by law-abiding, responsible adults, for self-defense within the home.

The sort of classifications created by the handgun roster and microstamping requirements are unacceptable under any sort of scrutiny reserved for enumerated rights. In California, unrostered guns are permitted by private importation or as intra-family gifts, just not as retail purchases. The roster thus privileges people who move into the state, or who have family out-of-state. Yet all people, not just relatives, may transfer unrostered handguns inside the state. These classifications

make no sense. Any of the Plaintiffs might live next door to individuals who lawfully obtained the same handguns denied by the roster law, prior to moving to the state, or as a gift from an out-of-state relative.

California's wide exemptions for law enforcement personnel, allowing them to purchase unrostered guns for personal use, is completely irrational. If a gun is unacceptably dangerous, it is odd to allow it to those perhaps most likely to use it. And if the harm to be ameliorated is the unauthorized use of guns by people not knowledgeable in their use, police weapons, including those owned privately by police officers, are no less likely to be stolen or mishandled by unauthorized users.

The exceptions for curios and relics seems particularly egregious. Brett Thomas's High Standard revolver is not quite old enough to be exempt from the rostering law as a curio or relic, though in perhaps ten years, it would qualify. Ironically, Mr. Heller's particular gun might qualify today based on the fact of its involvement in an historic Supreme Court case. 27 C.F.R. § 478.11. But then, if Thomas prevails here, his gun, too, by that virtue, might also be transformed into an exempted curio or relic.

Then there are the exceptions for movie and television production, which are not merely irrational, but also underscore the fact that unrostered handguns are so common in American culture that audiences would not expect to see only those guns approved by Defendant in realistic depictions of American life.

The distinctions between different guns on the basis of whether they have an acceptable chamber loaded indicator are also unconstitutional given the wholly arbitrary manner in which California regulators determine whether a CLI is

1    sufficient – asking around at the office whether random regulatory employees

2    understand the CLI's message. While the California Legislature might have

3    established "minimal guidelines," *City of Chicago* v. *Morales*, 527 U.S. 41, 60 (1999)

4    defining a CLI based on design intent and characteristics, Cal. Penal Code § 16380,

5    the regulatory practice is untethered from the legislative standard and in the end

6    amounts to "because we said so." Of course, since the government does not ban

7    revolvers or exceedingly popular handguns that fire rimfire rounds such as the .22,

8    CLIs will always be missing from significant numbers of handguns.

9

10        These and other senseless distinctions are inevitable considering the

11   audacious mission of the handgun roster law: to make a complete list of all lawful

12   handguns, and substitute the design and feature preferences of legislators and

13   regulators for that of a market comprising hundreds of millions of people over the

14   course of generations. That this project intrudes into the exercise of a fundamental

15   right calls for its abandonment.

16

17        The D.C. City Council reluctantly came to the same conclusion. Having

18   adopted the California roster as their own, with all the usual public assurances that

19   their law was constitutional, District officials re-considered upon being served with

20   a very similar motion for summary judgment. On June 17, 2009, in the United

21   States District Court for the District of Columbia, the District gave notice that it

22   was adopting an emergency regulation, abandoning its reliance on the California

23   roster, by creating a "District roster" that, while still unconstitutional, eliminated

24   many of the burdens associated with the laws challenged in that (and this) action.

25   The District based its emergency rule-making, in part, on the following findings:

26

27

28

---

1) recognition that California permits sale of firearms that have superficial differences to those firearms on its roster; 2) recognition that some handguns that have been placed on the California roster as safe handguns have been removed for administrative reasons not related to the handguns' safety; and 3) review of similar safe gun rosters maintained by Maryland and Massachusetts.

Exhibit J .

The new "District Roster" consists not only of the California and Massachusetts rosters, but also that of Maryland. 24 DCMR § 2323.1. The addition of the Maryland roster is significant, as that state allows anyone to petition for additions to the roster, it does not require an annual maintenance fee for guns to remain rostered, and it does not require handguns to have either a magazine disconnect device nor CLI nor microstamping. Not surprisingly, the Maryland roster contains approximately twice the number of handguns as does the California roster. Exhibit K.

Moreover, the new District roster expressly includes models removed from the California roster for lack of payment, as well as guns that have only minor cosmetic differences from those listed. 24 DCMR §§ 2323.2, 2323.3. Exhibit K.

On June 25,  2009, the District imported another critical piece of Maryland's law into its own: an exemption from rostering requirements of all handguns manufactured prior to 1985. Exhibit L & Exhibit M.

All of these improvements made by Washington, D.C. to address its adoption of the California roster have resulted in a bloated regulatory regime that, in the end, does not actually ban very many handguns – and would allow all of the handguns at issue in this case to be sold in California. It appears unlikely that the

1   California Legislature will be able to avoid summary judgment by timely repealing

2   or significantly modifying its roster law.

3                                  CONCLUSION

4          The facts in this case are well-established, as are the controlling legal

5   principles: the State of California cannot ban handguns of the kind in common use

6   for lawful purposes, regardless of its policy preferences. Nor are the design

7   requirements here consistent with other California laws aimed at improving gun

8   safety, which condition the public to ignore these mandatory features in the name of

9   safety. Finally, the classifications riddling the rostering scheme are irrational and

10  beyond defense. The Court should enter summary judgment for Plaintiffs.

11

12

13        Dated: October 25, 2013          Respectfully submitted,

14  Alan Gura, Cal. Bar No.: 178221       Donald E.J. Kilmer, Jr., Cal. Bar No. 179986
    Gura & Possessky, PLLC                Law Offices of Donald Kilmer, A.P.C.
15  101 N. Columbus St., Suite 405        1645 Willow Street, Suite 150
16  Alexandria, VA 22314                  San Jose, CA 95125
    703.835.9085/Fax 703.997.7665         408.264.8489/Fax 408.264.8487
17  alan@gurapossessky.com                Don @DKLawOffice.com

18  /s/ Alan Gura                         /s/ Donald E.J. Kilmer, Jr.
19  Alan Gura                             Donald E.J. Kilmer, Jr.

20  Jason A. Davis, Cal. Bar No.: 224250
    Davis & Associates
21  27201 Puerta Real, Suite 300
22  Mission Viejo, CA 92691
    949.310.0817/Fax 949.288.6894         Attorneys for Plaintiffs
23

24

25

26

27

28

_____