Alan Gura, Calif. Bar No.: 178221
Gura & Possessky, PLLC
101 N. Columbus St., Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

Donald E.J. Kilmer, Jr., Calif. Bar No.:  179986
Law Offices of Donald Kilmer, A.P.C.
1645 Willow Street, Suite 150
San Jose, CA 95125
408.264.8489/Fax 408.264.8487

Jason A. Davis, Calif. Bar No.: 224250
Davis & Associates
27201 Puerta Real, Suite 300
Mission Viejo, CA 92691
949.310.0817/Fax 949.288.6894

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Ivan Peña, et al., | ) | Case No. 2:09-CV-01185-KJM-CKD |
| | ) | |
| Plaintiffs, | ) | PLAINTIFFS' MEMORANDUM OF |
| | ) | POINTS AND AUTHORITIES IN |
| v. | ) | SUPPORT OF PLAINTIFFS' |
| | ) | MOTION FOR SUMMARY |
| Stephen Lindley | ) | JUDGMENT [Fed. R. Civ. P. 56] |
| | ) | [CORRECTED] |
| Defendant. | ) | |
| | ) | |

Come now Plaintiffs Ivan Peña, Roy Vargas, Doña Croston, Brett Thomas,

the Second Amendment Foundation, Inc., and the Calguns Foundation, Inc., by and

through undersigned counsel, and submit their Memorandum of Points and

Authorities in Support of their Motion for Summary Judgment.

1           Dated: October 25, 2013      Respectfully submitted,

2       Alan Gura, Cal. Bar No.: 178221     Donald E.J. Kilmer, Jr., Cal. Bar No. 179986
        Gura & Possessky, PLLC          Law Offices of Donald Kilmer, A.P.C.
3       101 N. Columbus St., Suite 405     1645 Willow Street, Suite 150
4       Alexandria, VA 22314            San Jose, CA 95125
        703.835.9085/Fax 703.997.7665     408.264.8489/Fax 408.264.8487
5       alan@gurapossessky.com          Don @DKLawOffice.com

6
        /s/ Alan Gura                /s/ Donald E.J. Kilmer, Jr.
7       Alan Gura                   Donald E.J. Kilmer, Jr.

8       Jason A. Davis, Cal. Bar No.: 224250
9       Davis & Associates
        27201 Puerta Real, Suite 300
10      Mission Viejo, CA 92691
        949.310.0817/Fax 949.288.6894     Attorneys for Plaintiffs
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.    *The Handgun Rostering Program.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2.    *Defendant's Enforcement of the "Handgun Roster" Program*
          *Against Plaintiffs.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    I.    The Second Amendment Protects the Acquisition of Arms
        of the Kind in Common Use for Traditional Lawful Purposes. . . . . . . 9

    II.    Defendant's Handgun Rostering Program Violates the Second
        Amendment By Restricting Access to Handguns of the Kind in
        Common Use for Traditional Lawful Purposes. . . . . . . . . . . . . . . . . . 13

    III.    Defendant's Handgun Rostering Program Violates the Fourteenth
         Amendment's Equal Protection Clause. . . . . . . . . . . . . . . . . . . . . . . . 16

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

Cases

*Andrews* v. *State,*
     50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*City of Chicago* v. *Morales,*
     527 U.S. 41 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*District of Columbia* v. *Heller,*
     554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Ezell* v. *City of Chicago,*
     651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hussey* v. *City of Portland,*
     64 F.3d 1260 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*McDonald* v. *City of Chicago,*
     130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Parker* v. *District of Columbia,*
     478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Richmond Newspapers* v. *Virginia,*
     448 U.S. 555 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States* v. *Chester,*
     628 F.3d 673 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States* v. *Marzzarella,*
     614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States* v. *Masciandaro,*
     638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States* v. *Miller,*
     307 U. S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

*Wilson* v. *County of Cook,*
     2012 IL 112026. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

1

Statutes, Rules and Regulations

2

24 DCMR § 2323.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

3

24 DCMR § 2323.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

4

24 DCMR § 2323.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

5

27 C.F.R. § 478.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

6

Cal. Penal Code § 16380. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

7

Cal. Penal Code § 16380(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

8

9

10

Other Authorities

11

A New and Complete Law Dictionary (1771).. . . . . . . . . . . . . . . . . . . . . . . . . .   11

