**EXHIBIT C**

C000001

BILL ANALYSIS

```
                SENATE COMMITTEE ON PUBLIC SAFETY
                   Senator Gloria Romero, Chair        A
                     2007-2008 Regular Session         B

                                                       1
                                                       4
                                                       7
   AB 1471 (Feuer)                                     1
   As Amended April 10, 2007
   Hearing date:  June 26, 2007
   Penal Code
   SM:mc
```

## FIREARMS - MICROSTAMPING

### HISTORY

Source:  Brady Campaign to Prevent Gun Violence

Prior Legislation: AB 352 (Koretz) - 2006, died in conference
                   SB 357 (Dunn) - amended to remove relevant provisions

Support: Alameda County Board of Supervisors; Alameda County Sheriff's Office; American College of Emergency Physicians, California Alliance for Consumer Protection; California District of the American Academy of Pediatrics; California Chapters of the Brady Campaign to Prevent Gun Violence; City and County of San Francisco; City of Sacramento; Coalition Against Gun Violence; Friends Committee on Legislation; Grover Beach Police Department; Legal Community Against Gun Violence; Los Angeles County District Attorney's Office; Los Angeles Sheriff's Department; Mayor of San Diego; Mayor of San Francisco; Orange County Chiefs of Police and Sheriff's Association; Orange County Citizens for the Prevention of Gun Violence; San Francisco District Attorney's Office; Stockton Police Department; Superintendent, Alameda County Office of Education; Violence Prevention Coalition of Orange

(More)

```
                                           AB 1471 (Feuer)
                                           PageB
```

County; Women Against Gun Violence; Youth Alive; Chiefs of Police of the following cities: Anaheim; Antioch; Bell; Beverly Hills; Brentwood; Burlingame; Capitola; Chino; Clayton; Clearlake; Concord; Costa Mesa; Emeryville; Fresno; Glendale; Glendora; Grover Beach; Hawthorne; Healdsburg; Huntington Beach; Huntington Park; Irvine; Los Alamitos; Monrovia; National City; Nevada City; Newport Beach; Oakland; Piedmont; Pinole; Pittsburg; Pleasant Hill; Pomona; Sacramento; Salinas; San Diego; San Francisco; San Ramon; San Mateo; Santa Barbara; Seal Beach; Seaside; Stockton; Tustin; Twin Cities Police Authority (Corte Madera/Larkspur); Ventura; Vernon; Walnut Creek; West Covina; Westminster

Opposition: Amador County Sheriff; Berreta U.S.A., Corp.; California Association of Firearms Retailers; California Outdoor Heritage Alliance; California Rifle and Pistol Association; California Sportsman's Lobby, Inc.; Crossroads of the West Gun Shows; Gun Owners of California, Inc.; Mendocino County Sheriff; National Rifle Association; North State Sheriffs; Orange County Sheriff; Outdoor Sportsman's Coalition of California; Riverside County Sheriff; Safari Club International; San Bernardino County Sheriff; Sporting Arms and Ammunition Manufacturers' Institute (SAAMI); Tehama County Sheriff; Kahr Arms

Assembly Floor Vote:  Ayes  44 - Noes  31

NOTE:  AS PROPOSED TO BE AMENDED (See Comment 6.)

### KEY ISSUE

SHOULD THE EXISTING "UNSAFE HANDGUN" LAW, AS OF JANUARY 1, 2010, INCLUDE REQUIREMENTS FOR NEW MODELS OF SEMIAUTOMATIC PISTOLS THAT THEY BE EQUIPPED WITH A MICROSCOPIC ARRAY OF CHARACTERS THAT

IDENTIFY THE MAKE, MODEL, AND SERIAL NUMBER OF THE PISTOL, ETCHED
INTO THE INTERIOR SURFACE OR INTERNAL WORKING PARTS OF THE PISTOL,
AND WHICH ARE TRANSFERRED BY IMPRINTING ON EACH CARTRIDGE CASE WHEN

(More)

                                                    AB 1471 (Feuer)
                                                    PageC

THE FIREARM IS FIRED, AS SPECIFIED?

