IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE KIMBERLY J. MUELLER, JUDGE

---oOo---

IVAN PENA, et al.,

     Plaintiffs.

vs.                                    No. CV. S-09-1185

STEPHEN LINDLEY, Chief of
the California Department
of Justice Bureau of
Firearms,

     Defendant.

_____/

---oOo---

REPORTER'S TRANSCRIPT

CROSS MOTIONS FOR SUMMARY JUDGMENT

MONDAY, DECEMBER 16, 2013

---oOo---

Reported by:        KIMBERLY M. BENNETT, CSR #8953

RPR, CRR, RMR

APPEARANCES

For the Plaintiffs:

    Gura & Possessky PLLC
    105 Oronoco Street
    Suite 305
    Alexandria, Virginia  22314
    BY:  Alan Gura
       Attorney at Law

    Law Offices of Donald Kilmer, APC
    1645 Willow Street
    San Jose, California  95125
    BY:  Donald E. J. Kilmer, Jr.
       Attorney at Law

For the Defendant:

    United States Department Of Justice
    1300 I Street
    PO Box 255200
    Sacramento, California  95814
    BY:  Anthony R Hakl, III
       Deputy Attorney General

1                        SACRAMENTO, CALIFORNIA

2                     DECEMBER 16, 2013, 10:05 A.M.

3                              --o0o--

4          THE CLERK:  Calling Civil Case 09-1185; Pena, et al.

5     versus Cid.  This is on for cross-motions for summary

6     judgment.

7          THE COURT:  Good morning.  Appearances, please.

8          MR. GURA:  Good morning, Your Honor.  Alan Gura for

9     plaintiffs.

10         THE COURT:  Good morning, Mr. Gura.

11         MR. KILMER:  Don Kilmer for the plaintiffs, Your

12    Honor.

13         THE COURT:  Good morning, Mr. Kilmer.

14         MR. HAKL:  Good morning, Your Honor.  Anthony Hakl,

15    Deputy Attorney General, on behalf of defendants.  And I've

16    got a throat lozenge in this morning, I'm working on a cold.

17         THE COURT:  Good morning, Mr. Hakl.

18         The Court has hot tea for that reason as well.  We'll

19    take breaks as needed.

20         I have several questions.  I think we can get through

21    what we need to in an hour at the outside.  Let me ask all of

22    my questions, and then if there is something you think not

23    fully covered by the briefing or our discussion, then you

24    could briefly argue at the end, a few minutes each.

25         First, Mr. Gura, Mr. Kilmer, are you dividing the

1   argument in a certain way?

2          MR. GURA:  We don't plan to.  I suppose, if something

3   arises where Mr. Kilmer knows more than I do, but I'm

4   prepared to handle the argument.

5          THE COURT:  To take the lead.  All right.

6          And you may remain seated there.  That's fine with the

7   Court.

8          Just so I understand exactly -- I've looked at the

9   complaint.  I've looked at the motions.  In terms of the

10  focus of the plaintiffs' case at this stage, are you focusing

11  on the entire Act when it comes to the facial challenge and

12  the later amendments with respect to any as-applied

13  challenges?  Is there a way to distinguish the facial and the

14  as-applied?  And is that the right way to do it?

15         MR. GURA:  Should I sit or stand, Your Honor?

16         THE COURT:  Whatever you're most comfortable with.

17  The key is that you speak into a microphone so the court

18  reporter can hear you.

19         MR. GURA:  Sure.  Well, we argue that this rostering

20  requirement violates the Second Amendment on its face, but

21  also as applied.  To the extent that the Court might devise

22  some way of thinking that it may have some appropriate

23  application, we can't think of any, but sometimes courts and

24  other parties see things differently, then at the very least

25  we think that the defects that we've identified in the

1    roster, the things that we're challenging, the requirements

2    to have chamber load indicators, magazine disconnects, the

3    administrative requirements that make it impossible to place

4    guns on the roster unless the manufacturer/importer is

5    compliant, the fact that things fall off the roster for

6    administrative reasons such as nonpayment, the microstamping

7    requirement we are challenging, we are also challenging the

8    scheme as a whole because we think it's riddled with too many

9    exceptions.

10         The theory of this --

11         THE COURT:  I understand all that.  Is there a way to

12    just, in a sentence -- are the facial and the as-applied

13    challenges the same?

14         MR. GURA:  We believe they are, but we have to

15    preserve our arguments.  If the Court wants -- believes that

16    some of these aspects are constitutional and others are not,

17    then we'll take whatever relief we can get.

18         THE COURT:  All right.  And then to the extent you're

19    challenging the listing fee, the annual $200 fee, that's as a

20    prerequisite to rostering, not as exceeding what's needed to

21    cover administration.  Do I have that right?

22         MR. GURA:  The real problem with the fee -- we haven't

23    even addressed the issue of whether the $200 is something

24    that's fairly tailored to whatever the state spends the money

25    on.  But the basic problem with it is, is that once a handgun

1   is paid for and is listed on the roster, that this fee has to

2   come in every year, and if it doesn't, then suddenly the

3   handgun becomes unsafe.  And we believe that a handgun,

4   whether it's safe or unsafe, doesn't change based upon the

5   fact that a fee has been paid or not.  There could be a

6   consumer who wishes to purchase that handgun, the handgun is

7   still, perhaps, available in the stream of commerce, and the

8   fact that a manufacturer/importer doesn't send in the check

9   deprives the person of that access, that's unconstitutional.

10          THE COURT:  I understand that argument.

11          And your position is that even if the manufacturer is

12   making a concerted determination that it no longer wishes the

13   gun to be rostered, that the individual who wants to purchase

14   the gun, that individual's rights trump the manufacturer's in

15   the commercial sell context.  Is that right?

16          MR. GURA:  That's correct, Your Honor.  Once an

17   article has been manufactured, it's in the stream of commerce

18   in the United States, people buy and sell it in the ordinary

19   course of commerce, then people should be able to purchase

20   it, even if you have a manufacturer that, for example, just

21   likes to change the model number every year, and they like to

22   always find some new reason to change things up in the

23   catalog, or perhaps the manufacturer has chosen that they're

24   not against Californians having this gun, but for whatever

25   reason they wish to focus their efforts on marketing and

1    supplying other markets, or for whatever reason, people --

2         THE COURT:  What if the considered determination is

3    they don't want it sold in California such that it could be

4    subject to the statute?

5         MR. GURA:  Well, I don't believe that a manufacturer

6    could -- has any right to prevent an article that's already

7    been manufactured from being sold.  Once they've sold it to a

8    wholesaler, and it's gone to a dealer, and it's entered the

9    stream of commerce, if they don't have any sort of

10   contractual right to recall it from the dealership, then I

11   suppose people can buy it.

12        THE COURT:  All right.  I understand.

13        MR. GURA:  Thanks.

14        THE COURT:  For both of you now, I have questions

15   about standing.  Even though it's not really addressed in the

16   briefing, it is raised as an affirmative defense.  Even if

17   the parties don't think it's an issue, it's a threshold

18   question this Court needs to address, and I need to satisfy

19   myself that there is standing.

20        So, starting with you, Mr. Gura, just so I'm clear,

21   looking at the established tests for evaluating standing,

22   exactly what is the injury or injuries that plaintiffs suffer

23   that confer standing?

24        MR. GURA:  The injuries are several, Your Honor.  The

25   leading case here, I believe, is Carey versus Population

1    Services from the Supreme Court in the late 1970s, I believe

2    it's 1976, and the whole line of cases that flow from there.

3           And what Carey held was -- in Carey, you had a

4    situation where only licensed pharmacists could sell

5    contraceptives, you couldn't get mail order contraceptives.

6    And the Supreme Court held that there was standing, in fact,

7    to challenge that law, because whenever you limit the

8    distribution of an article, you invariably stifle

9    competition, you raise prices, you limit access, you limit

10   choice, and all of those things hurt the consumers who have

11   the right to make family planning decisions.

