KAMALA D. HARRIS
Attorney General of California
STEPAN A. HAYTAYAN, State Bar No. 205457
Supervising Deputy Attorney General
ANTHONY R. HAKL, State Bar No. 197335
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 322-9041
 Fax: (916) 324-8835
 E-mail: Anthony.Hakl@doj.ca.gov
*Attorneys for Defendant Stephen Lindley*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IVAN PEÑA, ROY VARGAS, DOÑA CROSTON, BRETT THOMAS, SECOND AMENDMENT FOUNDATION, INC. and THE CALGUNS FOUNDATION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> STEPHEN LINDLEY, <br><br> Defendant. | Case No. 2:09-CV-01185-KJM-CMK <br><br> **DEFENDANT STEPHEN LINDLEY'S SUPPLEMENTAL BRIEF** <br><br> Dept.: Courtroom 3, 15th floor <br> Judge: The Honorable Kimberly J. Mueller <br> Trial Date: None at this time <br> Action Filed: May 1, 2009 |

**TABLE OF CONTENTS**

                                                                                                    **Page**

Introduction ............................................................................................................................ 1

Argument .............................................................................................................................. 1

    I.    The Microstamping Requirement does not Amount to a *De Facto* Ban. ............... 1

        A.    Handguns, Including but not Limited to Semiautomatic Pistols Without Microstamping Technology, are Widely Available in California. ......................................................................................................... 1

        B.    Microstamping Technology Exists and can be Implemented..................... 3

    II.    The Microstamping Provisions do not Burden any Second Amendment Rights. ........................................................................................................................ 5

    III.    The UHA's Similar-Gun Exception Reasonably Fits the Statute's Purposes. .................................................................................................................... 7

Conclusion............................................................................................................................. 9

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Berman v. Parker*
   348 U.S. 26 (1954) ................................................................................................. 4

*Chovan v. United States*
   735 F.2d 1127 (9th Cir. 2013) ........................................................................ 5, 6, 8

*District of Columbia v. Heller*
   554 U.S. 570 (2008) ........................................................................................ 2, 6, 7

*Gonzales v. Oregon*
   546 U.S. 243 (2006) ............................................................................................. 4

*Jackson v. City and County of San Francisco*
   746 F.3d 953 (9th Cir. 2014) .......................................................................... 5, 6, 8

*Peruta v. County of San Diego*
   742 F.3d 1144 (9th Cir. 2014) ............................................................................... 5

*Turner Broad. Sys. Inc. v. FCC*
   520 U.S. 180 (1997) ............................................................................................. 4

*United States v. Marzzarella*
   614 F.3d 85 (3d Cir. 2010) ................................................................................... 6

*Washington v. Glucksberg*
   521 U.S. 702 (1997) ............................................................................................. 4

**STATUTES**

California Penal Code
   § 12126 .................................................................................................................. 8
   § 12131.5 ............................................................................................................... 8
   § 31910(a)(1)-(3) ................................................................................................... 7
   § 31910(b)(1)-(6) ................................................................................................... 7
   § 31910(b)(4)-(6) ................................................................................................... 8
   § 31910(b)(7)(A) ............................................................................................. 1, 2, 7
   § 32000(a) ......................................................................................................... 1, 6
   § 32030 ............................................................................................................. 2, 7
   § 32030(a)(1)-(4) ................................................................................................... 8
   § 32110(a) ............................................................................................................. 2
   § 32110(f) .............................................................................................................. 2

## **TABLE OF AUTHORITIES**
(continued)

**Page**

National Firearms Act, Chapter 757, § 8(a), 48 Stat. 1236 (1934) ................................................ 6

United States Code
    Title 26, § 5842 ......................................................................................................................... 6

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Second Amendment ............................................................................................................. *passim*

**OTHER AUTHORITIES**

Assem. Com. on Public Safety, Analysis of Assembly Bill No. 1471 (2007-2008 Reg.
    Sess.) April 17, 2007 ................................................................................................................. 4