12

Bureau of Alcohol, Tobacco, Firearms & Explosives,
        *Annual Firearms Manufacturing and Export Report*,
        available at http://www.atf.gov/files/statistics/download/
        afmer/2011-final-firearms-manufacturing-export-
        report.pdf (last visited Oct. 24, 2013). . . . . . . . . . . . . . . . . . . . . . . . . .   1, 13

13

14

15

16

N. Webster, American Dictionary of the
        English Language (1828) (reprinted 1989). . . . . . . . . . . . . . . . . . . . . . . . .   11

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

May the State of California demand that handguns contain unusual or even unavailable technologies as a condition of their lawful sale, or effectively prohibit gun sales based on arbitrary classifications, such as a gun's finish or color? Because the Second Amendment prohibits the state from banning firearms of the kind in common use for traditional lawful purposes, the answer to this question must be "no." *District of Columbia* v. *Heller*, 554 U.S. 570 (2008).

STATEMENT OF FACTS

1. *The Handgun Rostering Program*

[A]ny person in this state who manufactures or causes to be manufactured, imports into the state for sale, keeps for sale, offers or exposes for sale, gives, or lends any unsafe handgun shall be punished by imprisonment in a county jail not exceeding one year.

Statement of Undisputed Facts ("SUF") 4. California law presumes that all handguns are "unsafe" and therefore, generally barred from importation and sale, unless those handguns have been placed on the state's special roster of handguns "determined not to be unsafe." SUF 5.

Since 2007, a center-fire[1] semi-automatic[2] handgun cannot make the roster if

---

[1]Most handguns use center-fire ammunition, which fires a bullet when the primer at the bottom-center of the cartridge case is struck and thus ignited by the gun's firing pin.

[2]A semiautomatic handgun is a handgun that fires only one bullet each time the trigger is pulled, with the energy of the just-fired bullet causing the ejection of the spent case and loading of the next cartridge into the firing chamber. Most handguns sold in the United States today are semiautomatic. See Bureau of Alcohol, Tobacco, Firearms & Explosives, *Annual Firearms Manufacturing and Export Report* ("ATF Report"), available at http://www.atf.gov/files/statistics/

it does not have both a chamber loaded indicator ("CLI") and, if it has a detachable magazine, a magazine disconnect mechanism. SUF 6. Since 2006, a rimfire[3] semi-automatic handgun must have a magazine disconnect mechanism if it has a detachable magazine. SUF 7. Handguns rostered prior to the effective dates of these requirements can remain rostered despite lacking these features. SUF 8.

A magazine disconnect mechanism is "a mechanism that prevents a semiautomatic pistol that has a detachable magazine from operating to strike the primer of ammunition in the firing chamber when a detachable magazine is not inserted in the semiautomatic pistol." SUF 9. A chamber load indicator ("CLI") is "a device that plainly indicates that a cartridge is in the firing chamber." SUF 10.

Not all CLIs satisfy California's requirement. SUF 11. Although a CLI is sufficient if it is "designed and intended to indicate to a reasonable adult user" that the firearm is loaded, Cal. Penal Code § 16380, in practice Defendant tests the sufficiency of CLIs by asking his employees if they understand the CLI – and when the regulatory authority's employees allegedly fail to understand the CLI, regardless of what the CLI is "designed and intended to indicate to a reasonable adult," the CLI is ruled inadequate. SUF 12. Given the rarity of CLIs and magazine disconnect devices, handguns lacking these features are in common use today, comprising the majority of handguns currently for sale elsewhere. SUF 13.

---

download/afmer/2011-final-firearms-manufacturing-export- report.pdf (last visited Oct. 24, 2013). Almost all the rest are revolvers, *id.*, which hold several rounds in a rotating cylinder and fire only one bullet each time the trigger is pulled. This suit does not address fully automatic firearms, also known as machine guns.

[3]Rimfire ammunition incorporates the primer into the bottom rim of the case which ignites the gun powder upon striking that rim. For technical reasons, CLIs are not feasible for integration in firearms using rimfire ammunition.

Indeed, the rarity of CLIs and magazine disconnect mechanisms was a fact specifically relied upon by the California Legislature in mandating these features as part of the rostering program. California legislators considered that CLIs and magazine disconnects are available on only perhaps 11% and 14% of handguns, respectively. SUF 14. As CLIs and magazine disconnect mechanisms were viewed as beneficial, it was hoped that mandating these features would alter the firearms market. SUF 15. "[It] is arguable that a requirement in California would 'drive' the technology of chamber load indicators." Exhibit B at 9. "It might also be assumed that a mandate in California would drive technology in the market for magazine disconnect devices." *Id.* at 10.