                          PURPOSE

The purpose of this bill is to add to the existing "unsafe
handgun" law, as of January 1, 2010, requirements for new models
of semiautomatic pistols that they be equipped with a microscopic
array of characters that identify the make, model, and serial
number of the pistol, etched into the interior surface or
internal working parts of the pistol, and which are transferred
by imprinting on each cartridge case when the firearm is fired,
as specified.

 Existing law  provides that commencing January 1, 2001, no
"unsafe handgun" may be manufactured or sold in California by a
licensed dealer, as specified, and requires that the Department
of Justice prepare and maintain a roster of handguns which are
determined not to be unsafe handguns.  Private party sales (used
or previously owned) and transfers of handguns through a
licensed dealer or sheriff in smaller counties are exempted from
those restrictions.  (Penal Code  12125-12133.)

 Existing law  does the following:

Defines "unsafe handgun" as any pistol, revolver, or other
firearm capable of being concealed upon the person, as
specified, which lacks various safety mechanisms and does not
pass listed tests, as specified.  (Penal Code  12126.)

Requires any concealable firearm manufactured in California, or
intended to be imported for sale, kept for sale, or offered for
sale to be tested within a reasonable period of time by an
independent laboratory, certified by the state Department of
Justice (DOJ), to determine whether it meets required safety
standards, as specified.  (Penal Code  12130.)

Requires DOJ, on and after January 1, 2001, to compile,
publish, and thereafter maintain a roster listing all of the
pistols, revolvers, and other firearms capable of being

(More)

                                                    AB 1471 (Feuer)
                                                    PageD

concealed upon the person that have been tested by a certified
testing laboratory, have been determined not to be unsafe
handguns, and may be sold in this state, as specified.  The
roster shall list, for each firearm, the manufacturer, model
number, and model name.  (Penal Code  12131(a).)

Provides that DOJ may charge every person in California who
is licensed as a manufacturer of firearms, as specified, and
any person in California who manufactures or causes to be
manufactured, imports into California for sale, keeps for
sale, or offers or exposes for sale any pistol, revolver, or
other firearm capable of being concealed upon the person in
California, an annual fee not exceeding the costs of
preparing, publishing, and maintaining the roster of firearms
determined not to be unsafe, and the costs of research and
development, report analysis, firearms storage, and other
program infrastructure costs, as specified.  (Penal Code
12131(b)(1).)

 Existing law  provides that the sale, loan or transfer of
firearms in almost all cases must be processed by, or through, a
state licensed dealer or a local law enforcement agency with
appropriate transfer forms being used.  (Penal Code  12072(c)
and (d) and 12084.)  In those cases where dealer or law
enforcement processing is not required, a handgun change of
title report must still be sent to the Department of Justice
(DOJ).  (Penal Code  12078.)

C000003

Existing law provides that, on request, DOJ will register transactions relating to handguns in the Automated Firearm System Unit for persons who are exempt from dealer processing or are otherwise exempt by statute from reporting processes. (Penal Code 12078(l).)

Existing law requires handguns to be centrally registered at time of transfer or sale due to various transfer forms centrally compiled by the DOJ. DOJ is required to keep a registry from data sent to DOJ indicating who owns what handgun by make, model, and serial number and the date thereof. (Penal Code 11106(a) and (c).) Law enforcement agencies must promptly

(More)

AB 1471 (Feuer)
PageE

report to DOJ all reports they receive of lost, stolen, and found property. (Penal Code 11107 and 11108.) DOJ must keep a centralized and computerized list of all lost, stolen, and found serialized property reported to it. (Penal Code 11106(a).)

Existing law makes it a crime for any person with knowledge of any change, alteration, removal, or obliteration described herein, who buys, receives, disposes of, sells, offers for sale, or has in his or her possession any pistol, revolver, or other firearm which has had the name of the maker, model, or the manufacturer's number or other mark of identification including any distinguishing number or mark assigned by the Department of Justice changed, altered, removed, or obliterated, punishable as a misdemeanor. (Penal Code 12094.)