12          More recently there was a Fifth Circuit case called

13   NRA versus BATFE, which came out last year.  And here it was

14   about handguns.  The plaintiffs in that case challenged the

15   federal ban on licensed dealers selling handguns to adults

16   aged 18 to 20 years old.  And the federal government came in

17   with a standing challenge that was rejected both at the

18   district court and by the Fifth Circuit; although, the Fifth

19   Circuit rejected the claim on its merits.

20          And there what the courts said is, look, people have

21   the right to -- they're asserting they have a right to

22   purchase these handguns, and if that's the case, then a

23   prohibition on the sale of those handguns to them injures

24   them because it limits their access, it limits their ability,

25   it raises prices.  And, perhaps at a more basic level, it

1    simply prevents them from engaging in the desired

2    transaction.

3            When you have somebody who stands ready to engage in a

4    transaction, that transaction is thwarted by government

5    action, they refrain from engaging in that transaction

6    because it would subject them or others to criminal

7    liability, they're injured for Article III purposes.  And

8    that injury is redressable by the court, and it's fairly

9    traceable to the law.

10           Here you have a law that says these guns cannot be

11   sold or imported into the state for sale, they cannot be

12   offered for sale.  Obviously that, we would contend, number

13   one, it prevents people from engaging in their desired

14   transactions.  And it also, to the extent that even if they

15   could somehow theoretically purchase these guns, it certainly

16   limits choice and it raises prices by limiting the number of

17   outlets available.

18           I would add, Your Honor, that it's not just a simple

19   matter of the way that California law is structured for

20   people to actually buy these guns from out-of-state sellers,

21   because the way that the computer system is set up, and I'm

22   sure Mr. Hakl can talk about this, the dealer record of sale

23   system requires that California ID.  And so it's not like

24   someone can just come here from another state with a gun and

25   say, here, I'm offering to sell you this, and let's do a

 1   private party transaction.

 2          The only way I think a private party transaction could

 3   work in this area is if you had two Californians who are

 4   already -- one of them had the gun, and then they could sell

 5   to -- you know, through the dealer to the other individual.

 6   But there is no way in which you can import into the state

 7   for sale, or just show up with this gun from other places.

 8          THE COURT:  We'll get into the private party

 9   transactions in just a moment.

10          But are you conceding that the individual plaintiffs,

11   in fact, have no real risk of prosecution, because the

12   statute applies to sellers?

13          MR. GURA:  The individuals are harmed because they

14   can't -- they can't -- well, they couldn't import the handgun

15   for sale.  They couldn't cause it to be imported for sale to

16   themselves.  They also can't --

17          THE COURT:  So, that's how they would risk

18   prosecution?

19          MR. GURA:  But they also simply can't engage in the

20   transaction.

21          For example, in the NRA case, and also in the Carey

22   case, the arguments were that the sellers couldn't -- I mean,

23   we saw this argument in --

24          THE COURT:  What in the statute says that the buyer

25   would be prosecuted if it's a simple --

1          MR. GURA:  The buyer -- I don't see that the buyer can

2     be prosecuted, but the buyer has standing because the buyer

3     is injured by not being able to purchase.

4          THE COURT:  But not by risk of prosecution.  You

5     concede that.

6          MR. GURA:  Yes, Your Honor, as far as -- we concede

7     that.

8          THE COURT:  Mr. Hakl, any response to what you've

9     heard on standing?  Any authority the Court should consult in

10    satisfying itself on that point?

11         MR. HAKL:  Your Honor is correct, we have not briefed

12    standing or argued it in our papers.  As I understand

13    plaintiffs' claim, it's that they are unable to purchase the

14    handguns that they desire from the individuals that they want

15    to purchase them from.  That's the alleged injury.

16         THE COURT:  And you're satisfied that that --

17         MR. HAKL:  I'm satisfied that they can't purchase the

18    guns that they want from the individuals that they want, from

19    whom they wish.  There may be alternative channels that they

20    can get these particular guns.  But the claim is that they've

21    identified transactions that they want to engage in, that

22    they think are constitutionally protected, and they can't do

23    that.  And that is fine for me for purposes of individual

24    standing.

25         THE COURT:  All right.

 1              MR. HAKL:  There is a separate issue of organizational

 2     standing, which some courts have wrestled with.  We have not

 3     argued that, but that is a reasonable question in light of

 4     some of the cases out there.  As far as I know, I think,

 5     Mr. Gura -- maybe the NRA case is the big organizational

 6     standing case that Your Honor might want to consult.

 7              But that's -- so when it comes to standing, there is

 8     an individual issue and an organizational issue, but we've

 9     got six parties here, so -- but we haven't argued that in our

10     briefs, Your Honor.

11              MR. GURA:  Your Honor, if I may.

12              THE COURT:  I know that, but it's a question the Court

13     asks.

14              MR. GURA:  Two points, Your Honor.

15              First of all, with respect to organizational standing,

16     there are actually two kinds of standing an organization may

17     have.

18              One of them is organizational standing, which is the

19     type of harm the organization itself receives to its mission

20     by virtue of a law.

21              The other kind of standing, which I think is plainly

22     established here, is associational standing; that is, an

23     organization has the right to assert the rights of its

24     members whose rights are injured.  And we have members in

25     California from these organizations.  There is no dispute

1    that the membership is interested in acquiring these

2    handguns, their participation in the case is not strictly

3    necessary.  And so under -- I think it's Hunt versus

4    Washington Apple Growers, and that line of cases.

5          The Ezell case in the Seventh Circuit, Your Honor,

6    dealt with this on behalf of SAF.  And there is a little

7    discussion of that specifically in the Ezell case, if the

8    Court is interested in that.

9          And then, Your Honor, Mr. Kilmer reminds me that he

10   actually does have some particular experience with the

11   criminal prosecution in this context.  And I would defer to

12   him, if we may let him explain.

13          THE COURT:  Very briefly.

14          MR. KILMER:  Yes, very briefly --

15          THE COURT:  Can you slow down and make certain you're

16   speaking into the microphone.

17          MR. KILMER:  There actually is a case docketed in this

18   district, Your Honor, United States versus McGowan.  The

19   current case is currently on hold.  But I'm defense counsel

20   for one of the defendants in that case.  And it's a case

21   where the United States Government actually brought criminal

22   charges of conspiracy in cases where these off-roster guns

23   were being sold through licensed dealers by exempt parties,

24   police officers, to members of the public.  So, there is a

25   very real threat of prosecution.  There is actually a case

1    pending in this district.

2              THE COURT:  M-C-G-O-W-A-N?

3              MR. KILMER:  It's United States versus McGowan.  I'm

4    happy to e-mail the case number to the Court.

5              THE COURT:  Any reason I couldn't take judicial notice

6    of that criminal action, Mr. Hakl?

7              MR. HAKL:  There is no reason why you couldn't take

8    judicial notice of the case for -- I'm not familiar with the

9    case, other than what's been in the newspaper a little bit, I

10   think, on that case.

11             THE COURT:  It would be the fact of the charges being

12   filed.

13             MR. HAKL:  The fact of the charges, no objection to

14   that, Your Honor.

15             THE COURT:  All right.  All right.  Let's move on to

16   some provisions of the law.

17             And, Mr. Hakl, beginning with you, that private party

18   transaction, your position is that each of the individual

19   plaintiffs could obtain the firearm they want through a

20   private party transaction.  Do I have that right?

21             MR. HAKL:  That's correct.

22             THE COURT:  And so explain, taking into account what

23   you've heard, how they can do that without any risk of

24   prosecution.  Is importation one way they can do that?  And

25   doesn't that raise the risk of prosecution even if, as the

1    seller, they are not at risk, isn't the buyer at risk?

2         MR. HAKL:  Generally speaking, the roster is focused

3    on bringing new handguns to market.  There are exceptions.

4    For example, if Mr. Gura owned a handgun that I wanted to

5    purchase, and he wanted to sell it to me, he and I could go

6    to a licensed firearms dealer and basically engage in a

7    transaction whereby his handgun would be transferred to me,

8    and it doesn't need to be on the roster to do that.

9         THE COURT:  And no one in that transaction, including

10   the dealer, would risk prosecution?