Assem. Com. on Appropriations, Analysis of Assembly Bill No. 1471 (2007-2008 Reg.
    Sess.) May 16, 2007 .................................................................................................................. 4

Senate Com. on Public Safety, Analysis of Assembly Bill No. 1471 (2007-2008 Reg.
    Sess.) June 26, 2007 .................................................................................................................. 4

Kathryn E. Carso, Comment, *Amending the Illinois Postconviction Statute to Include
    Ballistics Testing*, 56 DePaul L. Rev. 695, 721 (2006) ............................................................. 6

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense: An
    Analytical Framework and a Research Agenda*, 56 UCLA L.Rev. 1443, 1455-56
    (2009) ........................................................................................................................................ 7

# INTRODUCTION

Defendant Stephen Lindley respectfully submits this supplemental brief addressing the two issues identified by the Court in its June 5, 2014 Order. (Doc. no. 89.) With respect to the first issue, the microstamping requirement of California's Unsafe Handgun Act ("UHA" or "the Act") does *not* amount to a *de facto* ban of unrostered weapons to which the requirement applies. Nor does the requirement burden plaintiffs' Second Amendment rights. Regarding the second issue, the UHA's handgun testing requirements, including the similar-gun exception, reasonably fit the statute's purposes. Accordingly, and as explained in further detail below, the Court should grant defendant's motion for summary judgment and deny plaintiffs' motion for summary judgment.

# ARGUMENT

## I. THE MICROSTAMPING REQUIREMENT DOES NOT AMOUNT TO A *DE FACTO* BAN.

### A. Handguns, including but not limited to semiautomatic pistols without microstamping technology, are widely available in California.

With certain exceptions, the UHA prohibits the manufacture or sale of any "unsafe handgun" in California. Cal. Penal Code § 32000(a).[1] An "unsafe handgun" includes a semiautomatic pistol if "it is not designed and equipped with" microstamping technology (i.e., "a microscopic array of characters that identify the make, model, and serial number of the pistol, etched or otherwise imprinted in two or more places on the interior surface or internal working parts of the pistol, and that are transferred by imprinting on each cartridge case when the firearm is fired"). § 31910(b)(7)(A). For a number of reasons, this requirement is not a *de facto* ban of the unrostered weapons to which it applies.

First, the UHA applies only to any person in California who "manufactures or causes to be manufactured, imports into the state for sale, keeps for sale, offers or exposes for sale, gives, or lends" any unsafe handgun. § 32000(a). Thus, the Act regulates a limited set of activities. Notably, the Act does not regulate the *possession* of handguns or the *use* of handguns. Because it still allows the possession and use of unrostered semiautomatic handguns lacking microstamping

---

[1] All further statutory citations are to the California Penal Code unless otherwise indicated.

technology, the UHA cannot be characterized as any kind of "ban" of those weapons. The facts in *District of Columbia v. Heller*, 554 U.S. 570 (2008) stand in stark contrast to the situation here. There, the Court struck down a law that "totally ban[ned] handgun possession in the home" and "ma[de] it impossible for citizens to use them for the core lawful purpose of self-defense." *Heller*, 554 U.S. at 628, 630. Due to the lack of restrictions on possession and use, the impact of the UHA is nothing like the impact of the total ban at issue in *Heller*.

Second, the microstamping requirement only recently took effect[2] and does not apply to any of the numerous semiautomatic pistols that were "already listed on the roster" on the effective date. § 31910(b)(7)(A). What is more, the requirement does not apply to any semiautomatic pistols later added to the roster under the similar-gun exception. § 32030. Nor will it apply to semiautomatic pistols added in the future under the similar-gun exception. *Ibid*. Thus, notwithstanding the microstamping requirement, there are still nearly one thousand handguns on the Roster of Handguns Certified for Sale. (Decl. of Stephen Lindley in Support of Def.'s Supp. Brief ("Lindley Decl.") ¶ 3.) This includes 735 semiautomatic pistols to which the microstamping requirement rule would otherwise apply. (*Id*. ¶ 5.) Given the availability of this large number of handguns, there is no way that the Act can be characterized as a ban of any kind.