Yet these "safety" features are not foolproof. A handgun safety mechanism may fail or be misused. SUF 16. A chamber loaded indicator is a mechanical device that may fail or be misinterpreted by the user of a handgun. SUF 17. A magazine disconnect mechanism is a mechanical device that may fail. SUF 18. As the state advises handgun purchasers, "Any machine can malfunction. A firearm is no different." SUF 19.

In fact, to acquire any handgun in California, an individual must pass a written handgun safety test. SUF 20. The test requires knowledge of the basic rules of handgun safety, the first of which is: "Treat all guns as if they are loaded." SUF 21, 22. The state's specific instructions for unloading a semi-automatic handgun contained in its gun safety study guide provides that mechanical safety mechanisms should not be trusted. SUF 23. The state's gun safety study guide does not discuss chamber load indicators or magazine disconnect devices. Yet it teaches, in order to

pass the mandatory safety test, rules that would have gun owners ignore such devices. The study guide specifically instructs that in order to verify a semi-automatic handgun is unloaded, one must remove the magazine and visually inspect the chamber to verify that it is empty. SUF 24, 25.

In order to purchase a handgun, the buyer must demonstrate that he or she knows how to safely operate the handgun, including following these instructions. SUF 26. Moreover, California law also generally requires that all newly purchased firearms either be accompanied by an approved gun lock or the purchaser's affidavit that she owns an adequate lock box or gun safe. SUF 27.

As of May 17, 2013, all semi-automatic handguns not already rostered cannot be submitted for roster listing unless they employ so-called "microstamping" or similar technology. SUF 28, 29, 30.

Defendant admits that no handguns for sale in the United States have the microstamping technology required by California's roster law. Exh. O, Response to Request for Admission No. 4. No firearms manufacturer has submitted any microstamping-compliant handguns, Exh. P, Response to Interrogatory Request No. 8, and Defendant has no information as to whether any manufacturer will ever produce microstamping handguns, Exh. O, Response to Request for Admission No. 5. Accordingly, the microstamping requirement imposes a *de facto* ban on the sale of all new semiautomatic handgun models in California. SUF 31.

Listings on the California handgun roster are valid for one year, and must be renewed annually, including payment of an annual fee, prior to expiration to remain valid. SUF 32. Defendant charges firearms manufacturers, importers, and

dealers annual fees, ostensibly to operate the handgun roster program. Any handgun whose manufacturer fails to pay the required fees may be excluded from the roster for that reason alone. SUF 33. The initial and renewal annual listing fees for inclusion on the handgun roster are $200. SUF 34.

Other than the California DOJ, only the manufacturer/importer of a handgun model is authorized to submit that handgun model to a DOJ-Certified Laboratory for testing. SUF 35. A handgun can remain on the roster if its manufacturer/ importer goes out of business or discontinues the model, provided that the model is not being offered for sale to licensed dealers, and "a fully licensed wholesaler, distributor, or dealer submits a written request to continue the listing and agrees to pay the annual maintenance fee." SUF 36. So long as a handgun is sold to dealers outside of California, the handgun's manufacturer can cause the sale of that handgun to be forbidden inside California by failing to submit the gun for testing in that state or refusing to pay the annual $200 fee. SUF 37.

A manufacturer/importer or other responsible party may submit a written request to list a handgun model that was voluntarily discontinued or was removed for lack of payment of the annual maintenance fee. The request may be approved, and the handgun restored to the "safe gun" roster, provided the fee is paid. SUF 38.

The following firearms and transactions are exempted from the handgun rostering requirement: (1) firearms defined as curios or relics under federal law; (2) the purchase of any firearm by any law enforcement officer – state or federal; (3) pistols that are designed expressly for use in Olympic target shooting events, as defined by rule; (4) certain single-action revolvers, as defined by rule; and (5) the

sale, loan, or transfer of any firearm that is to be used solely as a prop during the course of a motion picture, television, or video production by authorized people related to the production. SUF 39.

It is also not illegal in California to import an unrostered handgun when moving into the state without the intention of selling it, nor is it illegal in California to possess or use an unrostered handgun that is otherwise lawful to possess or use. SUF 40. California also exempts private party transfers, intra-familial transfers including gifts and bequests, and various loans.  SUF 41.[4]

2.     *Defendant's Enforcement of the "Handgun Roster" Program Against Plaintiffs*

Plaintiff Ivan Peña sought to purchase a Para USA (Para Ordnance) P1345SR / Stainless Steel .45 ACP 4.25", and has identified a willing seller who stands ready to deliver said handgun to him. SUF 42. The Para USA P1345SR that Peña wants to buy was listed on California's Handgun Roster until December 31, 2005, when it was discontinued and its listing not renewed. SUF 43.