Existing federal law provides that it shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered, or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce. (Title 18 USCS 922(k).)

This bill requires that commencing January 1, 2010, all semiautomatic pistols that are not already listed on the "not unsafe handgun" roster shall be designed and equipped with a microscopic array of characters that identify the make, model, and serial number of the pistol, etched into the interior surface or internal working parts of the pistol, and which are transferred by imprinting on each cartridge case when the firearm is fired.

RECEIVERSHIP/OVERCROWDING CRISIS AGGRAVATION ("ROCA")
IMPLICATIONS

California currently faces an extraordinary and severe prison and jail overcrowding crisis. California's prison capacity is

(More)

AB 1471 (Feuer)
PageF

nearly exhausted as prisons today are being operated with a significant level of overcrowding.<1> In addition, California's jails likewise are significantly overcrowded. Twenty California counties are operating under jail population caps. According to the State Sheriffs' Association, "counties are currently releasing 18,000 pre and post-sentenced inmates every month and many counties are so overcrowded they do not accept misdemeanor bookings in any form, . . . ."<2> In January of this year the Legislative Analyst's office summarized the trajectory of California's inmate population over the last two decades:

> During the past 20 years, jail and prison populations have increased significantly. County jail populations have increased by about 66 percent over that period, an amount that has been limited by court-ordered population caps. The prison population has grown even more dramatically

during that period, tripling since the mid-1980s.<3>

The level of overcrowding, and the impact of the population crisis on the day-to-day prison operations, is staggering:

> As of December 31, 2006, the California Department of Corrections and Rehabilitation (CDCR) was estimated to have 173,100 inmates in the state prison system, based on CDCR's fall 2006 population projections. However, . . . the department only operates or contracts for a total of 156,500 permanent bed capacity (not including out-of-state beds, . . . ), resulting in a shortfall of about 16,600 prison beds relative to the inmate population. The most significant bed shortfalls are for Level I, II, and IV inmates, as

---
<1> Analysis of the 2007-08 Budget Bill: Judicial and Criminal Justice, Legislative Analyst's Office (February 21, 2007).
<2> Memorandum from CSSA President Gary Penrod to Governor, February 14, 2007.
<3> California's Criminal Justice System: A Primer. Legislative Analyst's Office (January 2007).

(More)

AB 1471 (Feuer)
PageG

> well as at reception centers. As a result of the bed deficits, CDCR houses about 10 percent of the inmate population in temporary beds, such as in dayrooms and gyms. In addition, many inmates are housed in facilities designed for different security levels. For example, there are currently about 6,000 high security (Level IV) inmates housed in beds designed for Level III inmates.

> . . . (S)ignificant overcrowding has both operational and fiscal consequences. Overcrowding and the use of temporary beds create security concerns, particularly for medium- and high-security inmates. Gyms and dayrooms are not designed to provide security coverage as well as in permanent housing units, and overcrowding can contribute to inmate unrest, disturbances, and assaults. This can result in additional state costs for medical treatment, workers' compensation, and staff overtime. In addition, overcrowding can limit the ability of prisons to provide rehabilitative, health care, and other types of programs because prisons were not designed with sufficient space to provide these services to the increased population. The difficulty in providing inmate programs and services is exacerbated by the use of program space to house inmates. Also, to the extent that inmate unrest is caused by overcrowding, rehabilitation programs and other services can be disrupted by the resulting lockdowns.<4>

As a result of numerous lawsuits, the state has entered into several consent decrees agreeing to improve conditions in the state's prisons. As these cases have continued over the past several years, prison conditions nonetheless have failed to improve and, over the last year, the scrutiny of the federal courts over California's prisons has intensified.

---
<4> Analysis 2007-08 Budget Bill, supra, fn. 1.