11        MR. HAKL:  Correct.

12        The plaintiffs' response to that is they're not aware

13   of anyone out there who has this particular gun that they

14   could locate in California and engage in a private party

15   transaction, and that they shouldn't have to be able to do

16   that.

17        THE COURT:  Is there language on the face of the

18   statute that allows the Court to confirm that interpretation?

19        MR. HAKL:  Yeah.  It's in our brief where we lay out

20   the background section of the Unsafe Handgun Act.  I do

21   provide the citation to the particular statute that allows

22   for a private party transaction.

23        THE COURT:  All right.  I thought I had read the

24   statutes, but I will -- sometimes statutes need multiple

25   readings.

 1          MR. HAKL:  I can just flip through here --

 2          THE COURT:  The flip side of the question, it is your

 3   position that the UHA --

 4          MR. HAKL:  I found the private party transaction.

 5          THE COURT:  All right.

 6          MR. HAKL:  It's Section 32110(a).

 7          THE COURT:  Of?

 8          MR. HAKL:  The California Penal Code.

 9          THE COURT:  It is the Penal Code.  All right.

10          Any disagreement that that's a relevant statute here?

11          MR. GURA:  No disagreement that the statute is

12   relevant, Your Honor.  But as far as standing is concerned,

13   we disagree that the availability of private party

14   transactions is relevant, because even if you can find

15   somebody who has a gun at home, that's very different than

16   being able to buy it at a store, and it's very different than

17   having access to something in the regular stream of commerce.

18          And the cases, Carey versus Population Services, NRA,

19   and, in fact, I forgot to mention a third case, Your Honor,

20   which I consider to be interesting in this field, Doe versus

21   Bolton, an abortion case from the mid-seventies, I believe

22   one of the issues in that case was a limitation as to which

23   types of hospitals could perform abortions.  And there, of

24   course, there was standing on the part of the plaintiffs, who

25   would be the ones obtaining the abortions, even though the

1    restriction was on limiting the number of sellers, as you

2    were, of the services.

3            So, it's -- we believe it's well recognized that when

4    the government constricts choice, limits access, bars avenues

5    for people to exercise conduct, then it's harming them.

6            THE COURT:  I understand those positions.

7            Moving on beyond standing now, and looking at the

8    statute, is "responsible party" defined anywhere, Mr. Hakl,

9    in terms of who can pay the fee if the manufacturer is not?

10           MR. HAKL:  I think the only -- only a manufacturer can

11   submit a firearm and pay the fee for rostering.

12           THE COURT:  But "responsible party" is not defined in

13   the statute?

14           MR. HAKL:  Not that I'm aware of.

15           THE COURT:  Is it clarified in any legislative

16   history?

17           MR. HAKL:  Not that I'm aware of, Your Honor.

18           THE COURT:  All right.

19           Anything on that, Mr. Gura?

20           MR. GURA:  Yes, Your Honor.  This is in Subsection S

21   of -- let me read to you first, then I'll scroll up and get

22   the number.  The law defines "responsible party" as

23   "includes, but is not limited to, firearm manufacturers/

24   importers and law enforcement agencies."  And that is under

25   the definition of key terms, Title 11 of the California Code

1    of Regulations, Section 4049.

2         THE COURT:  All right.

3         MR. HAKL:  I think it's in the regulations, Your

4    Honor, not the statute.

5         THE COURT:  Right.  That would be the suggestion.

6         And then, Mr. Hakl, again for you, is a gun ever

7    delisted once it's on the roster for any reason other than

8    failure to pay the annual fee?

9         MR. HAKL:  I suppose it could be, Your Honor.  I'm

10   not -- if, for example, it were to come to the attention of

11   the department in some way that the roster -- that the

12   firearm doesn't comply with some requirement, I think it can

13   be removed.

14        In terms of the firearms in this case, the only one

15   that's been removed from the roster has been because the fee

16   -- as far as we can tell, the fee hasn't been paid.  But

17   there are other ways that it could come off the roster, I

18   believe.

19        THE COURT:  All right.  And a follow-up question,

20   before I hear from Mr. Gura if he has anything, just so I'm

21   clear in terms of understanding the operation of the law, a

22   semiautomatic handgun rostered before 2007 is grandfathered,

23   and not subject to the CLI, the MDM, and the microstamping

24   requirements, right?

25        MR. HAKL:  There are handguns that were on the roster

1    when the various provisions became in effect, and they

2    remained on the roster after that.

3              THE COURT:  Those are semiautomatics.

4              MR. HAKL:  There are handguns that were grandfathered.

5              THE COURT:  Semiautomatics.

6              MR. HAKL:  Yes.

7              THE COURT:  I want to get into some of the numbers in

8    just a bit, but any response to anything you've just heard?

9    Any dispute?

10             MR. GURA:  Not exactly a dispute, Your Honor.  We

11   believe that the DOJ is allowed to retest a certain

12   percentage of firearms every year, and on occasion I believe

13   that they've done that.

14             MR. HAKL:  And, Your Honor, if it helps Your Honor, I

15   do have representatives from the Bureau of Firearms here that

16   do know quite a bit about the actual technical operation of

17   the --

18             THE COURT:  This isn't an evidentiary hearing.

19             MR. HAKL:  All right.

20             THE COURT:  I mean, at this point I'm not

21   contemplating asking for supplemental briefing.  This is

22   summary judgment, so you're stuck with the record that you

23   have.

24             MR. HAKL:  I understand.

25             THE COURT:  If you need to consult with them before

1    answering a question, let me know.

2         Just, finally, on the law itself, I don't know if it

3    matters, but is California at this point the only state with

4    the microstamping requirement that's actually in effect by

5    virtue of the department's declaration?

6         MR. HAKL:  As far as I know, but I know it's been

7    considered by Congress, it's been considered by other states.

8    But I'm -- I just got a nod from my colleague in the back

9    that it doesn't look like it's been passed by other states,

10   but it's been considered at the federal level, bills have

11   been introduced --

12        THE COURT:  Do you agree with that, Mr. Gura, just in

13   terms of the way the law is developing, and whether or

14   not there are any other --

15        MR. GURA:  I'm not aware of any other laws that have

16   microstamping.

17        THE COURT:  All right.  Are there any other challenges

18   of the nature currently before this Court that have been

19   brought against the UHA?

20        MR. GURA:  Your Honor, not that I'm aware of.

21        THE COURT:  All right.

22        MR. HAKL:  I know that -- go ahead, Mr. --

23        THE COURT:  Attacking the provisions that are --

24        MR. GURA:  I'm not aware of any.

25        We had a case in DC that we filed that was very

1    quickly resolved when DC changed its law to avoid the

2    lawsuit.  That was years ago.

3              THE COURT:  I'm aware of that.

4              Mr. Hakl.

5              MR. HAKL:  No lawsuits like this one, Your Honor.

6    Massachusetts has a rostering scheme.  There was a lawsuit --

7              THE COURT:  I'm talking about the California law.

8              MR. HAKL:  I'm sorry.  No.  No other -- this is the

9    case, Your Honor.

10             THE COURT:  All right.

11             Turning now to this Court's scrutiny of the law,

12   assuming that I do scrutinize the law, starting with you,

13   Mr. Gura, can you help me understand your position?  Courts

14   often defer to legislatures, so what's the best authority for

15   providing this Court with guidance on how to take account of

16   any deference due?

17             Assume for sake of argument that I decide intermediate

18   scrutiny is the proper level of scrutiny.

19             MR. GURA:  Your Honor, the leading case as far as

20   deference would be Heller.  And Heller clarified, once again,

21   and brought the Second Amendment into the rest of the Bill of

22   Rights, and held that there is no presumption of

23   constitutionality, as we learned way back in Footnote 4 of

24   Carolene Products, for laws that implicate the Bill of

25   Rights.  It's a fundamental right, we know that from

1    McDonald.  And so there is no presumption of

2    constitutionality, and deference should be limited.