Third, the microstamping requirement does not apply to *every* handgun sale. Simply stated, the Act focuses on new handguns as they are introduced into the California firearms marketplace. It does not focus on the large number of handguns already in California and owned by private parties. (*See* Lindley Decl. ¶ 4.) For example, the UHA exempts the transfer of firearms between private parties, § 32110(a), and firearms delivered for consignment sale or as collateral for a pawnbroker loan. § 32110(f). Indeed, it is undisputed that under the private-party transfer exception each of the individual plaintiffs could lawfully purchase his or her desired firearm from

---

[2] The California Legislature set the microstamping rule to take effect January 1, 2010, "provided that the Department of Justice certifies that the technology used to create the imprint is available to more than one manufacturer unencumbered by any patent restrictions." § 31910(b)(7)(A). That certification did not occur until May 17, 2013, about one year ago. (*See* Pls.' Mem. of P. & A. in Support of Pls.' Mot. for Summ. J. at 7-8.)

a private party in California.  (*See* RT at 14-17.)  Thus, because it does not prohibit the sale of handguns through these channels, the UHA cannot be characterized as a handgun ban of any sort.

Finally, the robust market for handguns in this state makes it clear that there is no ban, *de facto* or otherwise.  The number of handgun transactions in California continues to rise.  Since plaintiffs filed suit in 2009, the Bureau of Firearms has processed nearly *two million* DROS transactions involving handguns.  (Lindley Decl. ¶ 4.)  And notably each of the plaintiffs has admitted to being able to purchase a handgun suitable for self-defense.  In fact, each has admitted to already owning a handgun suitable for self-defense.  (*See* Opp'n to Pls.' Mot. for Summ. J. by Def. Stephen Lindley at 2.)  In the face of these facts, plaintiffs cannot reasonably argue that the UHA is a handgun ban.

For all of these reasons, the microstamping requirement of the UHA does not amount to a *de facto* ban of unrostered weapons to which it applies.

**B.   Microstamping technology exists and can be implemented.**

If the Court sought this supplemental briefing out of a concern that the microstamping requirement amounts to a *de facto* ban because it is somehow impossible to comply with the requirement, that concern is easily addressed.  As explained below, available technology permits compliance with the requirement.  Firearms manufacturers could comply with the requirement on currently unrostered handguns.

As an initial matter, though, plaintiffs do *not* base their Second Amendment claim on the idea that microstamping "doesn't work" or is technologically impossible.  Rather, plaintiffs' claim is that the Second Amendment prohibits California from requiring handguns to have microstamping technology (or any other safety features) under any circumstances.  (*See, e.g.*, Pls.' Mem. of P. & A. in Opp'n to Def.'s Mot. for Summ. J ("Pls.' Opp'n") at 12 (claiming that if Court determines firearms at issue are "the sorts of weapons" that were "in common use at the time," then "the case ends").)  In discussing the "ban" issue at oral argument, counsel for plaintiffs explained: "The point is that even if some large percentage of microstamping semiautomatic handguns came onto the market, the fact is there would still be handguns of the kind in common use that don't have microstamping, people would be entitled to purchase those

3

handguns, and they would not be able to." (Reporter's Transcript ("RT") of Hearing on Cross-Motions for Sum. J. (Doc. no. 79) at 37.)  In other words, "even if microstamping came onto the market tomorrow, people still would have the right to non-microstamping guns." (RT at 38.)  In light of the all-or-nothing nature of plaintiffs' Second Amendment claim, the feasibility of microstamping is not at issue in this case.