Peña cannot lawfully purchase and take possession of the handgun as that handgun is not on the California Handgun Roster. SUF 44. Peña fears arrest, prosecution, fine and incarceration if he completes this handgun purchase. SUF 45.

Plaintiff Roy Vargas has sought to purchase a Glock 21 SF with an ambidextrous magazine release, and has identified a willing seller who stands ready to deliver said handgun to Plaintiff. SUF 46. However, Vargas cannot

---

[4]"Single" or "Double" action refers to the gun's trigger function.  If the trigger only drops the hammer (with the firing pin) after it is cocked, then the firearms is considered a "Single" action.  If the trigger can also draw back the hammer and release it, the firearm is considered a "Double" action.

lawfully purchase and take possession of the handgun as that handgun is not listed on the California Handgun Roster. SUF 47. Vargas fears arrest, prosecution, fine and incarceration if he completes this handgun purchase. SUF 48.

Vargas was born without an arm below the right elbow. SUF 49. The Glock 21 SF-STD with a standard magazine release is listed on the California Handgun Roster. SUF 50. However, the Glock 21 SF with ambidextrous magazine release is superior for left-handed shooters such as Mr. Vargas, as opposed to the approved version of the Glock 21. SUF 51. Glock's efforts to add the Glock 21 SF with ambidextrous magazine release to the California Roster have failed. SUF 52.

However, Defendant permits Glock customers to have their Glock 21 SF-STD handguns fitted with an ambidextrous release at the Glock factory. SUF 53. In other words, California permits the sale of a Glock 21 SF-STD, and the alteration of that handgun by Glock to add an ambidextrous magazine release, but will not allow consumers to purchase new Glock 21 SFs with an ambidextrous magazine release in the first place.

Plaintiff Doña Croston has sought to purchase a Springfield Armory XD-45 Tactical 5" Bi-Tone stainless steel/black handgun in .45 ACP, model number XD9623, and has identified a willing seller who stands ready to deliver said handgun to her. SUF 54. Croston cannot lawfully purchase and take possession of the handgun as that handgun is not on the California Handgun Roster. SUF 55. Croston fears arrest, prosecution, fine and incarceration if she completes this handgun purchase. SUF 56.

Other models of this identical gun – but in different colors – are listed on the

handgun roster and are thus available to Ms. Croston. SUF 57. However, the

particular Bi-Tone XD-45 that Ms. Croston would possess was not released until

after California required newly-listed guns to have a chamber load indicator and

magazine disconnect device. SUF 58. Springfield Armory could not get the XD-45 in

.45 ACP and Bi-Tone finish registered given the new listing requirements. SUF 59.

The XD-45 Bi-Tone in .45 has a loaded chamber indicator, but the California

Department of Justice decided it does not qualify under Cal. Penal Code § 16380(c).

SUF 60. The gun also lacks a magazine disconnect device. SUF 61.

The handgun at issue in *Heller* was a High Standard 9-shot revolver in .22

with a 9.5" Buntline-style barrel. SUF 62. Plaintiff Brett Thomas has sought to

purchase an identical High Standard 9-shot revolver in .22 with a 9.5" Buntline-

style barrel, and has identified a willing seller who stands ready to deliver said

handgun to Thomas. SUF 63. Thomas cannot lawfully purchase and take possession

of the handgun as that handgun is not on the California Handgun Roster. SUF 64.

Thomas fears arrest, prosecution, fine and incarceration if he completes this

handgun purchase. SUF 65.

Plaintiffs Ivan Peña and Brett Thomas are law-abiding citizens, shooting

enthusiasts and gun collectors, as are other members and supporters of Plaintiffs

Second Amendment Foundation, Inc. ("SAF") and Calguns Foundation, Inc.

("CGF"). Peña, Thomas, Croston, and other SAF and CGF members and supporters

would acquire new semiautomatic handguns of the kind in common use throughout

the United States, for traditional lawful purposes including self-defense, but cannot

do so owing to the operation of California microstamping scheme. SUF 66.

Moreover, even if Plaintiffs could procure the handguns they intend to purchase consistent with California law, the handgun rostering scheme substantially limits commerce in (and therefore Plaintiffs' access to) these handguns, since no dealer can stock these firearms. This results in a significant loss of choice and price competition. SUF 67. Plaintiffs would also suffer increased costs in transporting and transferring their firearms from out-of-state dealers that they would not suffer if the firearms were available for sale in California. SUF 68.