(More)

AB 1471 (Feuer)
PageH

In February of 2006, the federal court appointed a receiver to take over the direct management and operation of the prison medical health care delivery system from the state. Motions filed in December of 2006 are now pending before three federal court judges in which plaintiffs are seeking a court-ordered

limit on the prison population pursuant to the federal Prison Litigation Reform Act. Medical, mental health and dental care programs at CDCR each are "currently under varying levels of federal court supervision based on court rulings that the state has failed to provide inmates with adequate care as required under the Eighth Amendment to the U.S. Constitution. The courts found key deficiencies in the state's correctional programs, including: (1) an inadequate number of staff to deliver health care services, (2) an inadequate amount of clinical space within prisons, (3) failures to follow nationally recognized health care guidelines for treating inmate-patients, and (4) poor coordination between health care staff and custody staff."<5>

This bill does not appear to aggravate the prison and jail overcrowding crisis outlined above.

COMMENTS

1. Need for This Bill

According to the author:

> California has an enormous and diverse problem of unsolved homicides committed with handguns. No arrest is made in approximately 45% of all homicides in California because police lack the evidence they need. Of the approximately 2400 homicides in California per year over 60% are committed with handguns (2004 DOJ data). Approximately 70% of new handguns sold in California are semiautomatics ("Handgun Commerce in California 1999," Sacramento: Violence Prevention Research Program, 2002)

---------------------
<5> Primer, supra, fn. 4.

(More)

AB 1471 (Feuer)
PageI

> Microstamping technology would give law enforcement a tool that will provide evidence to help investigate, arrest and convict more people who use semiautomatic handguns in crimes. It will provide rapid leads in the first crucial hours after a homicide.
>
> AB 1471 will help law enforcement identify and apprehend armed gang members before they inflict more harm on others, including innocent bystanders. In instances of drive-by shootings, where the only evidence at the crime scene may be a spent cartridge case, law enforcement could quickly obtain a critical lead.

2. What is Microstamping?

The following information from NanoMark Technologies (Hitachi Via Mechanics USA, Inc. in Londonderry, New Hampshire) is taken from their website (http://www.nanomark.com/Ballistic-id-tagging/ballistic-id.htm.)

> NanoMark Technologies has developed a PATENTED BALLISTIC TAGGING TECHNOLOGY. The technology places an identification mark on each cartridge casing ejected from a properly outfitted firearm at the moment of firing each bullet. The idea is to have this technology integrated in firearms as an alternative to the ballistic "fingerprinting" methods currently under such hot debate.
>
> Today's common "ballistic fingerprinting" technology is the computer automation of the science practiced by Forensic Firearms Examiners. These specialists have honed the science of comparing the signature of two bullets and/or cartridges, and have shown an extremely high degree of success as long as two physical specimens are available for the match. In ballistic fingerprinting, it is hoped that a computer can

(More)

AB 1471 (Feuer)
PageJ

compare one physical piece of evidence to a virtual picture of the first ammunition fired by a firearm. Relying on a vast database containing tediously large image files, the computer systems have fallen short in delivering accuracy and repeatability. This has called into question the concept of ballistic fingerprint database technology's readiness by some of the most respected Forensic Firearms Examiners in the world.

Our technology eliminates the need for national gun registration or a national database for new guns sold. The ID marks delivered by Ballistic ID Tagging can be simply viewed by utilizing imaging equipment commonly found at local, state and federal forensics laboratories. Because of its uniqueness, it does not require extensive cross-jurisdictional ballistic image databases or a national ballistic image database containing the files of new guns sold every year.

Our technology imparts a unique, indelible, and microscopic code onto the cartridge casings when a bullet is fired and the cartridge case is ejected from a properly outfitted firearm. This code takes the form of encrypted symbols, bar codes or simple alpha-numeric characters (such as a serial number or some type of tracking number) that can be accessed at the individual manufacturers' level. This type of identifier would immediately and unquestionably lead investigators to a specific gun without requiring the manpower and expense associated with the creation and maintenance of a ballistic image database containing millions of images. Furthermore, it has been shown that as a gun wears over time, its fingerprint changes enough to confuse the current generation of database search routines.

(More)

AB 1471 (Feuer)
PageK

(All emphasis in original.)