3          It's interesting that --

4          THE COURT:  Is there deference to legislative

5    findings?  If the legislature has engaged in fact finding, do

6    I defer to those?

7          MR. GURA:  Your Honor, we don't believe that the Court

8    should.  The legislature will always find that its laws are

9    reasonable and just and wise.  And the legislature would

10   never pass a law on any subject for which it wouldn't assert

11   that it's wholesome and useful and doesn't violate the

12   Constitution.

13         The Court exercises an independent judgment.  This is

14   a co-equal branch of the government.  And this is where

15   constitutionality gets tested.  And so while the legislative

16   findings should be considered, of course, we don't think that

17   they should necessarily be ignored, I don't know that the

18   Court should simply stop and say, well, there's been a

19   finding and therefore that's as far as it goes.

20         Intermediate scrutiny requires still the government to

21   bear the burden of proving that there is a substantial fit

22   between an important regulatory in trust and the regulation

23   at stake.  And so if the fit is not good enough, then

24   obviously the law is not going to survive constitutional

25   review, even under intermediate scrutiny.

 1              And courts have been very inconsistent, I'll -- I must

 2       admit, Your Honor.  In the Second Amendment field, we've seen

 3       intermediate scrutiny cases that have been more or less

 4       deferential.  Some of the ones that have been -- in

 5       particular in the Fourth Circuit I recall a variety of cases,

 6       and we can offer supplemental briefing if you want, but I'm

 7       sure it's fairly easy to locate, cases where repeatedly the

 8       Fourth Circuit had remanded to the district court for

 9       additional fact finding and additional support to sustain

10       some laws that one would not imagine to be unconstitutional,

11       things like the domestic violence prohibition, things like

12       the -- I believe there was something else relating to -- with

13       a 922 recently.  And I have the cases, we can brief it.  But

14       the court said, look, it's nice that, obviously, Congress

15       felt it had a good reason to do this, but we actually do need

16       facts, we do need some evidence, we do need some

17       justification, and there is going to need to be a substantial

18       fit.

19              We submit that, obviously, the state has an interest

20       in reducing gun violence and gun accidents, there is no

21       dispute about that.  However, to ban all new semiautomatic

22       models because they lack microstamping is not a substantial

23       fit to achieving those goals.  Nor is it a substantial fit to

24       the state's interests to say that all of these firearms

25       henceforth shall have chamber loaded indicators or magazine

1    disconnect devices, when the state's own handgun safety

2    manual teaches people that the way you can tell that a

3    handgun is unloaded is by emptying it, and looking at it, and

4    verifying that it's unloaded.  And that's --

5            THE COURT:  I understand that argument.

6            Accidental -- the concern -- the substantial public

7    interest in preventing accidental deaths extends to the

8    deaths of children who aren't reading those manuals.

9            MR. GURA:  Sure.  But children may also not understand

10   anything about what a chamber loaded indicator is, children

11   may not know or care about whether or not a magazine is in or

12   outside the handgun.

13           In any event, the rights of law-abiding Americans are

14   not reduced to what is fit for children who should always be

15   supervised when it comes to firearms, if they have access to

16   them at all.

17           We are dealing with a right that is designed for, to

18   be enjoyed by, responsible, law-abiding adult citizens.  And

19   to so drastically curtail the market for handguns in common

20   use because of these requirements we submit would fail

21   intermediate scrutiny, even if that were the test.

22           THE COURT:  I understand those arguments.

23           So, Mr. Hakl, it's not disputed that we have here

24   law-abiding citizens who wish to use the firearms identified

25   in protection of hearth and home, that's not -- I don't see

1    great evidence on that point, but it's not disputed either,

2    correct?

3          MR. HAKL:  Correct.

4          THE COURT:  All right.  So, assuming -- I mean, I -- I

5    understand your position that intermediate scrutiny may not

6    be the right test, but assume for sake of argument that the

7    Court does apply that level of scrutiny, just help me

8    understand your reading of Chovan.  Why would that be

9    incorrect?  Because the holding in Chovan doesn't use the

10   words "substantial burden," it just says "burden," right, any

11   burden on the right is sufficient.

12         MR. HAKL:  Chovan actually talks about burden in two

13   places.  It talks about it to get through, what they call,

14   step one, does it burden the Second Amendment right.  And

15   then go through that analysis.  And if you get to step two,

16   the Court directs that you're supposed to apply what they

17   refer to as an appropriate level of scrutiny.  They don't say

18   any particular kind.

19         THE COURT:  But it's not rational basis, right?

20   Post-Heller.

21         MR. HAKL:  Assuming that the -- assuming the Second

22   Amendment right recognized in Heller is implicated in step

23   one, it would not be rational basis at step two of the Chovan

24   inquiry, that's correct.

25         THE COURT:  So, it's either intermediate or strict.

1    Is there any other?  Appropriate is fairly open ended.  Is

2    there some other level of scrutiny?

3         MR. HAKL:  The courts talk a lot about the familiar

4    tiers of scrutiny; rational basis, intermediate, strict.

5    Looking at all the cases very carefully, one court's

6    intermediate scrutiny isn't necessarily the exact same as

7    others court's intermediate scrutiny.  I think, frankly,

8    there is a lot of play in the intermediate scrutiny standard.

9         But I -- but, yeah, if intermediate scrutiny -- well,

10   first, before we get to the intermediate scrutiny question,

11   to answer your question about burden, at step one they talk

12   about -- the Ninth Circuit talked about burden.

13        At step two, in determining the appropriate level of

14   scrutiny, they -- the Court directed that we consider two

15   things, and that's where it's whether the -- I think it's

16   the -- there is a substantial burden, and if -- and it also

17   considers to what extent the regulation approaches the core

18   of the Second Amendment.  And in Chovan, the court found one

19   of those elements met.

20        My point is that here there is no substantial burden,

21   and the core of the Second Amendment isn't threatened in any

22   way, shape, or form.  So if -- you know, it -- it's not -- it

23   wouldn't be the same level of scrutiny in Chovan that would

24   be needed.  But I appreciate your Court's question -- the

25   Court's question about, well, what else is there between

1    rational basis and intermediate scrutiny.  But in light of

2    the facts of this case, and the standard laid out in Chovan,

3    I would just -- I think it would be important to keep in mind

4    that all intermediate scrutiny requires is a reasonable fit.

5    I mean, it's not a perfect fit between the interests and the

6    rule.

7         THE COURT:  Just so I understand, is it possible to

8    see your argument and take it to its logical extension that

9    the state can ban all types of unsafe handguns except even

10   one without triggering heightened scrutiny?

11        Is that -- if it's -- if it's one handgun available,

12   or a few, is that enough to provide the choice that

13   plaintiffs deserve in light of their Second Amendment rights?

14        MR. HAKL:  Well, I -- if -- the state could further

15   limit handguns provided it continued to respect the -- what

16   the Second Amendment protects, which is the ability to

17   possess and use a handgun for self-defense.  Whether or not

18   that -- you know, I don't know --

19        THE COURT:  How much choice is enough?

20        MR. HAKL:  For example -- I mean, if the state were to

21   issue a handgun to everybody in the -- you know, every

22   citizen, issue a handgun and say that's the handgun you can

23   use, I think -- you know, I think that would probably be okay

24   in terms of -- because they would be respecting the right to

25   possess and use a handgun for self-defense purposes.  There

1    is no right to own any handgun you want whatsoever, or to --

2    what we're talking about here is purchasing handguns.

3              THE COURT:  I understand that.

4              Also help me understand your reference to the

5    gunpowder storage laws, which is fairly passing.  I mean, is

6    that a serious argument, that the law is presumptively lawful

7    because of historically long-standing prohibitions?

8              MR. HAKL:  No.  The -- the point -- I cited the

9    language about commercial sale of regulation -- you know,

10   commercial sale of firearms, and there is also some reference

11   in Heller to gunpowder storage laws, and also laws requiring

12   that firearms be stored to prevent accidents, and how the

13   court admittedly, you know, only implicitly endorsed these

14   kinds of laws that are designed for safety reasons, reasons

15   to prevent accidents.