In any event, microstamping is possible beyond any reasonable dispute.  The legislative history of Assembly Bill ("A.B.") 1471, the microstamping law, shows that the Legislature understood the patented technology of microstamping, recognized how it worked, and understood its efficacy in fighting crime.  *See* Senate Com. on Public Safety, Analysis of Assembly Bill No. 1471 (2007-2008 Reg. Sess.) June 26, 2007 at pages H-O; *see also* Assem. Com. on Appropriations, Analysis of Assembly Bill No. 1471 (2007-2008 Reg. Sess.) May 16, 2007; Assem. Com. on Public Safety, Analysis of Assembly Bill No. 1471 (2007-2008 Reg. Sess.) April 17, 2007.[3]  The Court should afford "substantial deference to the predictive judgments" of the California Legislature.  *Turner Broad. Sys. Inc. v. FCC*, 520 U.S. 180, 195 (1997); *see also Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (deferring to state legislative judgments regarding the exercise of the police power); *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (same); *Berman v. Parker*, 348 U.S. 26, 32 (1954) (same).

Moreover, there is now additional evidence in the record regarding the details of microstamping technology.  With this supplemental brief Lindley has filed the declaration of Todd Lizotte, the inventor of microstamping.  (Decl. of Todd Lizotte in Support of Def.'s Supp. Brief ¶¶ 1 & 2.)[4]  That detailed declaration further shows how microstamping functions and how it can be used to solve crimes.  (*See id.* ¶¶ 3-16.)  It also shows that handgun manufacturers can

---

[3] These committee analyses of A.B. 1471 are attached as Exhibits C, D and E to the declaration of the undersigned filed in support of the Opposition to Plaintiffs' Motion for Summary Judgment by Defendant Stephen Lindley.  (Doc. Nos. 74-5, 74-6, & 74-7.)

[4] Mr. Lizotte's work is also cited in the legislative history of the microstamping law. *See* Senate Com. on Public Safety, Analysis of Assembly Bill No. 1471 (2007-2008 Reg. Sess.) June 26, 2007 at pages M & N.  (Doc. No. 74-5.)

apply available technology to comply with the microstamping requirement and that they can do so at a minimal cost. (*See id.* ¶¶ 4, 17 & 18.)

Accordingly, because microstamping technology is available and feasible, the UHA does not amount to a *de facto* ban of any new weapons to which the microstamping requirement applies.

## II. THE MICROSTAMPING PROVISIONS DO NOT BURDEN ANY SECOND AMENDMENT RIGHTS.

Assuming the microstamping requirement does not amount to a *de facto* ban, the Court has also asked the parties to address the extent of any burden the requirement imposes on Second Amendment rights. As explained below, there is no burden.

In *Chovan v. United States*, 735 F.2d 1127 (9th Cir. 2013), the Ninth Circuit adopted a two-step Second Amendment inquiry. That approach "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *Chovan*, 735 F.2d at 1136. The Ninth Circuit recently confirmed this two-step inquiry in *Jackson v. City and County of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014), upholding San Francisco regulations governing handgun storage and prohibiting certain ammunition sales.[5]

This Court's question regarding burden goes to the first step of the two-step Second Amendment inquiry. Here, the first step is to assess whether the microstamping requirement "burdens conduct protected by the Second Amendment." *Jackson*, 746 F.3d at 962. In assessing

---

[5] The issue in *Jackson* was "whether two of San Francisco's firearm and ammunition regulations, which limit but do not destroy Second Amendment rights, are constitutional." *Jackson*, 746 F.3d at 957-58. In contrast, in *Peruta v. County of San Diego*, 742 F.3d 1144, 1170, 1167 (9th Cir. 2014), the Ninth Circuit found San Diego County's concealed weapons policy required "*Heller*-style per se invalidation" because it "destroys (rather than merely burdens) a right central to the Second Amendment." Plaintiffs have brought *Peruta* (but not *Jackson*) to the Court's attention by way of a notice of supplemental authority. (Doc. no. 83.) In *Jackson*, which is the most recent of the Second Amendment opinions issued by the Ninth Circuit, there is no mention of *Peruta*, in which rehearing en banc remains a possibility. *See Peruta v. County of San Diego*, No. 10-56971 (Doc. Nos. 121, 122 & 126.) In any event, even if *Chovan* and *Jackson* on the one hand, and *Peruta* on the other, lay out different Second Amendment tests, *Chovan* and *Jackson* apply here. One could not reasonably argue that the UHA totally "destroys" any Second Amendment right. Under the Act, plaintiffs remain free to possess and use handguns for the purpose of self-defense.