## SUMMARY OF ARGUMENT

This case begins and ends with the fact that California will not roster handguns lacking features which are missing from many, if not the vast majority, of handguns of the kind in common use throughout the United States. Indeed, no new semiautomatic handgun models can be sold in California at all. The challenged requirements constitute a massive ban on handguns whose possession and use is secured by the Second Amendment.

Defendant's handgun rostering program also violates equal protection principles, in that it arbitrarily distinguishes between otherwise identical firearms, inherently making arbitrary distinctions among the people who would possess them, and arbitrarily bars people from possessing handguns deemed safe for others.

## ARGUMENT

I.   The Second Amendment Protects the Acquisition of Arms of the Kind in Common Use for Traditional Lawful Purposes.

"[T]he sorts of weapons protected [by the Second Amendment are] those 'in common use at the time,'" *Heller*, 554 U.S. at 627 (quoting *United States* v. *Miller*, 307 U. S. 174, 179 (1939)), "the sorts of lawful weapons that [citizens] possessed at

home." *Id.* "[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. Handguns plainly satisfy this test:

> It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon . . . [H]andguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition on their use is invalid.

*Id.* at 629.

Because there is a right to keep and bear firearms, there is, necessarily, a right to acquire them. "[C]ertain unarticulated rights are implicit in enumerated guarantees . . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers* v. *Virginia*, 448 U.S. 555, 579-80 (1980). "The right to keep arms, necessarily involves the right to purchase them . . ." *Andrews* v. *State*, 50 Tenn. 165, 178 (1871). A complete ban on gun commerce would violate the Second Amendment right at its core. *United States* v. *Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010). Of course, Defendant is still free to ban "arms" that are nonetheless "dangerous and unusual weapons," *Heller*, 554 U.S. at 627 (citations omitted), including "sophisticated arms that are highly unusual in society at large." *Id.* "Historically, weapons like machine guns, sawed-off shotguns, grenade launchers, and other high-powered weapons have fallen into this category due to their extreme nature." *Wilson* v. *County of Cook*, 2012 IL 112026, at ¶ 46.

And while "all firearms constituted 'arms,'" *Heller*, 554 U.S. at 581 (citation omitted), Defendant can ban those weapons which do not meet the historic legal definition of "arms" as used in the Second Amendment – "any thing that a man

wears for his defence, or takes into his hands, or useth in wrath to cast at or strike

another." *Id.* (citing 1 A New and Complete Law Dictionary (1771); N. Webster,

American Dictionary of the English Language (1828) (reprinted 1989)).

But the acquisition of handguns of the kind in common use for lawful

purposes, the sort of handguns that law-abiding citizens would expect to keep,

cannot be prohibited– even if the state would prefer people use different (or no)

firearms. In making this point, the Supreme Court notably did not reference any

"standard of review" or means-ends balancing test. "It is enough" that handguns, as

a general class of arms, are in common use for traditional lawful purposes. *Heller*,

554 U.S. at 629.

Nor did the Supreme Court utilize such tests in resolving *Heller*'s challenge

to Washington, D.C.'s bans on the possession of functional firearms in the home,

and handgun carrying within the home. With respect to Washington's complete ban

on the possession of functional firearms within the home, the Court simply offered

that the ban "makes it impossible for citizens to use [guns] for the core lawful

purpose of self-defense and is hence unconstitutional." *Id.* at 630. This same

process, identifying whether a regulation conflicts with a "core protection" of the

Amendment without resort to interest-balancing, resolved Heller's challenge to a

requirement that he obtain an unavailable permit to move a handgun inside his

home. The D.C. Circuit found the restriction violated the Second Amendment's core:

> It is sufficient for us to conclude that just as the District may not flatly ban
> the keeping of a handgun in the home, obviously it may not prevent it from
> being moved throughout one's house. Such a restriction would negate the
> lawful use upon which the right was premised–i.e, self-defense.

1   *Parker* v. *District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom,*

2   *Heller*.[5] The Supreme Court affirmed using the same approach, concluding the city

3   had no discretion to refuse issuance of the permit. *Heller*, 554 U.S. at 635.

4          In its methodology, *Heller* repeatedly demonstrated a simple fact that is too-

5   often forgotten: not every constitutional question is answered with balancing tests.