3. What This Bill Would Do

AB 1471 provides that, after January 1, 2010, semiautomatic pistols that are not already listed on the "safe handgun list" maintained by the Department of Justice would be required to be designed and equipped with "a microscopic array of characters that identify the make, model, and serial number of the pistol, etched into the interior surface or internal working parts of the pistol, and which are transferred by imprinting on each cartridge case when the firearm is fired." This would apply only to new models of semiautomatic pistols that a manufacturer offered for sale in California after January 1, 2010 . Handgun owners would not be required to turn in their previously purchased handguns and gun dealers would still be permitted to sell all the existing models that could be legally sold in California (i.e., were on the "safe handgun list") prior to January 1, 2010, that do not have this microstamping technology.

4. Questions of Efficacy

Opponents of this bill raise a number of issues regarding the efficacy of the microstamping technology. Many of these arguments address the possibility that the microstamp could be defaced or otherwise defeated by a determined criminal. While these claims are open to debate, they are somewhat beside the point because most people who use firearms in a crime would, in all likelihood, not exhibit enough determination or skill to either file down the firing pin or plant pre-fired cartridges at a crime scene or engage in any similar form of subterfuge. The real question is, would this technology help law enforcement in a significant number of cases to trace a crime bullet to the gun that fired it? If so, while there might still be questions relating to the ability to positively establish a chain-of-custody in relation to the gun or other limitations of

the evidence, it seems clear that this information would provide
an extremely useful lead for investigators to follow in their

(More)

AB 1471 (Feuer)
PageL

attempts to solve gun-related crimes.

The most significant question regarding the efficacy of the
technology is whether the stamp would actually work the way the
manufacturer claims; that is, would the stamp be legible under
most real-life circumstances?  In the Winter 2006 issue of the
peer-reviewed journal of Association of Firearm and Toolmark
Examiners (AFTE Journal),<6> George Krivosta, Suffolk County
Crime Laboratory, Hauppauge, New York, published the finding of
his tests of the NanoMark microstamping technology.  Krivosta
tested two different firing pins engraved with NanoMark
microstamps placed in, "one of the most popular pistols made":

> Each of the two firing pins was placed in a Colt .45
> auto caliber semiautomatic pistol, customized
> Government Model.  Each firing pin was test fired
> using Winchester and Federal brands of ammunition, to
> generate a total of ten cartridge cases for
> microscopic examination and comparison.  Initial
> testing with one of the pins required an examination
> of all ten test fired casings to determine that the
> NanoTag" serial number of this pin was "0H5K B4M3".
> The other pin was NanoTag" engraved with many, much

---

<6> The publishers state:  "All papers published in The AFTE
Journal are reviewed for scientific validity, logical reasoning,
and sound methodology, where applicable.  The editor, assistant
editors, and the editorial review panel conduct a detailed
review of all papers prior to publication.  Papers in which the
author engages in experimentation or testing from which
conclusions are drawn, or those that present an opinion,
technique, or method having scientific significance are all
subject to post-publication review by the members of the
Association of Firearm & Toolmark Examiners.  The "AFTE Peer
Review and Letters to the Editor" section of the Journal
provides a forum for post-publication review."

(More)

AB 1471 (Feuer)
PageM

> smaller, fonts.  It was found to have "NanoTag"", the
> numerals 0 to 9, and the entire alphabet engraved into
> the pin's tip.  The vast majority of this pin's
> characters were never visualized in the firing pin
> mark of any of the expended cartridge cases generated
> and examined.

Krivosta concludes, "[c]ertainly this research has shown that
implementing this technology will be much more complicated than
burning a serial number on a few parts and dropping them into
firearms being manufactured."

Todd Lizotte, co-inventor and Board Member of NanoMark
Technologies, when contacted by Committee staff, correctly
pointed out that Krivosta had set out to test whether
microstamped images left on cartridge casings in normal
conditions using the NanoMark microstamping technology, would be
legible without resorting to the "use of highly trained and
skilled individuals."  To test this, Lizotte states, Krivosta
attempted to read the markings using a method known as "Optical
Microscopy Stereo with Polarization."  Lizotte explained that
the results Krivosta observed would have been different, and the
markings would have been "fully legible," if a more
sophisticated method had been used to read the markings known
as, "Scanning Electron Microscopy (SEM) (Standard and
Backscatter Methods)."