16             Plaintiffs took me to task in the briefs about the

17   gunpowder storage laws.  Between the three examples of laws

18   cited in my brief, I would concede that that one is the most

19   attenuated.  But I think perhaps the better example in the

20   Supreme Court's opinion is the one about storage of laws so

21   that accidents don't occur -- storage laws so that accidents

22   don't occur.  And then, of course, also the commercial sale

23   language.

24             THE COURT:  And those prior laws would support the

25   argument that the statute is presumptively --

1          MR. HAKL:  Right.

2          THE COURT:  -- lawful.

3          MR. HAKL:  In my mind, Your Honor, the presumptively

4    lawful analysis goes to whether or not there is a burden on

5    the Second Amendment right at step one of the Chovan inquiry.

6          You know, our argument is that there are numerous

7    handguns available in California.  And, in fact, in addition

8    to that, these -- the kind of law that we're looking at here

9    today is within the realm of laws that the Supreme Court has

10   endorsed in its language in Heller, and that other courts

11   have held up.

12         THE COURT:  I understand that argument.

13         Any response, Mr. Gura?

14         MR. GURA:  Yes, Your Honor.  I mean, perhaps it might

15   be easier to conceive of the arguments here if we thought of

16   what would happen if the state had said, not only are

17   handguns without magazine disconnects unsafe, handguns with

18   certain calibers are unsafe because they cause more damage.

19   So, henceforth, the only handgun caliber allowable in

20   California would be a .22, the smallest standard type of

21   caliber, and if you have a .38, if you have a 9 millimeter,

22   perhaps a .45 definitely, all of those would be prohibited

23   because they're unsafe because they cause too much damage.

24         In fact, the state could take the argument further,

25   the state could say, you can have no firearms necessarily,

1    you can have only, perhaps, tazers.  Which I believe there is

2    one -- one court in Michigan upheld as something within the

3    protections of the Second Amendment.

4         We're getting into this idea that the state can

5    dictate what types of arms are the ones that are safe enough

6    to have, which was, of course, exactly the type of argument

7    we had in Heller, where the city made a huge effort to assert

8    that handguns, for whatever reason, they're concealable,

9    they're used by criminals a lot, they're portable, they can

10   be used irresponsibly, those are too dangerous, we let people

11   have rifles and shotguns, that should be good enough.

12        I would submit it's not a question of how many arms

13   are enough, whether there is some magic number or proportion

14   that would satisfy the Second Amendment.  The question is

15   much simpler than that.

16        The question is, we have a Second Amendment case, so

17   the Court has to answer whether or not the articles in

18   question are even implicated by the amendment; are they arms,

19   are they the type of arms that are protected.  And if so,

20   then if we had a regulation like a storage law, for example,

21   then we can apply a level of scrutiny and see whether or not

22   the state's interest in the regulation was sufficient to

23   impose on people who wanted to have access to that protected

24   arm.  But if the arm is protected, then you cannot

25   prohibit -- the state cannot prohibit its sale, that would be

1   a prohibition of the type that Heller condemned.

2          And this is why we think that once we go down this

3   rabbit hole of trying to find a magic number of guns -- if I

4   heard Mr. Hakl correctly, he believes that the state could

5   issue a gun to everybody, one type of gun, and that would be

6   good enough.  We would submit, Your Honor, that the right to

7   keep arms is not the right to keep whatever arms the state

8   thinks you should have, it's the right to keep arms of the

9   kind in common use for traditional lawful purposes.

10          THE COURT:  How important is the right to a particular

11   color?  I understand there is a dispute about whether or not

12   it's just about the finish, but the plaintiff who wants the

13   two-tone arm that's available in a different color

14   grandfathered in --

15          MR. GURA:  Because --

16          THE COURT:  -- what's the problem with the different

17   color?

18          MR. GURA:  The problem is it's an arbitrary

19   restriction, Your Honor, and we don't allow arbitrary

20   restrictions -- arbitrary classifications in the exercise of

21   a fundamental right.

22          The state can come up with all kinds of restrictions

23   that implicate fundamental rights and say, what's your

24   problem, I mean, you can handle, perhaps --

25          THE COURT:  But the state is not restricting the

 1    color.  It happens to be this two-tone model has become

 2    available after the new regulations have kicked in.

 3            MR. GURA:  The state is not even enabling -- but this

 4    type of gun with the two tones is still a gun of the kind in

 5    common use for lawful purposes.  So the state should have the

 6    burden of showing why it is that this kind of gun should not

 7    be allowed.  They would say, well, it doesn't have a chamber

 8    loaded indicator of the type we like, it doesn't have a

 9    magazine disconnect that we would like, it doesn't do

10    microstamping anymore --

11            THE COURT:  I understand the arbitrariness argument.

12            MR. GURA:  We believe it's arbitrary.

13            THE COURT:  All right.

14            In terms of what the evidence in the record shows,

15    help me understand some of the numbers or the statistics, if

16    I even --

17            MR. HAKL:  Your Honor, could I respond to the

18    arbitrary point, if that's okay?

19            THE COURT:  You may, very briefly.

20            MR. HAKL:  It's not arbitrary.  The evidence shows

21    that the reason that that particular gun isn't on the roster

22    is because it hasn't been submitted by the manufacturer for

23    testing.  The fact that it's not on the roster has nothing to

24    do with its color.

25            THE COURT:  Any -- is that disputed?  Does the record

1    even tell me one way or the other?

2          MR. GURA:  What's not disputed, Your Honor, is that

3    we -- we don't dispute that that handgun is not on the

4    roster.  The state does not dispute that other identical guns

5    are on the roster.  So, we're left with an impasse, in a

6    sense, that we're claiming, look, there are handguns of the

7    kind in common use that are protected, the state even allows

8    some of them, it doesn't allow this particular one for

9    whatever reason.  The fact is, people are entitled, under the

10   Second Amendment, to access this arm.  There is no good

11   reason to deprive them of access to it.

12         THE COURT:  If there is that kind of gap in the

13   record, and -- is there a possibility -- the Court has the

14   same question with respect to microstamping, for example.  It

15   appears there is a gap.

16         The state is saying, you know, no longer sole source,

17   technically microstamping could become available.  The

18   plaintiffs are saying no one is making microstamping

19   available.  It doesn't really answer the question, does it,

20   if the question needs to be answered at this point, is that a

21   temporary situation?  Is it a permanent ban?  Do I deny

22   summary judgment and proceed to a bench trial on -- to fill

23   in those gaps --

24         MR. GURA:  Your Honor --

25         THE COURT:  -- both here and with respect to

1    microstamping?

2         MR. GURA:  There is no factual dispute, the defendant

3    has admitted that microstamping does not exist.  It's not --

4    the defendant has stated in response to discovery that he

5    doesn't know of any plans to introduce it.  Right now --

6         THE COURT:  He says he doesn't have the knowledge --

7         MR. GURA:  But the point is --

8         THE COURT:  -- to ultimately answer the question.

9         MR. GURA:  He also says he doesn't know if anyone will

10   ever introduce it.

11        What we do know is that today, as we sit here right

12   now, the Second Amendment is in operative effect in this

13   state.  And so today people do have a right to access

14   handguns of the kind in common use for traditional lawful

15   purposes.  They are unable to obtain any new models now, and

16   for the indefinite future, because of this microstamping

17   requirement, and therefore their injury is ripe and it's

18   completed today.

19        If we have a right to these things --

20        THE COURT:  Is it sufficient for me to grant summary

21   judgment if it's at this point in time?  I mean, say -- is it

22   undisputed that at this point in time that microstamping

23   provision has the effect of reducing the market for new

24   semiautomatic handguns by about 80 percent?  Is that

25   undisputed at this point in time, Mr. Hakl?

1          MR. HAKL:  The -- I mean the microstamping, it did not

2     come in effect, for practical purposes, until May, so it's

3     only been a few months.  I mean, I think that the

4     legislature, you know, thinks that, you know, if the

5     technology is there, it's available, if manufacturers want to

6     sell their guns in California, they will incorporate that

7     technology.  You know --

8          THE COURT:  It's a technology forcing regulation,

9     that's clear.  But there is --

10         MR. HAKL:  The technology exists.

11         THE COURT:  Well, it's patented.  Is it available for

12    purchase anywhere?