any burden, the Ninth Circuit cases have considered whether the applicable statute "regulates conduct 'historically understood to be protected' by the Second Amendment 'right to keep and bear arms.'" *Jackson*, 746 F.3d at 962 (quoting *Chovan*, 735 F.3d at 1136, 1137). In analyzing the scope of the Second Amendment, both *Chovan* and *Jackson* looked to "the list of 'presumptively lawful' regulations provided by *Heller*." *Jackson*, 746 F.3d at 962. And *Heller* expressly lists laws like the microstamping requirement. Specifically, the requirement, like the UHA as a whole, is a "law[] imposing conditions and qualifications on the commercial sale of arms." *See Heller*, 554 U.S. at 626-27; § 32000(a) (including any person who "imports into the state for sale, keeps for sale, [or] offers or exposes for sale"). For this reason alone, the Court should conclude that the microstamping requirement does not burden Second Amendment rights.

Additionally, there is historical precedent for the microstamping requirement. *See Jackson*, 746 F.3d at 962 (considering whether regulation "resemble[s]" prohibitions discussed in historical evidence). For example, ammunition components have had markings such as etches and striations ever since ammunition has been loaded into firearms and subjected to the firing process, which has been occurring for centuries. *See* Lizotte Decl. ¶ 6; *Heller*, 554 U.S. 570, 581-84 (2008) (Americans have been using firearms for centuries). As one commenter has observed, "[b]allistics testing is over one hundred years old." Kathryn E. Carso, Comment, *Amending the Illinois Postconviction Statute to Include Ballistics Testing*, 56 DePaul L. Rev. 695, 721 (2006). The use of serial numbers on firearms has occurred for more than 150 years. *See United States v. Marzzarella*, 614 F.3d 85, 93 n.11 (3d Cir. 2010) (upholding regulation prohibiting obliterated serial numbers). And federal law has *required* serial numbers since at least the passage of the National Firearms Act of 1934. National Firearms Act, ch. 757, Sec. 8(a), 48 Stat. 1236 (1934) ("[e]ach manufacturer and importer of a firearm shall identify it with a number or other identification mark approved by the Commissioner, such number or mark to be stamped or otherwise placed thereon in a manner approved by the Commissioner"); *see* 26 U.S.C. § 5842 ("[e]ach manufacturer and importer and anyone making a firearm shall identify each firearm . . . manufactured, imported, or made by a serial number"). Requiring microstamping is very similar to requiring serial numbers. Indeed, the microstamping process simply involves the transference

of the serial number of the pistol, along with the make and model, on to a component of the ammunition.  § 31910(b)(7)(A).

The microstamping requirement is a presumptively lawful rule under *Heller* because it simply regulates the commercial sale of handguns.  It is also supported by historical precedent.  And as discussed above, handguns remain widely available in California and plaintiffs remain free to defend themselves irrespective of the microstamping requirement.  *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L.Rev. 1443, 1455-56 (2009) ("tracking regulations" like serial number and microstamping requirements "are not much of a burden on self-defense").  Accordingly, the requirement does not burden plaintiffs' Second Amendment rights.

### III. THE UHA'S SIMILAR-GUN EXCEPTION REASONABLY FITS THE STATUTE'S PURPOSES.

Turning to the Court's final question, the issue is whether a reasonable fit exists between the UHA's testing requirements, particularly the similar-gun exception, and the statute's purposes.  As explained below, such a fit exists.