6   Sometimes, interpretation is enough. At other times, categorical rules will apply.

7   Means-ends scrutiny can play a role, but not where the problem is fairly basic. Just

8   as some First Amendment cases turn on the question of whether something

9   constitutes protected speech, and some Fourth Amendment cases turn on whether

10  conduct constitutes a "search" or a "seizure," *Heller* demonstrates that in the Second

11  Amendment, categorical prohibitions on types of "arms" are resolved by the

12  common-use test, derived from *Miller*. Were balancing tests required to discern

13  whether handguns are protected "arms" under the Second Amendment, *Heller*

14  would have utilized them. Illinois' Supreme Court, considering a challenge to a so-

15  called "assault weapons" ban, acknowledged the categorical nature of examining a

16  prohibition on a class of arms. Remanding the case, that court explained,

17
18         it cannot be ascertained at this stage of the proceedings whether these arms
           with these particular attributes as defined in this Ordinance are well suited
19         for self-defense or sport or would be outweighed completely by the collateral
           damage resulting from their use, making them "dangerous and unusual" as
20         articulated in *Heller*.

21  *Wilson*, 2012 IL 112026, at ¶ 49.

22         This case addresses not so-called "assault weapons," a discrete if

23  inconsistently-defined subset of firearms purportedly possessing uniquely

---

[5]Heller did not request a public-carry permit. *Id.*

dangerous functions, but handguns—which the Supreme Court has already held are

categorically within the Second Amendment's protection. Indeed, the rostering

scheme begins with the now-unconstitutional presumption that *all* handguns are

"unsafe" until declared otherwise by the state, including *all* new semiautomatic

handgun models (since none contain microstamping). The state's burden of showing

that somehow, all handguns that do not fit its complex rostering requirements are

outside the Second Amendment's protection as defined in *Heller* is impossible.

II.     Defendant's Handgun Rostering Program Violates the Second Amendment
        By Restricting Access to Handguns of the Kind in Common Use for
        Traditional Lawful Purposes.

        The handguns banned by Defendant's rostering program – guns that do not

microstamp (e.g., all new gun models for the foreseeable future if not forever), guns

not incorporating CLIs and/or magazine disconnect mechanisms, guns that have not

been (and cannot be) submitted by their manufacturer for government testing, and

guns that would be perfectly acceptable by the government but for lack of an annual

listing fee – are all nonetheless handguns of the kind in common use protected by

the Second Amendment. Moreover, none of these characteristics render a firearm

"dangerous or unusual" or militarily "sophisticated."

        The Supreme Court required no particular evidence to discern that handguns

are in common use for traditional lawful purposes. Looking further, the federal

government's latest manufacturing report reveals that in 2011, the latest year for

which numbers are available, the nation produced 3,170,990 handguns, of which

2,598,133—81.9%—were not revolvers, and thus, virtually all semi-automatic. See

ATF Report, supra n.2. Of these, only 427,448 were chambered in calibers up to .22,

which would be rimfire pistols. The remainder, 68.5% of all handguns manufactured in the United States in 2011, utilized center-fire ammunition calibers. *Id*. Thus, not only are handguns generally arms of the kind in common use for traditional lawful purposes. SUF 1. Semi-automatic handguns with detachable magazines, including those utilizing center-fire ammunition, are in common use for traditional lawful purposes. SUF 2, 3.

The CLIs and magazine disconnect mechanisms required for rostering are rare features, found on perhaps only 11% and 14% of all handguns in the marketplace. Considering California's particularly harsh and entirely arbitrary enforcement of its CLI requirement, that number of qualified CLI's is surely lower than even 11% of the market. Microstamping guns currently command exactly 0% of the market for handguns in the United States. As much as California's legislature would like for these guns to exist, they do not exist. Nor will they probably ever exist. Defendant is not expecting them to show up any time soon. Likewise, many guns are still protected by the Second Amendment even if they have not been manufactured for many years prior to the advent of the California Handgun Roster, or have been manufactured by a company that does not wish to sell its products in one particular state. And plainly, a gun model deemed "not unsafe" does not somehow alter its characteristics and become "unsafe" simply because a check has not been cashed in Sacramento within the year.

The specific handguns denied Plaintiffs are plainly within the Second Amendment's protection. Croston's gun appears on Defendant's approved list, albeit in different colors, but is unavailable in the black/stainless finish because it was not

made available for testing in that particular color before the CLI and magazine

disconnect requirements came into effect. Ivan Peña's gun was once deemed safe

enough for sale, but is only unavailable because its listing was not renewed. The

gun did not suddenly become dangerous on January 1, 2006, when its listing

expired because the manufacturer would not pay a fee and fill out a piece of paper.