IS THIS TECHNOLOGY SUFFICIENTLY EFFECTIVE TO REQUIRE THAT IT BE

UTILIZED IN ALL NEW MODEL SEMIAUTOMATIC HANDGUNS SOLD IN
CALIFORNIA AFTER JANUARY 1, 2010?

5. Can Broken Parts Be Replaced ?

Penal Code section 12090 states that it is a felony to change,
alter, remove or obliterate the name of the maker, model,
manufacturer's number, or other mark of identification,
including any distinguishing number or mark assigned by DOJ to
any firearm, without the written permission of DOJ.
Additionally, Penal Code section 12091 states that possession of
a handgun upon which the name of the maker, model,

(More)

AB 1471 (Feuer)
PageN

manufacturer's number or other mark of identification has been
changed, altered, removed or obliterated is presumptive evidence
that the person in possession is responsible for the alteration,
removal, etc. However, the California Court of Appeal found
Penal Code section 12091 unconstitutional in 2001. (In re
Christopher K. 91 Cal. App.4th 853 (2001).) Nonetheless,
section 12090 would appear to prohibit, as to any gun sold with
microstamping technology, any replacement of the firing pin or
any other part of the pistol that stamps the cartridge casing
with the identifying information, unless that replacement part
has the same microstamping characteristics as the broken part.
For the replacement part to bear the pistol's unique identifying
information, it would have to be specially made by the gun's
manufacturer.

6. Is This a Sole Source Technology ?

Microstamping technology is a patented technology belonging to
one company, NanoMark Technologies. Does it present public
policy concerns to mandate a manufacturing industry's use of a
product when that product is only provided by a single source?
In response to these concerns, Todd Lizotte, Board Member of
NanoMark Technologies, issued a press release on June 15, 2007,
stating the following:

> NanoMark a wholly owned division of ID, LLC is issuing
> this press release to clarify that a royalty free
> license will be provided and cover its patented
> microstamping technology as applied to semi-automatic
> handguns sold for civilian use within the United
> States and its territories, as stipulated and in
> support of AB1471.
>
> Highlights:
> Royalty free license for semi-automatic firearms (as
> stipulated in AB1471) for civilian use over the entire
> United States and its territories. The license will
> provide options for process outsourcing or job-shop.
> Microstamping job-shops across the United States
> currently outfitted with the equipment will provide

(More)

AB 1471 (Feuer)
PageO

> processing services to the industry as an alternative
> to purchasing the capital equipment. (No capital
> investment required by large and small manufacturers
> as an option.) No sole source, the License will
> provide the firearm industry a variety of options for
> selecting pre-qualified equipment suppliers and
> job-shop services or they will have the option of
> building their own equipment or use existing equipment
> to perform the microstamping process.

AB 352 (Koretz) of the 2005-2006 legislative session was
substantially similar to this bill and the same concerns
regarding the sole source issue were raised in both the Assembly
Public Safety and Senate Public Safety Committee analyses. To
address those concerns AB 352 was amended on the Senate floor to
include the following language (new amended language is
highlighted):

(7) Commencing January 1, 2009, for all semiautomatic pistols that are not already listed on the roster pursuant to Section 12131, it is not designed and equipped with a microscopic array of characters that identify the make, model, and serial number of the pistol, etched ~~into~~ or otherwise imprinted onto the interior surface or internal working parts of the pistol, and which are transferred by imprinting on each cartridge case when the firearm is fired , and further provided that a technology to create the imprint, if reliant upon a patent, is available to more than one manufacturer. A method of equal or greater reliability and effectiveness in identifying ammunition fired from a firearm than that which is set forth in this paragraph, via an imprint on a cartridge may also be approved by the Attorney General and thereafter required as otherwise set forth by this paragraph. Approval by the Attorney General shall include notice of that fact via regulations adopted by the Attorney General for purposes of implementing that method for purposes of this section.