13         MR. HAKL:  No.  I -- in California, I'm not aware of a

14    firearm that has microstamping technology on it for sale.

15         MR. GURA:  Your Honor --

16         THE COURT:  But my question is, so your position is

17    that the Court could conclude, based on the record before it,

18    that it's a temporary situation?

19         MR. HAKL:  I think so.

20         THE COURT:  But how do I know that for summary

21    judgment purposes?  How can I, based on the record before

22    me --

23         MR. HAKL:  Well, I think the legislative history, I

24    think -- well, we know the technology is there, and the

25    legislative history shows, I think, that, for example, with

1    the chamber loaded indicator and the magazine disconnect

2    mechanism and so forth, that that technology would, quote,

3    unquote, drive the market.  I mean, that's the reason why the

4    legislature -- the legislature indicated that.

5           THE COURT:  Can I fill the gap, then, on summary

6    judgment?

7           MR. HAKL:  I think you can defer to that legislative

8    finding -- well, I don't -- I don't -- for example, Your

9    Honor, I don't think it matters.  I mean, I guess what you

10   might be asking is what if a gun manufacturer never decides

11   to incorporate microstamping into any of their handguns, and

12   decides to never offer those handguns for sale in California.

13   If that's the logical conclusion, I still think defendant is

14   entitled to summary judgment because -- I mean, for all the

15   reasons that we've stated.  There is no burden on the Second

16   Amendment.

17          I mean, the California legislature has made a decision

18   that certain handguns that are for sale need to have

19   these certain features.  And if certain -- those handguns

20   don't, they can't be sold.  You know, those new handguns

21   can't be sold.

22          MR. GURA:  Your Honor --

23          THE COURT:  So why should I -- again, on the record

24   before me, how can I conclude that it's a permanent ban?

25   That's essentially you're -- you're saying I can conclude

1    that, right?

2          MR. GURA:  I would agree, actually, with Mr. Hakl

3    about this much, I would agree with him that it doesn't

4    matter, for this reason:  Suppose, for example, that tomorrow

5    every manufacturer decides to introduce microstamping.  All

6    the same, Brett Thomas still could not access Dick Heller's

7    High Standard revolver, because that's not on the roster.  I

8    know microstamping is not an issue of a revolver --

9          THE COURT:  We'll get to that.  Just focus on

10   microstamping right now.

11         MR. GURA:  The point is that even if some large

12   percentage of microstamping semiautomatic handguns came onto

13   the market, the fact is there would still be handguns of the

14   kind in common use that don't have microstamping, people

15   would be entitled to purchase those handguns, and they would

16   not be able to.

17         And I would reference the amicus brief we got from

18   Glock.  The most interesting thing about that amicus brief is

19   it related facts that are fairly well-known, at least in the

20   firearms community, which is that California does not allow

21   the sale of the Generation 4 Glock models that came out, I

22   believe, in 2008.  And Glock still doesn't sell those

23   handguns here.  They are, obviously, quite popular throughout

24   the United States in many lawful applications, but they don't

25   meet -- never mind the microstamping, they don't meet the

 1    magazine disconnect and some of the other requirements.

 2         People do have the right to purchase a modern Glock

 3    firearm.  It is the quintessential handgun that would be

 4    within Heller's definition.

 5         So, yes, even if microstamping came onto the market

 6    tomorrow, people still would have the right to

 7    non-microstamping guns.

 8         Your Honor, I would also, for the record, just

 9    highlight Request for Admission Number 4, just to clarify

10    something that came up.  We requested, and this is docket

11    number 61-22 --

12         THE COURT:  I've reviewed those responses.

13         MR. GURA:  So, the defendant admitted that no handguns

14    currently available for sale in the United States have

15    microstamping technology that satisfies the requirements of

16    the Act.

17         THE COURT:  That's a fair characterization of the

18    response?  No supplementation to that response, Mr. Hakl?

19         MR. HAKL:  That's -- I mean, as far as we know, yeah.

20    I mean, I think there is language in there to defendant's

21    knowledge, or -- we stand by the admission that is in our

22    discovery, Your Honor.

23         THE COURT:  All right.

24         On that buntline revolver, do the parties have -- do

25    they agree as to why it's not rostered?

 1          MR. HAKL:  It's -- I think the declaration that we've

 2    submitted shows that we have no record of a High Standard

 3    buntline style revolver ever being submitted to the

 4    department to be considered for rostering.

 5          THE COURT:  Do you dispute that?

 6          MR. GURA:  I don't dispute it wasn't submitted because

 7    that handgun has not been made for many years, the High

 8    Standard company -- this may be beyond the record, but I

 9    think it's certainly within judicial notice that they went

10    out of business, their name was purchased by somebody else.

11    But that's an old revolver.  Dick Heller purchased that

12    revolver back in the 1970s.  And it's a -- it's not quite a

13    curio or relic.

14          And this raises another issue.  The state exempts

15    curios or relics as defined under federal law.  When we look

16    at that CFR section, we see that one way to become curio or

17    relic is to be 50 years old.  So, in a sense, all of these

18    handguns that are currently not on the roster might well be

19    for sale in California if only we were to wait half a

20    century.  And I suppose there might be 45 years ticking on

21    the Glock Gen4, there might be fewer years left on Dick

22    Heller's gun.  But, again, another issue, that's an old gun

23    of the type that is not on the roster.

24          Other states have different ways of dealing with this.

25    For example, in Maryland, I believe when they created their

1    rostering program, which is far more generous than

2    California, one of the provisions there, I believe, is that

3    firearms manufactured prior to 1985 are exempt.  So, that

4    takes care of the historical issues.

5              THE COURT:  Any response to that information with

6    respect to the buntline?

7              MR. HAKL:  I, frankly, do not know whether the

8    buntline would qualify as a curio or relic.  I mean, there is

9    some reference to that in their papers.  I don't know if it

10   would -- it -- it has gained certain status as a result of

11   what -- apparently its involvement in the Heller case.  But

12   other than that, no, I don't have a response.

13             THE COURT:  All right.  Just checking some other facts

14   here.

15             With respect to the fee, Pena points to the delisting

16   because a fee was not paid.  Does Pena have the ability to

17   try to get the fee paid one way or the other?

18             MR. GURA:  I don't believe that he does because, first

19   of all, he wouldn't be a responsible party under the

20   definition, he's not a law enforcement agency or an importer,

21   manufacturer, distributor, wholesaler, even if you go that

22   far.

23             THE COURT:  Does he have the ability to try to get it

24   paid by a responsible party?  That's a burden on him.

25             MR. GURA:  I suppose it's -- he could always make a

1   request.  He could also request the DOJ to list it.  I

2   believe the DOJ can submit things for testing.  Nothing bars

3   the state from listing things -- testing things on their own

4   initiative.  The law provides for it, in fact.  But, you

5   know, that's his First Amendment right, to make a request to

6   the government.  That's not within his power.

7          MR. HAKL:  Mr. Pena himself could not pay the fee, but

8   there is -- I think at least the implication is correct, that

9   there is nothing stopping him from, you know, a grassroots

10  movement to, you know, lobby the particular manufacturer to,

11  you know, pay the fee.

12         THE COURT:  All right.  Let me just -- here are the

13  numbers I think I have in the record.  Tell me if there are

14  any other numbers that help me understand the -- what's going

15  on with the market.

16         The record discloses that at least for 2011, and I

17  think only 2011, that 81.9 percent of all handguns were

18  semiautomatic.  I think that's a fair characterization.

19         I think I can calculate from the numbers in the record

20  that approximately 68.5 percent of all handguns manufactured

21  in 2011 were centerfire semiautomatics.

22         I don't think I know how many of the rostered handguns

23  were semiautomatic, either centerfire or rimfire.  If that's

24  in the record someplace, I'd like to know where it is.

25         I believe the record discloses that there are slightly

 1   more than 1200 handguns on the roster as of October 2013, but

 2   there is a difference between handguns and semiautomatics.  I

 3   don't think it's disputed that most new handguns are

 4   semiautomatics.