For revolvers, the testing requirements include the safety device, firing, and drop safety testing requirements.  § 31910(a)(1)-(3).  For semi-automatic pistols, they include the safety device, firing, drop safety, chamber load indicator, and magazine disconnect mechanism testing requirements.  § 31910(b)(1)-(6).  The similar-gun exception allows placing a handgun on the roster without testing only if the firearm differs in limited cosmetic ways from a handgun by the same manufacturer already on the roster.  *See* § 32030.

Regarding the purposes of the UHA, the record shows that the Act's general aim is to improve consumer and public safety by reducing firearm accidents and violence and reducing crime, and that there is a reasonable fit between the provisions of the Act and those purposes.  (*See, e.g.*, Def. Stephen Lindley's Mem. of P. & A. in Supp. of Mot. for Summ. J. at 3-4; Opp'n to Pls.' Mot. for Summ. J. by Def. Stephen Lindley at 8-10.)  There is a reasonable fit between the similar-gun exception in particular and public and consumer safety because the exception allows the rostering of a handgun based on the existence of a gun already on the roster only if the

differences between the two are cosmetic, as opposed to functional. More specifically, the handguns can differ only in their finish; grip material, shape, and texture; and *"[a]ny other purely cosmetic feature* that does not in any way alter the dimensions, material, linkage, or functioning of the magazine well, the barrel, the chamber, or any of the components of the firing mechanism of the firearm." § 32030(a)(1)-(4) (italics added).[6] Thus, if a handgun is added to the roster under the similar-gun exception, it may be cosmetically different, but a gun that is its functional equivalent necessarily has already been tested and met the safety device, firing and drop safety requirements of the Act. Requiring that a similar gun be functionally equivalent to a tested gun on the roster furthers the consumer and public safety purposes of the Act, without placing any additional burdens on gun manufacturers who simply wish to make cosmetic changes to their firearms.

Defendants recognize that a some pistols could be added to the roster under the similar-gun exception even though it may not have a chamber load indicator or magazine disconnect mechanism. But those two particular requirements were not part of the original UHA; they were added in 2003.[7] And the language of the relevant statutes reflect the Legislature's express intention to "phase in" those requirements. Depending on the firearm in question, the requirements were effective "[c]ommencing January 1, 2006," or "January 1, 2007," and applied only to "semiautomatic pistols *that are not already listed on the roster*." § 31910(b)(4)-(6) (italics added). This phased implementation chosen by the Legislature still fits the aims of the Act. Finally, as mentioned above, the statutory scheme, including the similar gun exception, was

---

[6] The face of the Act, its legislative history and the studies cited in that history and the case law are all relevant when considering the question of fit. *Jackson*, 746 F.3d at 966; *Chovan*, 735 F.3d at 1139-40.

[7] The California Legislature added the safety device, firing and drop safety requirements in 1999. Former § 12126, added by Stats. 1999, c. 248 (S.B. 15), § 1. The similar-gun exception also was included in the 1999 law. Former § 12131.5, added by Stats. 1999, c. 248 (S.B. 15), § 1. The chamber load indicator and magazine disconnect mechanism requirements were added later in 2003. Former § 12126, added by Stats. 1999, c. 248 (S.B. 15), § 1, amended by Stats. 2003, c. 500 (S.B. 489), § 1.

drafted to ensure that any handgun, no matter how it is added to the roster, meets the basic testing requirements of the Act (i.e., the safety device, firing and drop safety requirements).

Accordingly, the Court should find that the similar-gun exception reasonably fits the purposes of the UHA.

**CONCLUSION**

For all of these reasons, the Court should grant defendant's motion for summary judgment and deny plaintiffs' motion for summary judgment.

Dated: July 7, 2014

Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
STEPAN A. HAYTAYAN
Supervising Deputy Attorney General

/s/ ANTHONY R. HAKL

ANTHONY R. HAKL
Deputy Attorney General
*Attorneys for Defendant*
*Stephen Lindley*

SA2009310413
32014501.doc