It makes no sense that Vargas cannot simply purchase a Glock 21 SF with an

ambidextrous magazine release, but that he can purchase the right-handed version

of this exact same gun, and undergo the additional burden and expense of having

the Glock factory make him a custom modification– resulting in the exact same

handgun that Defendant will not place on the roster. That the handgun roster law

is incompatible with Supreme Court precedent is illustrated by the roster's banning

of Brett Thomas's High Standard revolver. This is the exact same make and model

gun the possession of which the Supreme Court ordered Washington, D.C. to allow

Mr. Heller. This gun may not appear on the state's  approved list, but per the

Supreme Court, it appears in the Second Amendment. New handguns

manufactured and offered for sale in the other 49 states without microstamping

technology are similarly protected.

The empirical evidence regarding handguns in common-use is conclusive, but

it also bears noting that nothing about the lack of CLIs, magazine disconnect

devices, or microstamping makes handguns "dangerous and unusual." Indeed, the

magazine disconnect and CLI requirements contravene the state's own gun safety

policies. The state mandates that all handgun purchasers pass a handgun safety

test that specifically teaches people not to rely on gimmicks like magazine

disconnects and CLIs. And on top of the mandatory instruction on such practices, and the requirement that handgun purchasers demonstrate safe handling techniques, the state mandates that each handgun sale be accompanied by the sale of a lock or a guarantee that room exists in a safe for the gun.

The state's instructions with respect to safe gun handling and unloading are unassailable. Whatever the merits of the state's safe storage requirements, they do not ban a single gun, while making the magazine disconnect and CLI requirements redundant. It is irresponsible to rely on magazine disconnects and CLIs for gun safety, which is perhaps why the market has obviously rejected these features, and why the Defendant has such a difficult time agreeing to a standard of what actually constitutes a CLI.

Since microstamping is, for all intents and purposes, more a piece of science fiction than commercial reality, it can hardly be said that guns *lacking* this concept are "dangerous and unusual." Microstamping may not be dangerous, but it is not merely "unusual"—it is non-existent. And plainly, administrative failures—the lack of a fee to support a gun's continued listing, or the lack of a manufacturer to support the rostering of an historic firearm such as Heller's—have nothing to do with whether a gun is "dangerous and unusual."

III.  Defendant's Handgun Rostering Program Violates the Fourteenth Amendment's Equal Protection Clause.

"Where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized." *Hussey* v. *City of Portland*, 64 F.3d 1260, 1265 (9th Cir. 1995) (citation omitted). Rational basis is not a standard of review for Second Amendment

claims, which are as important as other enumerated rights. *Heller*, 554 U.S. at 629

n. 27. Second Amendment rights are fundamental. *McDonald* v. *City of Chicago*,

130 S. Ct. 3020, 3042 (2010).

That does not mean that there is a one-size-fits-all standard for Second

Amendment claims in those contexts where means-ends scrutiny is relevant. "[A]s

has been the experience under the First Amendment, we might expect that courts

will employ different types of scrutiny in assessing burdens on Second Amendment

rights, depending on the character of the Second Amendment question presented."

*United States* v. *Masciandaro,* 638 F.3d 458, 470 (4th Cir. 2011).

"Borrowing from the Court's First Amendment doctrine, the rigor of this

judicial review will depend on how close the law comes to the core of the Second

Amendment right and the severity of the law's burden on the right." *Ezell* v. *City of*

*Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (citations omitted). Thus, while courts

typically reduce the level of scrutiny given laws addressing criminal misconduct or

irresponsibility, see, *e.g., United States* v. *Chester*, 628 F.3d 673 (4th Cir. 2010)

(intermediate scrutiny for domestic abuser), or conduct that the court believes to

fall outside the Second Amendment's "core" purpose, see, *e.g.*, *Masciandaro*

(possessing handgun in park), courts employ higher levels of scrutiny where the

conduct being impacted is closer to the Second Amendment's perceived "core,"

and/or exercised by responsible, law-abiding adults. "[W]e assume that any law that

would burden the 'fundamental,' core right of self-defense in the home by a

law-abiding citizen would be subject to strict scrutiny." *Masciandaro*, 638 F.3d at

470; *Ezell*, 651 F.3d at 708 ("not quite strict scrutiny" for regulating gun ranges).

To the extent Defendant's practices implicate equal protection concerns, the proper standard of review is strict scrutiny. After all, at issue is the acquisition of handguns, by law-abiding, responsible adults, for self-defense within the home.