(More)

AB 1471 (Feuer)
PageP

NOTE: The author will propose the following amendment in Committee:

after the word "fired" on page 3, line 14, insert:

provided that the Department of Justice certify that the technology used to create the imprint is available to more than one manufacturer unencumbered by any patent restrictions. The Attorney General may also approve a method of equal or greater reliability and effectiveness in identifying the specific serial number of a firearm from spent cartridge casings discharged by that firearm than that which is set forth in this paragraph, to be thereafter required as otherwise set forth by this paragraph where the Attorney General certifies that this new method is also unencumbered by any patent restrictions. Approval by the Attorney General shall include notice of that fact via regulations adopted by the Attorney General for purposes of implementing that method for purposes of this paragraph.

DOES THIS BILL REQUIRE A MANUFACTURING INDUSTRY TO BUY A PRODUCT THAT IS PATENTED AND ONLY MADE BY ONE COMPANY?

IF SO, DOES THE AUTHOR'S AMENDMENT ADEQUATELY ADDRESS THE SOLE SOURCE ISSUE?

7.  UC Davis Press Release

On May 3, 2007, UC Davis issued a press release under the title, "Microstamping Guns Feasible but Flawed, Study Finds." As it turns out, the press release was both inaccurate and misleading. In a letter to the author of AB 1471 dated May 15, 2007, UC Davis Chancellor stated:

First, this is an "Author's Report" and was posted by California Policy Research Center (CPRC), which funded the study, before CPRC's usual academic peer review and state legislative briefings, which violates CPRC's

(More)

AB 1471 (Feuer)
PageQ

own policy. As well, public release of the report and issuance of a press release by UC Davis was premature.

Second, contrary to the press release, the Legislature did not commission the study. The study was faculty-initiated with the CPRC.

Finally, I understand that you have concerns about the

> relevance of the specific contents of this study to your pending legislation, especially with respect to (1) the age and kinds of guns used in the study as compared to those that are covered in your legislation, (2) the technology tested in the study as compared to the technology called for in the legislation, and (3) differences in the amount of microstamping examined in the study compared to the amount of microstamping required in your legislation. While the accuracy of the findings can and must be assessed by the upcoming peer review, the press release should have not connected the study results with the legislation.
>
> I regret the issuance of this press release, premature posting of the report, the implication that the study pertains to your legislation, and the inaccurate statement about the legislative origins of the report. Please accept my apologies for complicating, rather than elucidating, a sensitive public policy issue on which you have taken statewide leadership.

8. <u>Arguments in Support</u>

The California Chapters of the Brady Campaign to Prevent Gun Violence state:

> Assembly Bill 1471 would require that newly designated semi-automatic handguns sold after January 1, 2010, be equipped with "micro-stamping" technology. This technology consists of engraving microscopic characters onto the firing pin and other interior

(More)

AB 1471 (Feuer)
PageR

> surfaces, which would be transferred onto the cartridge casing when the handgun is fired. Micro-stamping technology would substantially enhance law enforcement's ability to rapidly identify and link shell casings found at a crime scene to the individual semi-automatic handgun from which it was fired and to the gun's last lawful possessor.
>
> Nearly half of the homicides in California are unsolved and the majority of homicides are committed with handguns. In this time of escalating gang violence in our state, new tools for finding and apprehending armed criminals are needed. AB 1471 would help law enforcement solve murders and other handgun crimes as the information provided by a microstamped cartridge casing gives police important leads in the first crucial hours after a crime.
>
> In addition, AB 1471 would help reduce trafficking of new semi-automatic handguns by creating accountability. Legal purchasers who buy guns for traffickers ('straw' buyers), will be deterred when they realize that microstamped casings can be traced directly back to them. Consequently, this big source of crime guns, which rapidly fall into the hands of criminals and gang members, would be disrupted. Curbing the flow of illegal guns to prohibited purchasers, including felons and violent teens, would reduce gun violence in our streets and protect the innocent bystanders.
>
> Microstamping will not impose a new cost on the state of California as no new database or procedures are required. California already has a system for tracking guns and their owners and after a crime, law enforcement will simply check the existing database. Buyers of micro-stamping handguns will notice no change in the purchasing process as no new permitting or information is needed. Existing handguns and existing handgun owners will not be impacted by this

(More)

AB 1471 (Feuer)

Page5

bill since the law only applies to new handguns.