 5          So, let me stop there.

 6          Is there anything I'm missing in terms of the

 7   information that's in the record related to those stats?

 8          MR. HAKL:  I don't think we have a dispute about the

 9   numbers.

10          THE COURT:  All right.  Is there anything that tells

11   me how many of the rostered handguns are semiautomatics?

12          MR. HAKL:  Maybe the roster itself.  I would have to

13   look at that.

14          THE COURT:  All right.  Is there anything besides 2011

15   statistics that shows the Court if there is any trend,

16   Mr. Gura?

17          MR. GURA:  Your Honor, those are the latest years I

18   found on the ATF website.  There are previous reports

19   available from previous years.  I believe the numbers are

20   somewhat consistent.  We would have to look it up.

21          As we sit here, who knows the number of weeks or

22   months when we might get the 2012 data, as 2011, of course,

23   recedes into the background.  Those are the numbers we have,

24   Your Honor, I would agree.

25          MR. HAKL:  If Your Honor would like to know how many

1    exactly semiautomatics are on the roster, we could get -- I

2    could get that information and supplement the record, if Your

3    Honor wants that piece of information.

4            THE COURT:  All right.  I'll let you know.

5            Do you think that would be a stipulated number?

6            MR. GURA:  We could probably stipulate to that.  It

7    involves counting the guns and seeing what they are, I

8    suppose.

9            THE COURT:  I'll let you know if I need that.

10           And I think it's not disputed that handgun sales,

11   including revolvers and .22 calibers, have increased

12   approximately 70 percent between 2009 and 2012.  I think

13   that's a calculation that can be made based on the

14   defendant's numbers.  That's not disputed?

15           MR. GURA:  We don't dispute the defendant's numbers,

16   Your Honor.

17           MR. HAKL:  And I have not calculated the percentage

18   myself, Your Honor, but the -- the numbers set forth in our

19   declaration are accurate, and they are on the rise.

20           THE COURT:  And I don't believe there is anything in

21   the record, to the extent it matters to the Court ultimately,

22   to show me what percentage of semiautomatics have detachable

23   magazines in the current time period, say, during the last

24   five years.  Is there anything that addresses that question

25   if the Court --

1          MR. HAKL:  Not that I'm aware of.

2          MR. GURA:  We have -- I believe we have declarations

3     in the record that say they're in common use, and we would

4     stand by that.  But we don't have any precise numbers if that

5     is what Your Honor is asking.  We submit it's within judicial

6     notice that detachable magazines exist, and are common for

7     lawful purposes.

8          THE COURT:  Is there any evidence in the record, that

9     magazine disconnect devices impede functionality for

10    self-defense?

11         MR. GURA:  Some people do take that view.

12         THE COURT:  But is there evidence in the record?

13         MR. GURA:  I don't believe that we have evidence on

14    that.  I mean, we have -- I believe the Glock amicus brief

15    made that argument.

16         MR. HAKL:  Just with respect to the amicus brief, I

17    mean, it's not supported by any evidence, it's just --

18         THE COURT:  It's an argument.  It's an amicus.

19         MR. HAKL:  Your Honor, just --

20         THE COURT:  I have a few questions about equal

21    protection.

22         MR. HAKL:  All right.

23         THE COURT:  Then one final question circling back to

24    standing.  And then, again, brief -- if you have a few

25    minutes of anything you think we haven't covered you think

1    the Court needs to hear, I'll give you a few moments to do

2    that.

3              On equal protection, Mr. Gura, is it your position

4    that you have actually identified for the Court similarly

5    situated classes who are treated disparately?

6              MR. GURA:  Yes, Your Honor.

7              THE COURT:  I know you run through -- so, those are

8    those similarly situated classes, the actors, the law

9    enforcement, the --

10             MR. GURA:  People who have and introduced handguns

11   into the communities who should not have and introduce unsafe

12   handguns into the communities.  People -- if a handgun is

13   unsafe, and it can be fired accidentally by somebody who

14   finds it, or somebody who misjudges it, then it should -- you

15   know, if that's the theory, then it's an arbitrary

16   classification, yes, Your Honor.

17             THE COURT:  What's the best authority for law

18   enforcement personnel and lay persons being similarly

19   situated?

20             MR. GURA:  Silvera, Your Honor.  Silvera is a case

21   that was overruled.  It was the Ninth Circuit case from 2003

22   dealing with the California Assault Weapons Act.

23             THE COURT:  Did it actually address whether or not

24   those categories were similarly situated?

25             MR. GURA:  Yes.  I believe what -- the one thing that

1    Silvera did, at the very end of the opinion there is a long

2    discussion of it, is it struck down the exemption for law

3    enforcement personnel to have so-called assault weapons for

4    private purposes.  The Court went into an extended discussion

5    of the fact that the legislature had determined these guns to

6    be unsafe, to be a danger to the public, to not be something

7    that people should have, and there is no reason why a retired

8    law enforcement person should have these for private purposes

9    any more than someone who didn't retire from law enforcement.

10   And they found that it was irrational.

11              THE COURT:  Rational basis.

12              MR. GURA:  It applied rational basis, because it found

13   no Second Amendment right exists, which of course is no

14   longer the law.

15              But the logic there, I think, at least with respect to

16   that exemption, is very telling.

17              THE COURT:  Is the plaintiffs' equal protection claim

18   coextensive with the Second Amendment claim?

19              MR. GURA:  It is.  And the way we argue it is,

20   obviously, as the Court knows, our primary Second Amendment

21   argument is on common use.  The heightened scrutiny argument

22   is more of a secondary argument.  But when it comes to equal

23   protection, that's where we do look to see whether or not the

24   state has some kind of heightened scrutiny rationale to treat

25   similarly situated people differently in the exercise of

1  fundamental rights.  So, that brings it in.

2          But you're right, Your Honor, it's coextensive in that

3  sense.

4          THE COURT:  Anything to say in response to what you've

5  just heard, Mr. Hakl?

6          MR. HAKL:  Just with respect to Silvera's discussion

7  of law enforcement officers is nuanced.  They make

8  distinctions between retired law enforcement officers, law

9  enforcement officers that are active duty, and things like

10  that.  So, it doesn't discuss law enforcement officers in a

11  blanket fashion as petitioners may have just suggested.

12  There are distinctions in there.  There are other cases in

13  our brief that demonstrate the difference between law

14  enforcement officers and lay persons.

15          THE COURT:  What's your best authority for the

16  exemption extending to off-duty law enforcement personnel?

17          MR. HAKL:  I would have to rely on the cases in my

18  brief for that, Your Honor.

19          THE COURT:  Just finally circling back on standing,

20  there was an additional question I had there.

21          Technically, should the Court be analyzing standing

22  looking at the as-applied challenge first?  Because if the

23  law is constitutional in the face of an as-applied challenge,

24  then there is no standing for a facial challenge.  Isn't that

25  the proper order?

1          MR. GURA:  Your Honor, standing is a separate inquiry

2     than the merits.  If the law is constitutional or not is a

3     different -- is a very different question than whether anyone

4     has standing or not.

5          So, we believe that whether the Court wants to look at

6     standing discretely first with respect to as-applied

7     challenges and then with respect to facial challenges, or the

8     other way around, in any event, standing should come first.

9     And then once the Court gets through standing, if we have

10    standing, then the Court can determine the merits of the

11    claim.

12         But I don't -- I believe the Court should keep those

13    two inquiries separate.  That is, it's -- this is one of the

14    critiques that the people had of the Ninth Circuit's former

15    Second Amendment approach, where they viewed it as a standing

16    question when they held there was no right, and that was very

17    different than what had gone on even in the other circuits

18    that didn't adopt the individual acts point of view.  And I

19    think that the other courts are a little bit more correct on

20    that.

21         THE COURT:  Is it possible that the analysis ends up

22    being intertwined because the Court can't figure out the

23    standing question without getting into the merits?

24         MR. GURA:  No.  I think the Court can figure out

25    standing without getting into the merits at all.

1          The standing question is really quite distinct from

2     the merits.  The standing question is, is there an injury, is

3     the injury redressable, and is it fairly traceable to the

4     conduct of the defendants.  That's Lujan.