The sort of classifications created by the handgun are unacceptable under any sort of scrutiny reserved for enumerated rights. In California, unrostered guns are permitted by private importation or as intra-family gifts, just not as retail purchases. The roster thus privileges people who move into the state, or who have family out-of-state. Yet all people, not just relatives, may transfer unrostered handguns inside the state. These classifications make no sense. Any of the Plaintiffs might live next door to individuals who lawfully obtained the same handguns denied by the roster law, prior to moving to the state, or as a gift from an out-of-state relative.

California's wide exemptions for law enforcement personnel, allowing them to purchase unrostered guns for personal use, is completely irrational. If a gun is unacceptably dangerous, it is odd to allow it to those perhaps most likely to use it. And if the harm to be ameliorated is the unauthorized use of guns by people not knowledgeable in their use, police weapons, including those owned privately by police officers, are no less likely to be stolen or mishandled by unauthorized users.

The exceptions for curios and relics seems particularly egregious. Brett Thomas's High Standard revolver is not quite old enough to be exempt from the rostering law as a curio or relic, though in perhaps ten years, it would qualify. Ironically, Mr. Heller's particular gun might qualify today based on the fact of its involvement in an historic Supreme Court case. 27 C.F.R. § 478.11. But then, if

Thomas prevails here, his gun, too, by that virtue, might also be transformed into an exempted curio or relic. Then there are the exceptions for movie and television production, which are not merely irrational, but also underscore the fact that unrostered handguns are so common that audiences would not expect to see only those guns approved by Defendant in realistic depictions of American life.

The distinctions between different guns on the basis of whether they have an acceptable chamber loaded indicator are also unconstitutional given the wholly arbitrary manner in which California regulators determine whether a CLI is sufficient. While the California Legislature might have established "minimal guidelines," *City of Chicago* v. *Morales*, 527 U.S. 41, 60 (1999) defining a CLI based on design intent and characteristics, Cal. Penal Code § 16380, the regulatory practice is untethered from the legislative standard and in the end amounts to "because we said so." Of course, since the government does not ban revolvers or exceedingly popular handguns that fire rimfire rounds such as the .22, CLIs will always be missing from significant numbers of handguns.

These and other senseless distinctions are inevitable considering the handgun roster law's audacious mission: to make a complete list of all lawful handguns, and substitute the design and feature preferences of legislators and regulators for that of a market comprising hundreds of millions of people over the course of generations.

The D.C. City Council reluctantly concluded as much. Having adopted the California roster as their own, District officials re-considered upon being served with a very similar motion for summary judgment. The District noted its:

1        1) recognition that California permits sale of firearms that have superficial
2    differences to those firearms on its roster; 2) recognition that some handguns
that have been placed on the California roster as safe handguns have been
3    removed for administrative reasons not related to the handguns' safety; and
3) review of similar safe gun rosters maintained by Maryland and
4    Massachusetts.

5    Exhibit **J** . The new "District Roster" consists not only of the California and

6    Massachusetts rosters, but also that of Maryland. 24 DCMR § 2323.1. Notably,

7    Maryland allows anyone to petition for additions to its roster, does not require an

8    annual maintenance fee for guns to remain rostered, and does not require handguns

9    to have neither a magazine disconnect device nor CLI nor microstamping.

10   Moreover, the new District roster expressly includes models removed from the

11   California roster for lack of payment, as well as guns that have only minor cosmetic

12   differences from those listed, and exempts all handguns manufactured prior to

13   1985. 24 DCMR §§ 2323.2, 2323.3. Exhibit K, L, M.

16   CONCLUSION

17       The Court should enter summary judgment for Plaintiffs.

18       Dated: October 25, 2013      Respectfully submitted,

20   Alan Gura, Cal. Bar No.: 178221    Donald E.J. Kilmer, Jr., Cal. Bar No. 179986
Gura & Possessky, PLLC        Law Offices of Donald Kilmer, A.P.C.
21   101 N. Columbus St., Suite 405     1645 Willow Street, Suite 150
Alexandria, VA 22314           San Jose, CA 95125
22   703.835.9085/Fax 703.997.7665    408.264.8489/Fax 408.264.8487
alan@gurapossessky.com         Don @DKLawOffice.com

24   /s/ Alan Gura              /s/ Donald E.J. Kilmer, Jr.
Alan Gura                  Donald E.J. Kilmer, Jr.

25   Attorneys for Plaintiffs

28