The microstamping technology is highly tamper resistant. The redundant markings are durable and routine maintenance and servicing of the firearm will not affect the technology. Criminals will find it extremely difficult to defeat the technology. AB 1471 has broad support from police chiefs around the state, who want this new tool for solving handgun crime and curbing the flow of illegal weapons to prohibited purchasers.

The Stockton Police Department states:

The Stockton Police Department believes that AB 1471 would allow law enforcement to positively link used cartridge casings recovered at crime scenes to the crime gun. Further, AB 1471 would help law enforcement solve handgun crimes, reduce gang violence, and reduce gun trafficking of new semiautomatic handguns.

* * * * * *

One of the benefits of microstamping technology is that it does not require any new database or additional information from gun purchasers and will be virtually cost free for law enforcement. The cartridge casings expelled from the firearm will indicate the serial number of the firearm, which is already available through the dealer record of sale. Using California's current handgun database, the owner of the gun can then be identified. Finding the guns and identifying its owners are critical pieces of information for violent gun crime investigation.

9.  Arguments in Opposition

The North State Sheriffs' state:

(More)

AB 1471 (Feuer)
Page7

As we see it, the technology to implement the micro-stamping is flawed, there would be an increase in the potential for civil liability for law enforcement agencies that continue to use handguns which will be placed on the "unsafe" handgun list, there would be an increase in law enforcement training costs due to not being able to reuse spent cartridge casings, the technology could be easily defeated since the stamping is only 25 microns deep and the cost of the technology would be passed on to law enforcement agencies and citizens alike.

The California Association of Firearm Retailers state:

The technology which this proposed bill seeks to promote has not been shown to work under actual field conditions. Mandating its implementation by law at this time would be excessively premature as it cannot be scientifically justified, and it has not been proven to be practical in application. Impartial testing to date has raised very serious questions relative to whether this technology could actually work in the field given all the variables and other factors that are present outside of the laboratory.

(More)

For example, criminals can easily defeat it in a number of different ways, and it is well known that the overwhelming majority of handguns used in crime are stolen. Fired casings from them found at crime scenes in most cases would not lead law enforcement to the actual perpetrator. Placing micro-stamping on semi-automatic handguns, even if the technology was reliable, would be ineffective as a law enforcement tool.

Furthermore, micro-stamping is a "sole source" technology at the present time. It is owned by a single company. If micro-stamping did work, a matter that the results of recent independent scientific research casts in doubt and highly questions, it would probably continue to be "sole source" as other forms of cartridge case marking have reportedly been proven to be more difficult and costly to engineer.

This increases the likelihood that the sole source problem would in fact continue and that the costs of using it would not be contained by realistic competition. The result would be higher costs for retailers and their customers for a system that is not reliable and would not be of much assistance to law enforcement.

The California Rifle and Pistol Association, Inc., states:

Though the mechanical technology this proposed legislation seeks to promote has been shown to sometimes work under tightly controlled and limited laboratory conditions, it has not been adequately tested for the actual conditions under which it would be utilized. In fact, testing to date shows that [it] would not work well in real life application.

Whether the technology actually and consistently works (a matter that has not been proven) is just one factor

(More)

AB 1471 (Feuer)
PageV

to consider. Regardless of the technology, legislation should not be enacted that would be ineffective in achieving it purported purpose.

For example, how many rounds of fire ammunition can the proposed markings endure before being worn off? [] [W]hat about lacquered primers or dirt and debris filling or fouling the characters making them unreadable? [] [W]hat happens when a firing pin breaks and the local gunsmith does not have the expensive micro-engraving equipment necessary to mark the replacement (in such a case would the customer and gunsmith be subject to felony prosecution for violations of Penal Code sections 12090 and 12091)? [] [W]hat about the fact that this technology can be readily defeated by a criminal using a file, sand paper, hone, or other implement? The list of applicable unanswered questions is a long one.

***************

C000014