5          And none of that has anything to do with whether or

6     not the injury is a -- in fact, a constitutional violation.

7     The injury is the inability to access an item, and it's the

8     fact that people have less choice, and that they pay higher

9     prices, and they're frustrated in their ability to engage in

10    something that they claim to be within their right.  That's

11    the injury.

12         Now, it could well be, I hope it's not the case, but

13    the Court could logically, even though we would disagree with

14    the outcome, it could decide, yes, the plaintiffs are injured

15    in that they are being frustrated in their access to these

16    items, but based on the Court's analysis, that injury is not

17    a constitutional injury, it's just an injury in fact.

18         That's an outcome that would be consistent, as much as

19    we wouldn't like it.

20         THE COURT:  All right.

21         Anything else on that, Mr. Hakl?

22         MR. HAKL:  No, Your Honor.

23         THE COURT:  All right.  These are cross-motions so,

24    you know, I'm not certain it matters who really goes first.

25    But is there anything else you think we haven't covered that

1    the Court needs to hear that you can tell me in a few

2    minutes?

3              Mr. Gura?

4              MR. GURA:  Yes, Your Honor, just one thing briefly.

5              First of all, we do very much thank the Court for

6    obviously taking a lot of time to look at this carefully and

7    call us in here and have a very thorough hearing.

8              The only thing I wanted just to make sure we discussed

9    here today, if we needed to, is the fact that the record does

10   indicate that these features are available only in 11 percent

11   and 14 percent; that is, chamber loaded indicators and

12   magazine disconnect devices of handguns.  Those are the facts

13   that were found by the legislature.  We would agree that

14   these are rare features, these are not common features.  More

15   importantly, guns lacking these features are common.

16             The reason I bring this up again, Your Honor, we had

17   some discussion about what percentage of handguns were

18   semiautomatic, and what percentage had detachable magazines.

19   We know that these particular features are required -- are

20   quite rare, and we know that from the legislative findings,

21   and I believe that's not disputed.

22             THE COURT:  Agreed, Mr. Hakl?  That's both at the time

23   the law was passed and today?

24             MR. GURA:  We believe -- go ahead.

25             MR. HAKL:  That's what the legislative history

1    indicates at the time that the legislative history was

2    written.  I don't think there is any evidence in the record

3    as to what the current percentages are.

4           MR. GURA:  We know that Glock Generation 4 handguns

5    are not available for sale in California.  That is the latest

6    version of the Glock that's been for sale for five years now

7    in the United States.  At some point we might surmise Glock

8    will be tired of making the old and increasingly dated models

9    just for the sake of this state.  I mean, people here in

10   California should be able to access the 2008 models.

11          MR. HAKL:  And --

12          THE COURT:  All right.  So, anything else, Mr. Gura?

13          MR. GURA:  No.

14          THE COURT:  Mr. Hakl.

15          MR. HAKL:  With respect to the percentages in the

16   legislative history, I think that's a reference to the

17   percentage of new handguns coming to market, not all of the

18   handguns currently in the marketplace, whether new or used.

19   So, I think that's what those percentages refer to.  But I

20   would defer to what, exactly, the legislative history says on

21   that.

22          THE COURT:  All right.  Anything else you think the

23   Court needs to hear?

24          MR. HAKL:  Not from defendant's perspective, other

25   than I'm not sure -- we think the Chovan case applies here.

 1    And would -- you know -- so, we stand by what's in our brief

 2    in terms of the steps of the inquiry we think the Court

 3    should take in evaluating the Act.

 4          The common use test, whether -- we don't think -- you

 5    know, there may be gaps in the record as to what is in common

 6    use and what is not, but it -- we think that that's actually

 7    an immaterial question, because even when it comes to

 8    handguns that are in common use, or handguns that are -- it

 9    doesn't mean they can't be regulated.

10          So, that -- other than that, Your Honor, we have no

11    further comments today, unless Your Honor has questions.

12          THE COURT:  Just one final question.

13          I am not -- I don't know where I'm going with this,

14    but let's say I don't grant summary judgment in full for

15    either side, I think what I would do is set a status and we'd

16    talk about a bench trial date.

17          Does that sound right to you both?  Mr. Gura?

18          MR. GURA:  That's the procedure.  If summary judgment

19    is denied to everybody, that's what you wind up with is a

20    trial, I suppose.

21          MR. HAKL:  You --

22          THE COURT:  Even with this kind of case?  It seems to

23    me that's --

24          MR. HAKL:  Well, I think --

25          THE COURT:  I don't know if that's where we end up,

1    but I wanted to see if you had other thoughts about next

2    steps, if that's the Court's decision.

3          MR. HAKL:  That would -- I agree with Mr. Gura on

4    that, just generally that is the next step.  I don't know --

5    looking at plaintiffs' claim, I'm not sure what there is to

6    try.  I mean, for example, there is no evidence that, you

7    know, chamber load indicators don't work.  This isn't a case

8    where -- I mean, the nature of the claim isn't that magazine

9    disconnect mechanisms don't work.  I mean, there is no

10   evidence of that.  I mean, the claim is a straight ahead

11   legal constitutional claim that they have a constitutional

12   right to buy these particular handguns, and that the state

13   can't -- can't regulate them.  I mean, I think it's a legal

14   question before the Court.  The facts before the Court go to

15   the burden, and things like that.

16         THE COURT:  That's exactly right.  The question is,

17   are burdens satisfied, or how does the Court scrutinize the

18   law in light of burdens.

19         MR. GURA:  One point I would raise, I suppose there is

20   one other option that we can have, we may have to research

21   this a little bit, and perhaps we can both get back to the

22   Court, if the Court is unprepared to give summary judgment to

23   anybody, then the Court might be able to certificate an

24   appeal for one or both sides.  If both sides believe that

25   they have submitted enough on the record to entitle them to

1    summary judgment, and there is a dispute on that, I suppose

2    that's one way we can proceed.  I'm just thinking out loud

3    here.

4         The other thing, just to get back, it came to my mind,

5    Your Honor, on the standing question, the NRA case in the

6    Fifth Circuit lays out the framework; that is, first, they

7    only discretely dealt with the injury issue as to whether or

8    not there was a fairly traceable, redressable injury, and

9    then they ruled against the plaintiffs on the Second

10   Amendment question, but those were kept very separate.

11        THE COURT:  All right.  Understood.

12        All right.  Don't think about next steps, I was just

13   wondering if you had thought about that and had thoughts.

14        So, you will -- in my order I will either invite your

15   suggestions or set a status if I do not end up granting

16   summary judgment.

17        The matter is submitted.  This was very helpful.

18   Thank you.

19        MR. HAKL:  Thank you, Your Honor.

20        MR. GURA:  Thank you, Your Honor.

21        THE CLERK:  Court is in recess.

22             (Proceedings adjourned, 11:15 a.m.)

23                  ---oOo---

24

25

1                          REPORTER'S CERTIFICATE

2

3                              ---oOo---

4    STATE OF CALIFORNIA      )
     COUNTY OF SACRAMENTO      )

5

6        I, KIMBERLY M. BENNETT, certify that I was the Official

7    Court Reporter, and that I reported verbatim in shorthand

8    writing the foregoing proceedings; that I thereafter caused

9    my shorthand writing to be reduced to typewriting, and the

10   foregoing pages constitute a complete, true, and correct

11   record of said proceedings:

12        COURT:   U.S. District Court
                   Eastern District of California
13
          JUDGE:   Honorable KIMBERLY J. MUELLER, Judge
14
          CASE:    IVAN PENA, et al. Vs. STEPHEN LINDLEY,
15                 Chief of the California Department of
                   Justice Bureau of Firearms,
16
          DATE:    DECEMBER 16, 2013
17
         IN WITNESS WHEREOF, I have subscribed this certificate at
18   Sacramento, California.

19                            /s/ Kimberly M. Bennett
                              KIMBERLY M. BENNETT
20                            CSR No. 8953, RPR, CRR, RMR

21

22

23

24

25