UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

IVAN PEÑA, et al.,

          Plaintiffs,

    v.

STEPHEN LINDLEY, in his official
capacity as Chief of the California
Department of Justice Bureau of Firearms,

          Defendant.

No. 2:09-CV-01185-KJM-CKD

ORDER

        On cross-motions, the parties move for summary judgment on claims related to
the constitutionality of California's Unsafe Handgun Act ("UHA").  The court heard argument
on December 16, 2013, with Alan Gura and Donald Kilmer appearing for plaintiffs and
Anthony Hakl III appearing for defendant.  Subsequent to the hearing, the court directed
supplemental briefing.  In light of the supplemental briefing, plaintiffs' pending motion to
supplement the record, ECF No. 82, is DENIED as moot.  For the following reasons, the court
DENIES plaintiffs' motion and GRANTS defendant's motion.

/////

/////

/////

/////

I.      BACKGROUND

     A.      PARTIES

Individual plaintiffs Ivan Peña, Roy Vargas, Doña Croston, and Brett Thomas are law-abiding citizens of the United States and California. Pls.' Second Am. Compl. ("SAC") ¶¶ 1–4, ECF No. 53; Pls.' Resp. to Def.'s Undisputed Facts ¶¶ 4, 9, 14, 19, ECF No. 73-1. Each is a member of plaintiff Second Amendment Foundation, Inc. ("SAF"), and plaintiffs Vargas and Croston are "supporter[s] of and participant[s] in" the activities of plaintiff Calguns Foundation, Inc. ("CGF"). SAC ¶¶ 1–4. Plaintiffs Peña and Thomas are board members of CGF. *Id.* ¶¶ 1, 4.

Plaintiff SAF is

> a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including California. The purposes of SAF include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control.

*Id.* ¶ 5; *see also* Pls.' Resp. to Def.'s Undisputed Facts ¶ 2. Plaintiff CGF is

> a non-profit organization incorporated under the laws of California with its principal place of business in San Carlos, California. The purposes of CGF include supporting the California firearms community by promoting education for all stakeholders about California and federal firearm laws, rights and privileges, and defending and protecting the civil rights of California gun owners. CGF represents these members and supporters, which include California firearm retailers and consumers. CGF brings this action on behalf of itself and its supporters, who possess all the indicia of membership.

SAC ¶ 6; *see also* Pls.' Resp. to Def.'s Undisputed Facts ¶ 3.

Plaintiffs name as defendant Stephen Lindley in his official capacity as the Chief of the California Department of Justice Bureau of Firearms. SAC ¶ 7; Pls.' Resp. to Def.'s Undisputed Facts ¶ 1. In this capacity, defendant is responsible for formulating, administering, enforcing, and executing the challenged laws. SAC ¶ 7.

/////

/////

2

## B. UNSAFE HANDGUN ACT

The UHA is a penal statute that prohibits the manufacture, sale, gifting, or lending of any handgun in California that does not meet certain requirements. Cal. Penal Code §§ 31910, 32015(a). It finds its genesis in 1997, when the California Legislature passed S.B. 500, which attempted to ban guns, known as "Saturday Night Specials," that did not comply with federal safety standards. S.B. 500, 1997–1998 Leg., Reg. Sess. § 1 (Cal. 1997) (as passed by Senate, Sept. 9, 1997, but not enacted); Assem. Comm. on Appropriations, 1997–1998 Leg.-Comm. Analysis of S.B. 500, Reg. Sess. at 1 (Cal. July 30, 1997). Noting that "[t]he leading cause of death among young people ages 10 to 17 in California [in 1996] was firearm violence," "[t]he overwhelming majority of [which] were caused by the cheaply manufactured Saturday Night Special," the Legislature sought to require that any handgun sold or manufactured in California undergo independent laboratory testing and be certified by the California Department of Justice ("DOJ") as "safe." Assem. Comm. on Appropriations, 1997–1998 Leg.-Comm. Analysis of S.B. 500, Reg. Sess. at 2 (Cal. July 30, 1997). Finding that the bill would "fail to keep guns out of the hands of criminals," while "depriv[ing] law-abiding, legitimate gun users of the needed protection of handguns," however, Governor Peter Wilson vetoed the legislation, saying that S.B. 500's "net [was] cast much too wide . . . ." S.B. 500 Veto Message from Governor Wilson to Members of the Cal. Senate (Sept. 26, 1997).

The next year, the Legislature passed a narrower version of S.B. 500, known as S.B. 15 or the UHA, which the Governor signed into law. The UHA established a comprehensive regulatory scheme applicable to all handguns sold commercially in California. S.B. 15, 1999–2000 Leg., Reg. Sess. § 1 (Cal. 1999). Specifically, the UHA criminalized the manufacture, import, lending, or sale of any "unsafe handgun," permitting "imprisonment in a county jail [for a period] not exceeding one year." Cal. Penal Code § 32000. The term "unsafe handgun" is defined to include any revolver or semiautomatic pistol that is "not already listed on the roster" of "tested handguns determined not to be unsafe" by the California Department of Justice. *Id.* §§ 31910, 32015(a).

/////

The purpose of the UHA was twofold.  First, it was intended to reduce crime by eliminating the sale of cheap handguns.  *Fiscal v. City & Cnty. of San Francisco*, 158 Cal. App. 4th 895, 912 (2008); *see also* Assem. Comm. on Appropriations, 1999–2000 Leg.-Comm. Analysis of S.B. 15, Reg. Sess. at 2 (Cal. July 7, 1999) (Bureau of Alcohol, Tobacco and Firearms statistics show that four of five guns used in criminal acts are cheap guns that do not meet drop safety and other gun specification requirements).  Second, it was meant to ensure handguns "fire when they are supposed to and that they do not fire when dropped" by requiring that all handguns be subject to a "drop test," which the bill's author submitted is "fair and reasonable for weapons sold to the public for self-protection.  If a weapon is not reliable for self-defense it has no business being sold in California."  S. Rules Comm., 1999–2000 Leg.-Comm. Analysis of S.B. 15, Reg. Sess. at 11 (Cal. Apr. 28, 1999).  To be considered safe, revolvers must meet firing and drop safety requirements and must have a "safety device . . . that causes the hammer to retract to a point where the firing pin does not rest upon the primer of the cartridge."  Cal. Penal Code § 31910(a).  Pistols must also meet the firing and drop safety requirements and must have a "positive manually operated safety device."  *Id.* § 31910(b)(1)– (3).  If a handgun not on the roster is sufficiently similar to a model already listed, then the similar model may be listed without undergoing testing, upon certification by the applicant in an affidavit that the model is indeed similar.  *Id.* § 32030.  Sufficient similarity means differing only in purely cosmetic feature[s] not affecting the "dimensions, material, linkage, or function[] of the magazine well, the barrel, the chamber, or any of the components of the firing mechanism of the firearm," or differing only in finish or the material from which the grips are made.  *Id.*

Manufacturers and importers who seek to have a handgun listed bear the costs of creating and maintaining the rostering program.  Cal. Code Regs. tit. 11, § 4072.  There is a $200.00 annual listing fee for each model, payable by the manufacturer or importer.  *Id.* §§ 4071, 4072.  If the responsible party fails to make this payment, the gun is delisted.  *Id.* § 4071(d).  If a manufacturer or importer discontinues manufacturing or importing the model, then a fully licensed wholesaler, distributor, or dealer may submit a written request and pay the

listing fee to maintain the model on the roster. *Id.* § 4070(d). Similarly, if a listing has lapsed or was removed for lack of payment, a manufacturer, importer, or "other responsible party" may submit a written request to have the model relisted. *Id.* § 4070(e). "'Responsible party' includes, but is not limited to, firearm manufacturers/importers and law enforcement agencies." *Id.* § 4049(s).

The UHA was amended in 2003, requiring among other things that center fire[1] semiautomatic[2] pistols not listed by January 2007 come equipped with two additional safety features:

- a "chamber load indicator," which is "a device that plainly indicates that a cartridge is in the firing chamber"; and

- a magazine disconnect mechanism, which is a "mechanism that prevents a semiautomatic pistol that has a detachable magazine from operating to strike the primer of ammunition in the firing chamber when a detachable magazine is not inserted in the semiautomatic pistol."

Cal. Penal Code §§ 32010(d), 16380, 16900. Not every chamber load indicator ("CLI") meets the statutory requirement. Rather, each CLI must be "designed and intended to indicate to a reasonably foreseeable adult user of the pistol, without requiring the user to refer to a user's manual or any other resource other than the pistol itself, whether a cartridge is in the firing chamber." *Id.* § 16380. Rimfire[3] semiautomatic pistols do not require a CLI but do require a magazine-disconnect mechanism ("MDM"). *See id.* § 32010(d). The CLI requirement took effect in January 2007, while the MDM requirement took effect a year earlier, in January 2006.

---

[1] Center fire ammunition "fires when the primer at the bottom-center of the cartridge case is struck and thus ignited by the gun's firing pin." Pls.' Corrected Mot. Summ. J. ("Pls.' Mot.") at 1 n.1, ECF No. 67-1.

[2] A semiautomatic gun fires "only one shot with each pull of the trigger." *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1263 (D.C. Cir. 2011) (internal quotation marks omitted). The energy of the just-fired bullet causes ejection of the spent case and the loading of the next cartridge, enabling rapid firing. Pls.' Mot. at 1 n.2.

[3] Rimfire ammunition incorporates the primer into the bottom rim of the case; when the rim is struck by the firing pin, the primer ignites the gun powder. Pls.' Mot. at 2 n.3. For technical reasons, plaintiffs assert, CLIs are not feasible for firearms that use rimfire ammunition. *Id.*

5

1  Handguns that appeared on the roster prior to an effective date are grandfathered in and need

2  not comply with the respective requirements.  *See id.*

3          In 2007, the Legislature also passed the Crime Gun Identification Act ("CGIA").

4  Assem. B. 1471, 2007–2008 Leg., Reg. Sess. § 1 (Cal. 2007).  This legislation imposed a

5  microstamp-technology requirement, amending the UHA to expand the definition of "unsafe"

6  handguns to include "semiautomatic pistols that are not designed and equipped with a

7  microscopic array of characters that identify the make, model, and serial number of the pistol

8  . . . and that are transferred by imprinting on each cartridge case when the firearm is fired."

9  Assem. B. 1471,  2007–2008 Leg., Reg. Sess. Leg. Counsel Digest (Cal. 2007).  In theory, a

10  gun equipped with the technology imprints every bullet fired with a "microstamp" that

11  identifies the weapon and owner.

12          According to the bill's author, the CGIA "is about catching criminals."  Assem.

13  Comm. on Pub. Safety, 2007–2008 Leg.-Comm. Analysis of Assem. B. 1471, Reg. Sess. at 2

14  (Cal. Apr. 17, 2007).  Proponents claimed generally it would: "(a) help law enforcement solve

15  handgun crimes; (b) help reduce gang-violence; and (c) help reduce gun trafficking of new

16  semiautomatic handguns."  *Id.*  Moreover, they claimed the legislation would "place[] no

17  additional burden [on] gun owners," because the "additional cost w[ould] be $0.50 to $2 a gun

18  and no new licenses or permits [would be] required."  *Id.*

19          The opposition countered that "[m]andating [micro-stamping technology] . . . at

20  th[at] time would be excessively premature as it [could] []not be scientifically justified, and it

21  ha[d] not been proven to be practical in implementation."  *Id.* at 4.  Further, the opposition

22  noted that as of 2007, "micro-stamping [wa]s a 'sole source' technology" and that the costs

23  "would not be contained by realistic competition," "result[ing] [in] higher costs for retailers and

24  their customers."  *Id.* at 4–5.

25          The Legislature addressed opponents' concern about microstamping's status as a

26  sole-source technology, conditioning implementation of the requirement on DOJ certification

27  "that the technology used to create the imprint is available to more than one manufacturer

28  unencumbered by any patent restrictions."  Cal. Penal Code § 31910(b)(7)(A).  Thus, although

the microstamping bill was signed into law in October 2007, Assem. B. 1471, 2007–2008 Leg., Reg. Sess. (Cal. 2007), the requirement did not take effect until May 2013, when the DOJ issued the required certification. DOJ Information Bulletin, Ex. N at 2, ECF No. 61-21.[4] Guns listed prior to the May 2013 date are grandfathered. DOJ Information Bulletin at 3. Despite the DOJ certification, "[n]o handguns currently available for sale in the United States have microstamping technology that satisfies the requirements of California's Handgun Roster Law," Interrog. No. 4, Ex. O at 3, ECF No. 61-22, and no manufacturer has submitted a handgun that complies with the UHA's microstamping provision for approval, Interrog. No. 8, Ex. N at 4, ECF No. 61-23.

Finally, the UHA includes several exemptions from the rostering scheme, some of which were added in 2010:

- "Firearms listed as curios or relics" under federal law,[5] Cal. Penal Code § 32000(b)(3);

- The sale or purchase of a handgun to the DOJ or other law enforcement organizations, including their "sworn members," for "use in the discharge of their official duties," *id.* § 32000(b)(4);

- Certain single-action[6] revolvers, *id.* § 32100; and

- The sale, loan, or transfer of any semiautomatic pistol to be used solely as a prop during the course of a movie, television, or video production, *id.* § 32110(h).

*See* Pls.' Undisputed Facts ¶ 39, ECF No. 63. Private party transfers, in which two parties who

---

[4] The court takes judicial notice of the issuance of the DOJ certification because it can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see Estate of Fuller v. Maxfield & Oberton Holdings, LLC*, 906 F. Supp. 2d 997, 1004 (N.D. Cal. 2012) (citing *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) ("It is appropriate to take judicial notice of this information, as it was made publicly available by government entities . . . .")).

[5] Federal law defines curios or relics as "[f]irearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended for sporting use or as offensive or defensive weapons." 27 Fed. Reg. § 478.11. Additionally, a firearm must fall within one of three categories to be considered a relic, such as "[f]irearms which were manufactured at least 50 years prior to the current date, but not including replicas thereof." *Id.*

[6] "Single-action" refers to a gun's trigger function. In a single-action gun, the trigger drops the hammer only after the gun is cocked. Pls.' Mot. at 6 n.4.

7

are not licensed firearm dealers wish to enter into a sale, are likewise unencumbered by the UHA. *See* Cal. Penal Code § 32110(a). Additional exemptions exist, but plaintiffs do not challenge them.

### C.     SUMMARY OF CLAIMS

Plaintiffs bring two claims: (1) violation of the Second Amendment and (2) violation of the Equal Protection Clause of the Fourteenth Amendment. SAC ¶¶ 63, 65. They seek injunctive relief, declaratory relief, costs of suit, and any other relief the court deems appropriate.

Plaintiffs argue the UHA violates the Second Amendment because it bars the purchase of certain handguns that are "in common use" and therefore, constitutionally protected under *District of Columbia v. Heller*, 554 U.S. 570, 573 (2008). These handguns may not be manufactured or sold in California because they: (1) have not been tested for firing and drop safety; (2) are not listed due to nonpayment of an annual listing fee; (3) do not have a CLI, MDM, or both; or (4) do not have microstamping technology. Pls.' Mot. at 13. Plaintiffs stated at hearing that their facial and as-applied challenges are "the same" but wished to "preserve [their] arguments." Dec. 16, 2013 Hr'g Tr. 5:11–17 , ECF No. 79.

Each plaintiff identifies a particular handgun that he or she seeks to purchase from a willing seller but cannot buy because that handgun is not on the UHA roster:

- Plaintiff Peña seeks to purchase an unlisted Para USA (Para Ordnance) P1345SR/ Stainless Steel .45 ACP 4.25". This gun was previously listed on the roster but removed in December 2005. Def.'s Resp. to Pls.' Undisputed Facts ¶¶ 43–44, ECF No. 74-8.

- Plaintiff Vargas, who was born without an arm below the right elbow, seeks to purchase an unlisted Glock 21 SF with an ambidextrous magazine release. *Id.* ¶¶ 46–47, 49. This model is not listed, but the same model without the ambidextrous magazine release is listed. Further, the UHA permits plaintiff to buy the listed model and have it subsequently fitted with the ambidextrous magazine release. *Id.* ¶¶ 50–51. Glock attempted to roster the model with the ambidextrous magazine release, but the DOJ determined it was not sufficiently similar to the listed model to be listed without independent testing. Decl. of Leslie McGovern ("McGovern Decl.") ¶ 9, ECF 74-1.

- Plaintiff Croston seeks to purchase an unlisted Springfield Armory XD-45 Tactical 5" Bi-Tone stainless steel/black handgun in .45

ACP, model number XD9623. Def.'s Resp. to Pls.' Undisputed Facts ¶ 54. This gun is grandfathered onto the roster but only in other colors. This particular color is not listed because, plaintiffs assert, it was released after the CLI and MDM requirements went into effect. SAC ¶¶ 50–52. Plaintiffs also assert that the XD-45 has a CLI but that the DOJ decided it was inadequate.[7] *Id.* ¶ 53. Defendant's undisputed evidence shows that the XD9623 was never submitted for rostering, whether as a similar gun or for testing in its own right. McGovern Decl. ¶ 5.

- Plaintiff Thomas seeks to purchase an unlisted High Standard Buntline style revolver, the handgun at issue in *Heller*. SAC ¶¶ 54–55. This model of revolver has never been submitted for DOJ testing. McGovern Decl. ¶ 7.

Plaintiffs assert the UHA violates the Equal Protection Clause because it bars individual plaintiffs from possessing handguns that it permits other people to possess. SAC ¶ 65. In plaintiffs' estimation, the UHA "arbitrarily distinguishes between otherwise identical firearms, inherently making arbitrary distinctions among the people who would possess them, and arbitrarily bars people from possessing handguns deemed safe for others." Pls.' Mot. at 9. Thus, they conclude, it is unconstitutional. *Id.*

D. PROCEDURAL HISTORY

Plaintiffs filed suit in April 2009. Compl. at 10, ECF No. 1. Due to the Ninth Circuit's then-pending decision in *Nordyke v. King*, the previously assigned district judge stayed the action in October 2009. October 2, 2009 Order at 5, ECF No. 24. In part to permit reconsideration in light of *McDonald v. City of Chicago*, 561 U.S. 742, 130 S. Ct. 3020, 3026 (2010), the *Nordyke* opinion was delayed. It ultimately issued, after rehearing en banc, in June

---

[7] There is no evidence in the record indicating why the DOJ considered model number XD9623's CLI inadequate. There is, however, a letter from the DOJ to Debra Else at Springfield Armory stating that models XD9611, XD9660, and XD9665 were not listed because their CLIs did not comply with DOJ regulations for CLIs, codified at title 11 section 4060(d)(1) of the California Code of Regulations. Pls.' Mot. for Summ. J., Ex. A at 4, ECF No. 61-8. These models' CLIs did not comply because they did not inform a "reasonably foreseeable adult user of the pistol," without consulting a user's manual, that there was a round in the chamber. *Id.* at 5. The DOJ made this determination by asking six randomly selected "non-sworn" employees of the Firearms Division whether they could tell these models were loaded by looking at the CLIs; only one employee of the six could in fact tell. *Id.* Defendant provides a declaration from Leslie McGovern, Associate Governmental Program Analyst at the DOJ, which states that the XD9623 has never been submitted for testing, an assertion plaintiffs' evidence does not contradict. McGovern Decl. ¶ 5.

2012. *Nordyke v. King*, 681 F.3d 1041, 1043 (9th Cir. 2012) (en banc).[8] This court

subsequently lifted the stay in this case in August 2012. Minute Order, ECF No. 42.

After the court lifted the stay, plaintiffs amended the complaint to account for

the microstamping provision, which had since taken effect, making other amendments as well.

*See, e.g.*, SAC ¶¶ 7, 19. Plaintiffs filed the operative Second Amended Complaint in June

2013, *id.* at 12, and defendants answered the following month, Def.'s Answer at 5, ECF No. 54.

The parties simultaneously filed the instant cross-motions in October 2013, and plaintiffs filed

a corrected memorandum in support of their motion in November 2013. Following the hearing

in December 2013, the court ordered supplemental briefing, June 5, 2014 Order at 1–2, ECF

No. 89, and both parties filed briefs, Def.'s Supp. Br. at 1, ECF No. 90; Pls.' Supp. Br. at 1,

ECF No. 91. Plaintiffs filed notices of supplemental authority on February 14, 2014, October

2, 2014, and February 12, 2015. ECF Nos. 83, 92, 93.

II.      STANDING

A.      INDIVIDUAL STANDING

Article III's "case or controversy" language imposes on "the party invoking

federal jurisdiction" the burden of establishing constitutional standing. *Lujan v. Defenders of

Wildlife*, 504 U.S. 555, 561 (1992); *Clapper v. Amnesty Int'l*, __ U.S. __, 133 S. Ct. 1138, 1146

(2013). To meet this burden, a plaintiff must show injury that is "[1] concrete, particularized,

and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable by a

favorable ruling." *Id.* (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149

(2010)). "[T]he irreducible constitutional minimum" requires that "the plaintiff suffer[] . . .

invasion of a legally protected interest." *Lujan*, 504 U.S. at 560; *Jackson v. City & Cnty. of

San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). Further, when seeking injunctive relief, a

plaintiff must show "a very significant possibility of future harm." *Mortensen v. Cnty. of

Sacramento*, 368 F.3d 1082, 1086 (9th Cir. 2004) (internal quotation marks omitted). On

---

[8] *Nordyke* emphasizes "the crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate . . . as lawmaker, and the government acting as proprietor . . . ." 681 F.3d at 1044–45 (citation and internal quotation marks omitted). Those facts are not before the court; thus, *Nordyke* is of limited utility here. *See id.*

summary judgment, a "plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the . . . motion will be taken to be true." *Lujan*, 504 U.S. at 561 (citations and internal quotation marks omitted).

Here, the individual plaintiffs claim that because the UHA "constitute[s] a massive ban on handguns," Pls.' Mot. at 9, including the handguns plaintiffs seek to purchase, they are injured in several ways. Plaintiffs say they suffer: (1) "fear [of] arrest, prosecution, fine and incarceration if [they] complete[] th[ese] purchases," *id.* at 6–7; (2) "increased costs in transporting and transferring . . . firearms from out-of-state dealers that they would not suffer if the firearms were available for sale in California," *id.* at 13; (3) "a significant loss of . . . price competition," *id.*; and (4) "a significant loss of choice," *id.*

Plaintiffs have not established injury on the first asserted basis. Where "persons hav[e] no fears of state prosecution except those that are imaginary or speculative, [they] are not to be accepted as appropriate plaintiffs . . . ." *Younger v. Harris*, 401 U.S. 37, 42 (1971). Here, although each plaintiff claims to "fear arrest, prosecution, fine and incarceration" for purchase of an unlisted weapon, the UHA criminalizes only those who "manufacture[] or cause[] to be manufactured, import[] into the state for sale, keep[] for sale, offer[] or expose[] for sale, give[] or lend[]" such weapons. Cal. Penal Code § 32000. The statute does not criminalize the purchase or mere possession of an unlisted weapon. *Id.* Because this alleged injury is therefore "imaginary or speculative," it is insufficient to confer standing. *Younger*, 401 U.S. at 42.

Plaintiffs have also failed to establish injury on the second and third asserted bases. Although "palpable economic injuries have long been recognized as sufficient to lay the basis for standing," *Sierra Club v. Morton*, 405 U.S. 727, 733 (1972), here, plaintiffs have adduced no "specific facts" to support their "mere allegations" as required under *Lujan*, 504 U.S. at 561. The record is devoid of affidavit testimony or other evidence indicating the actual "costs [of] transporting and transferring . . . firearms from out-of-state," or plaintiffs' likelihood of incurring such costs. Pls.' Mot. at 9. Similarly, plaintiffs have not directed the

/////

11

court's attention to data evincing loss of price competition in California resulting from the UHA. Plaintiffs have not established injury sufficient to confer standing on these bases.

Plaintiffs' fourth and final asserted basis presents a closer question. Plaintiffs claim injury because the UHA causes "a significant loss of choice" in plaintiffs' selection of "handguns whose possession and use is secured by the Second Amendment." Pls.' Mot. at 9. Injury requires "'invasion of a legally protected interest.'" *United States v. Windsor*, ___ U.S. ___, 133 S. Ct. 2675, 2685 (2013) (quoting *Lujan*, 504 U.S. at 560); *see also Jackson*, 746 F.3d at 967. To determine whether an invasion has occurred, the court must first define the right at issue. Thus, determining whether prosecution of third-party gun sellers and manufacturers, who are not before the court, invades plaintiffs' Second Amendment rights is necessary to resolution of both standing and the merits of plaintiffs' claims. Accordingly, "standing and the merits are inextricably intertwined." *Holtzman v. Schlesinger*, 414 U.S. 1316, 1319 (1973).

In such cases, the court must address the merits, as it does below. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243 n.5 (1983) (addressing merits where Court "could not resolve the question [of] . . . standing without addressing the constitutional issue"); *Holtzman*, 414 U.S. at 1319 ("If applicants are correct on the merits they have standing . . . . The case in that posture is in the class of those where standing and the merits are inextricably intertwined."). *But see Baker v. Carr*, 369 U.S. 186, 208 (1962) ("It would not be necessary to decide whether appellants' allegations of impairment of their [constitutional rights] . . . will, ultimately, entitle them to relief, in order to hold that they have standing to seek it. If such impairment does produce a legally cognizable injury, they are among those who have sustained it."). In so doing, however, the court does not assume injury has occurred. *Cf. Lujan*, 504 U.S. at 560 (holding injury may not be "hypothetical").

B.   ORGANIZATIONAL STANDING

An organization may sue in its own or in a representative capacity. *See United Food & Commercial Workers v. Brown Group*, 517 U.S. 544, 556 (1996). If suing in its own capacity, it must establish the same elements as an individual plaintiff. *Lujan*, 504 U.S. at 560. In a representative capacity, however, "an association has standing to bring suit on behalf of its

12

members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Here, organizational plaintiffs CGF and SAF join the five individual plaintiffs in the action. As noted, CGF's purposes "include supporting the California firearms community by promoting education for all stakeholders about California and federal firearm laws, rights and privileges, and securing, defending and protecting the civil rights of California gun owners, who are its members and supporters." Decl. of Gene Hoffman, Jr. ("Hoffman Decl.") ¶ 3, ECF No. 61-7. SAF's purposes "include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control." Decl. of Alan Gottlieb ¶ 4, ECF No. 61-6. Both organizations attest that the UHA "regularly cause[s] the expenditure of resources . . . as people turn to [the] organization[s] for advice and information." *Id.* ¶ 6; Hoffman Decl. ¶ 5. Also as noted, plaintiffs Peña, Croston and Thomas are members of both CGF and SAF. Decl. of Ivan Peña ¶¶ 2–3, ECF No. 61-2; Decl. of Doña Croston ¶¶ 2–3, ECF No. 61-3; Decl. of Brett Thomas ¶¶ 2–3, ECF No. 61-5. Vargas is a member of SAF and a "participant in CGF activities." Decl. of Roy Vargas ¶¶ 2–3, ECF No. 61-4.

The organizational plaintiffs have established direct standing. "An organization may establish a sufficient injury in fact if it substantiates by affidavit . . . that a challenged statute or policy frustrates the organization's goals and requires the organization to expend resources in representing clients they otherwise would spend in other ways." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (citation and internal quotation marks omitted). However, "[a]n organization cannot manufacture . . . injury by incurring litigation costs or . . . choosing to spend money fixing a problem that otherwise would not affect the organization . . . . It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (internal

quotation marks omitted).  As the UHA imposes a number of regulations on firearms, it adversely affects the missions of CGF and SAF, both of which endeavor to protect the right of Californians to possess firearms.  Further, the organizations attest to expending resources addressing the UHA that, in its absence, they could conserve or expend in other ways.  Finally, there is no indication the injury is "manufacture[d]," as the UHA would increase the organizations' expenditures, even barring direct involvement in the instant litigation.

Having found direct standing, the court declines to address representational standing.

III.    STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Material" facts are those that "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and an "issue of fact [is] . . . 'genuine'" where established by the presence or absence of "specific facts," not mere "metaphysical doubt," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A moving party is entitled to judgment as a matter of law "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . ."  *Id.* at 587 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)); *accord* Fed. R. Civ. P. 50(a) ("If a party has been fully heard on an issue . . . and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . grant a motion for judgment as a matter of law . . . .").

The moving party bears the initial burden of showing "that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party does so successfully, the burden shifts to the nonmoving party, who "must establish that there is a genuine issue of material fact . . . ."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 585.  In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . . or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

14

support the fact." Fed. R. Civ. P. 56(c)(1). On summary judgment, the court views all evidence and draws all inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).

IV.    ANALYSIS

A.    SECOND AMENDMENT

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. Const. amend. II. This language "confers an individual right to keep and bear arms," *Heller*, 554 U.S. at 622, "the core lawful purpose of [which] is self-defense," *id.* at 630; *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1166 (9th Cir. 2014). The right, however, "is not unlimited." *Heller*, 554 U.S. at 626. Instead, it is tempered by "presumptively lawful regulatory measures," *id.* at 627 n.26, including "longstanding prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," and "laws imposing conditions and qualifications on the commercial sale of arms," *id.* at 626–27.

To determine whether a statute violates the Second Amendment, the Ninth Circuit has adopted a two-step approach "bear[ing] strong analogies to the Supreme Court's free-speech caselaw." *Jackson*, 746 F.3d at 960; *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). Under this framework, the court "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, . . . appl[ies] an appropriate level of [heightened] scrutiny." *Chovan*, 735 F.3d at 1136. "[T]he rare law that 'destroys' the [Second Amendment] right[] requir[es] . . . per se invalidation." *Peruta*, 742 F.3d at 1170.

In this case, defendant contends the UHA does not burden the Second Amendment at step one because it is "presumptively lawful." Def.'s Opp'n to Pls.' Mot. ("Def.'s Opp'n") at 6, ECF No. 74. Alternatively, if the court reaches step two, defendant argues the UHA withstands even intermediate scrutiny. *Id.* at 10. For different reasons, plaintiffs also maintain the court need not apply means-ends scrutiny; because the UHA

15

prohibits protected arms, they argue it is per se invalid. Pls.' Opp'n to Def.'s Mot. Summ. J. ("Pls.' Opp'n") at 12, ECF No. 73. Relying on *Chovan*, plaintiffs argue in the alternative that the UHA imposes a substantial burden on the Second Amendment and the statute fails under either strict or intermediate scrutiny. *Id.* at 12–15.

Amicus Glock, Inc. asserts that the UHA burdens the Second Amendment because it bans handguns "that are in 'common use' by 'law-abiding citizens for lawful purposes.'" Glock Amicus Curiae Br. at 5 (quoting *Heller*, 554 U.S. at 625, 627), ECF No. 66. Accordingly, Glock advocates the application of heightened scrutiny: "The proper constitutional test for analyzing the challenged portions of California's roster requirements as applied to commercial sales is intermediate scrutiny analogous to that used when considering restrictions on commercial speech protected by the First Amendment." *Id.* at 2. Additionally, Glock contends the UHA does not survive intermediate scrutiny because its various exceptions and exemptions render it underinclusive. *Id.* at 8–9.

1.  Step 1: Burden on Conduct Protected by Second Amendment

The court asks first whether, "based on a 'historical understanding of the scope of the right,'" "the challenged law burdens conduct protected by the Second Amendment . . . ." *Jackson*, 746 F.3d at 960 (quoting *Heller*, 554 U.S. at 625). "[A] challenged law falls outside the historical scope," and thus does not burden protected conduct, where: (1) "the regulation is one of [several] 'presumptively lawful regulatory measures'";[9] or (2) "the record includes

---

[9] The Supreme Court provided a non-exhaustive list of "presumptively lawful regulatory measures," stating:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in [*Heller*] should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools or government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626–27. The language itself is ambiguous as to whether the Court here deems all regulatory measures falling within these categories "longstanding" and therefore presumptively lawful, or whether only "longstanding" regulatory measures within these categories are presumptively lawful. However, the Ninth Circuit has suggested the former reading is correct:

persuasive historical evidence establishing "that the regulation . . . imposes prohibitions that fall outside the historical scope of the Second Amendment." *Id.* (citing *Heller*, 554 U.S. at 627 n.26; *Chovan*, 735 F.3d at 1137). Additionally, as the test does not qualify the term "burdens," the question is not one of degree. *See id.*; *Chovan*, 735 F.3d at 1136. Thus, if the regulated conduct burdens the Second Amendment, even minimally, and the government cannot show that the regulation is a "presumptively lawful regulatory measure[]" or "fall[s] outside the historical scope of the Second Amendment," review proceeds to the second step. *Jackson*, 746 F.3d at 960.

Defendant argues the UHA does not burden plaintiffs' Second Amendment rights for two reasons. Def.'s Opp'n at 5–7. Defendant points out handguns remain widely available in California: over one million handgun transactions, a figure that grows by the hundreds of thousands annually, have occurred in California since plaintiffs filed suit, and the current handgun roster includes more than one thousand models. *Id.* at 5. Moreover, plaintiffs, who already own guns suitable for self-defense, are able to acquire more through alternate, legal avenues, *id.*, a factor which has led courts to uphold regulations akin to the UHA, *id.* at 6 (citing serial-number statute in *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010) and gun-registration law in *Heller II*, 670 F.3d at 1251–58).

Second, defendant contends the UHA is a law "imposing conditions and qualifications on the commercial sale of arms" and is, therefore, "presumptively lawful." *Id.* at 5–6 (quoting *Heller*, 554 U.S. at 626–27 & n.26). Likening the UHA's safety-feature requirements to founding-era gunpowder-storage laws, defendant insists the statute does not

---

> In the first step, we ask whether the challenged law burdens conduct protected by the Second Amendment, based on a historical understanding of the scope of the [Second Amendment] right, or whether the challenged law falls within a well-defined and narrowly limited category of prohibitions that have been historically unprotected.

*Jackson*, 746 F.3d at 960 (alteration in original) (citations and internal quotation marks omitted); *see also United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011) (equating "habitual drug users" with "felons and mentally ill people" and rejecting Second Amendment challenge without undertaking historical analysis).

burden the right of self-defense even "remotely." *Id.* at 6 (quoting *Heller*, 554 U.S. at 632).

Therefore, defendant concludes, the UHA does not infringe the core Second Amendment right

of "law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.*

Plaintiffs respond that because there is a right to keep and bear arms, there must

be a corresponding right to acquire them. Pls.' Mot. at 10 (citing, *inter alia*, *Marzzarella*,

614 F.3d at 92 n.8). Although conceding the State may ban "dangerous and unusual" arms, *id.*

(citing *Heller*, 554 U.S. at 627), plaintiffs argue "the acquisition of handguns of the kind in

common use for lawful purposes, the sort of handguns that law-abiding citizens would expect

to keep," "cannot be prohibited—even if the state would prefer people use different (or no)

firearms," *id.* at 11. Relying on *Heller*, they assert handguns are protected by the Second

Amendment because the guns are "in common use" and that the UHA not only burdens but

bans them. *See* Pls.' Mot. at 9 (quoting 554 U.S. at 627).

Plaintiffs accordingly contend that this court need determine only whether the

unlisted handguns, effectively banned in California because they are deemed "unsafe," are arms

"in common use" within the meaning of the Second Amendment. Pls.' Opp'n at 12. If they are

not, then plaintiffs' challenge ends because the arms are not protected; if they are, then an

injunction must issue because the arms may not be banned. *Id.* In plaintiffs' estimation, the

UHA amounts to a ban of new handguns that do not have microstamping, CLI, or MDM

technology; have not been submitted by the manufacturer for testing; or for which no annual

listing fee has been paid. Pls.' Mot. at 13. Plaintiffs analogize to First Amendment doctrine

and assert that permitting California to ban these types of handguns is akin to permitting it to

ban entire categories of books. Pls.' Opp'n at 1.

"In order to uphold the constitutionality of a law imposing a condition on the

commercial sale of firearms, a court necessarily must examine the nature and extent of the

imposed condition." *Marzzarella*, 614 F.3d at 92 n.8. Here, the UHA criminalizes the

manufacture and sale of new guns deemed "unsafe," Cal. Penal Code § 32000, permitting

commercialization of only handguns that appear on a state roster, *id.* § 32015. To be added to

the roster, a new handgun must comply with specified requirements, depending on the type of

gun and listing date: inclusion of microstamping (as of May 2013), CLI (as of January 2006 or 2007), and MDM features (same), *id.* § 31910; firing and drop safety testing (as of 1999), *id.*; and payment of a listing fee (as of 1999), *id.* § 32015(b)(1). The UHA thereby "impos[es] conditions and qualifications on the commercial sale of arms . . . ." *Heller*, 554 U.S. at 626–27.

The law does not, however, "prohibit[] the commercial sale of firearms." *Marzzarella*, 614 F.3d at 92 n.8; *see also United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011) (noting *Heller*'s distinction between "regulations" and "prohibitions"). Whereas the "imposi[tion] of conditions and qualifications on the commercial sale of arms" is "presumptively lawful," *Heller*, 554 U.S. at 627 n.26, the prohibition of commercial sale "would be untenable," *Marzzarella*, 614 F.3d at 92 n.8, because it would "effect[] a '*destruction* of the [Second Amendment] right,'" *Peruta*, 742 F.3d at 1168 (quoting *Heller*, 554 U.S. at 629) (emphasis in original). As opposed to "conditions and qualifications," *Heller*, 554 U.S. at 627, "[a] 'prohibition' does more than merely alter or restrain a person's behavior; it is an edict, decree, or order which forbids, prevents, or excludes," *Barton*, 633 F.3d at 175 (internal quotation marks omitted); *see also Jackson*, 746 F.3d at 964 ("[A] ban is not merely regulatory; it *prohibits* . . . ." (internal quotation marks omitted, emphasis in original)). Thus, categorical prohibitions "go too far."[10] *Peruta*, 742 F.3d at 1170. In *Heller*, for example, the Court invalidated the contested law, without subjecting it to constitutional scrutiny, because it was a "complete ban on handguns in the home . . . ." *Id.* at 1170 (citing *Heller*, 554 U.S. at 629). Similarly, in *Peruta*, the court summarily struck down the law in question because it was a "near-total prohibition on keeping [arms] . . . ." *Id.* In *Silvester v. Harris*, the subject of

---

[10] The court notes, however, that "*Heller* said nothing about extending Second Amendment protection to firearm manufacturers or dealers. If anything, *Heller* recognized that firearms manufacturers and dealers are properly subject to regulation . . . ." *Teixera v. Cnty. of Alameda*, No. 12-cv-03288-WHO, 2013 WL 4804756, at *6 (N.D. Cal. Sept. 9, 2013) (alteration in original) (internal quotation marks omitted). Thus, "'although the Second Amendment protects an individual's right to bear arms, it does not necessarily give rise to a corresponding right to sell a firearm.'" *Id.* (quoting *United States v. Chafin*, 423 F. App'x 342, 344 (4th Cir. 2011) (unpublished)); *cf. United States v. 12 200-Foot Reels of Super 8mm. Film*, 413 U.S. 123, 128 (1973) ("[T]he protected right to possess obscene material in the privacy of one's home does not give rise to a correlative right to have someone sell or give it to others.").

1  plaintiffs' second notice of supplemental authority, a fellow district judge found a ten-day

2  waiting period to purchase a firearm an unconstitutional burden on the rights of those who

3  already owned firearms.  2014 WL 4209563, at *28 (E.D. Cal. Aug. 25, 2014) (discussing

4  longstanding presumptively lawful regulations as discussed in *Heller*, finding that waiting

5  periods do not qualify, but noting laws "prohibiting the sale of certain types of firearms" may

6  qualify).

7          The UHA is distinguishable from the the laws at issue in *Heller* and *Peruta*; the

8  UHA does not effectively ban firearms.  Under the instant statutory scheme, the commercial

9  sale of firearms proceeds robustly: "[s]ince this lawsuit was filed, there have been

10  approximately 1.5 million legal handgun transactions in California," Pls.' Resp. to Def.'s

11  Undisputed Facts ¶ 25, and as of February 11, 2015, the handgun roster included 795 models,[11]

12  *Roster of Handguns Certified for Sale*, Cal. Dep't of Justice, Office of the Attorney Gen.

13  (accessible at http://certguns.doj.ca.gov/).  Plaintiffs concede "California's handgun rostering

14  laws [do not] bar access to *all* handguns."  Pls.' First Notice of Supplemental Authority at 4,

15  ECF No. 83 (emphasis in original).  In other words, the UHA does not "amount[] to a

16  prohibition of an entire class of 'arms'" requiring per se invalidation.  *Heller*, 554 U.S. at 628.

17  Further, each individual plaintiff admits to both having obtained and being able to obtain

18  handguns capable of use for self-defense.  Def.'s Opp'n at 5.  Plaintiffs nonetheless say "[t]hat

19  [whether] *some* handguns are allowed is beside the point."  Pls.' First Notice of Supplemental

20  Authority at 4 (emphasis in original).  "Rather, [they] claim that particular unrostered handguns

21  are constitutionally-protected [sic], such that barring access to *those* handguns violates their

22

23          [11] The court notes that in their proposed supplemental brief plaintiffs assert that the
24  number of listed handguns declined ten percent between October 2013 and January 2014 and
   that "the number . . . will continue its steep decline." Pls.' Mot. to Supplement R. at 2, ECF
25  No. 82-1.  "[A]bsent relief from the microstamping requirement," they continue, "semi-
   automatic handguns will all but disappear from the California consumer market in due course."
26  *Id.*  Even if the court considered this argument, plaintiffs do not offer evidence sufficient to
   support a finding of imminent disappearance and the court would have no reason to  address
27  hypothetical facts not before it.  *See Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)
   ("A justiciable controversy is . . . distinguished from a difference or dispute of a hypothetical or
28  abstract character . . . .").

Second Amendment rights, in the precise way that Plaintiffs would exercise those rights." *Id.* (emphasis in original). In essence, plaintiffs' position is that choosing the manner in which their Second Amendment rights are to be exercised—specifically, their selection of particular arms—is part and parcel of the right itself and the state's imposition of "conditions and qualifications" that deprive plaintiffs of their choices is unconstitutional. *See id.*

The court is not persuaded by plaintiffs' argument. "*Heller* did not purport to 'clarify the entire field' of Second Amendment jurisprudence and does not provide explicit guidance on the constitutionality of regulations which are less restrictive than . . . near-total ban[s] . . . ." *Jackson*, 746 F.3d at 959 (quoting *Heller*, 554 U.S. at 635). The Court in *Heller* addressed only a "handgun ban [that] amount[ed] to a prohibition of an entire class of 'arms' [handguns] that [was] overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]." *Heller*, 554 U.S. at 628. Because that "law totally ban[ned] handgun possession," it "amount[ed] to a destruction of the right," and was "clearly unconstitutional." *Id.* at 628–29. As discussed above, however, the equivalent circumstance is not present here. The UHA does not adversely impact the access to and sale of firearms generally; plaintiffs' Second Amendment rights are satisfied by the scheme's allowing the purchase of nearly 1000 types of rostered firearms. This degree of regulation is negligible and does not burden plaintiffs' rights under the Second Amendment.

Further, the Court noted in *Heller* that "the right [protected by the Second Amendment is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. Rejecting reasoning analogous to plaintiffs' here, the Ninth Circuit held in *Peruta* that California "has the power to" decide the manner in which Second Amendment rights may be exercised: "[A]s the historical sources have repeatedly noted, the state has a right to prescribe a particular manner of carry, provided it does not cut[] off the exercise of the citizen right altogether to bear arms, or, under the color of prescribing the mode, render[] the right itself useless." 742 F.3d at 1172 (alterations in original) (internal quotation marks omitted). "California's favoring [one mode of carry over another] . . . does not offend the Constitution, so long as it allows one . . . ." *Id.* Consequently, "[i]nsistence upon a

21

particular mode of carry" "fall[s] outside the scope of the right to bear arms . . . ." *Id.*; *see also*

*Heller*, 554 U.S. at 626.

Here, plaintiffs insist they have the right to determine "the precise way [in which they] . . . would exercise" their Second Amendment rights; they demand access to handguns of their choosing. Pls.' First Notice of Supplemental Authority at 4. California, however, has "express[ed] a preference for" handguns it deems safe, just as it has for "concealed rather than open carry" of arms. *Peruta*, 742 F.3d at 1172. The state "has the power to do so" subject to the limiting principle that the regulation not "cut[ ] off the exercise of the right of the citizen altogether to bear arms, or, under the color of prescribing the mode, render[ ] the right itself useless." *Id.* (internal quotation omitted, alteration in original); *cf. Poe v. Ullman*, 367 U.S. 497, 539 (1961) ("In reviewing state legislation, whether considered to be in the exercise of the State's police powers, or in the provision for the health, safety, morals or welfare of its people, it is clear that what is concerned are the powers of government inherent in every sovereignty." (internal quotation marks omitted)). The court finds plaintiffs' "[i]nsistence upon . . . particular" handguns to "fall outside the scope of the right to bear arms." *Peruta*, 742 F.3d at 1172; *see also Heller*, 554 U.S. at 626. It need pursue the inquiry no further. *See Jackson*, 746 F.3d at 960; *Chovan*, 735 F.3d at 1136. The court also rejects plaintiffs' contention that "particular unrostered handguns are constitutionally-protected [sic] . . . ." Pls.' First Notice of Supplemental Authority at 4. The Second Amendment does not protect guns, but rather conduct. *Chovan*, 735 F.3d at 1136.

The UHA is "one of the 'presumptively lawful regulatory measures' identified in *Heller*" and, as such, "falls outside the historical scope" of the Second Amendment.[12] *Jackson*, 746 F.3d at 960. As the *Jackson* court employed the disjunctive in its articulation of

---

[12] Because this court finds the UHA presumptively lawful, the court's holding is distinguishable from the holding in *Mance v. Holder*, 2015 U.S. Dist. LEXIS 16679 (N.D. Tex. Feb. 11, 2015), which plaintiffs submitted with their third notice of supplemental authority. ECF No. 93. In *Mance*, the court found a federal interstate handgun transfer ban was not presumptively lawful, and that it burdened plaintiffs' Second Amendment rights; the court struck down the restriction after applying strict scrutiny, which is not the standard applicable here.

the rule, no evaluation of "historical evidence" is required here. *See id.* ("To determine whether a . . . law falls outside the historical scope of the Second Amendment," the court "ask[s] whether the regulation is one of the presumptively lawful regulatory measures identified in *Heller* or whether the record includes persuasive historical evidence establishing that the regulation . . . imposes prohibitions . . . fall[ing] outside" the Amendment's scope. (internal quotation marks omitted)); *see also Dugan*, 657 F.3d at 999.

The UHA does not burden plaintiffs' Second Amendment rights.

2. Step 2: Scrutiny Required?

Because the UHA does not burden the Second Amendment at the first step, the court need not proceed to the second step. Heightened scrutiny is not triggered. *See id.* at 961 ("If a prohibition falls within the historical scope of the Second Amendment, [the court] . . . proceed[s] to the second step . . . ."); *accord NRA v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012) ("If a challenged law burdens conduct that falls outside the Second Amendment's scope, then the law passes constitutional muster."); *Ezell v. City of Chicago*, 651 F.3d 684, 702–03 (7th Cir. 2011) ("[I]f the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right . . . then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.").

Rational basis review is likewise improper here as it "is a mode of analysis . . . use[d] when evaluating laws under constitutional commands that are themselves prohibitions on irrational laws." *Heller*, 554 U.S. at 628 n.27. In such cases, "'rational basis' is not just the standard of scrutiny, but the very substance of the constitutional guarantee." *Id.* "[T]he same test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech . . . or the right to keep and bear arms." *Id.* Otherwise, "the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws[] and . . . have no effect." *Id.*

Instead, "[w]here a challenged statute apparently falls into one of the categories signaled by the Supreme Court as constitutional, courts have relied on the 'presumptively

lawful' language to uphold laws in relatively summary fashion." *Hall v. Garcia*, No. C 10-03799 RS, 2011 WL 995933, at *2 (N.D. Cal. Mar. 17, 2011) (citing *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010); *United States v. Davis*, 304 F. App'x 473, 474 (9th Cir. 2008); *United States v. White*, 593 F.3d 1199, 1206 (11th Cir. 2010)); *see also Dugan*, 657 F.3d at 999 (equating "habitual drug users" with "felons and mentally ill people" for Second Amendment purposes and summarily terminating analysis).

The court denies plaintiffs' Second Amendment challenge, without the need for further discussion.

### B.   EQUAL PROTECTION

The Equal Protection Clause of the Fourteenth Amendment provides: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This directive requires "that all persons similarly situated . . . be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). Indeed, "to trigger equal protection review at all, [a challenged law] must treat similarly situated persons disparately." *Barnes-Wallace v. City of San Diego*, 704 F.3d 1067, 1084 (9th Cir. 2012) (internal quotation marks omitted). Persons are not similarly situated where they "are different in fact," such that the "distinctions . . . drawn [by the challenged law] have some relevance to the purpose for which classification is made." *Rinaldi v. Yeager*, 384 U.S. 305, 309 (1966) (internal quotation marks omitted).

To establish an equal protection violation, a plaintiff must "show that the [challenged] law is applied in a discriminatory manner or imposes different burdens on different classes of people." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995). Accordingly, "'[t]he first step in equal protection analysis is to identify the [challenged law's] classification of groups.'" *Id.* (quoting *Country Classic Dairies, Inc. v. Mont. Dep't of Commerce Milk Ctrl. Bureau*, 847 F.2d 593, 596 (9th Cir. 1988)). "Once the plaintiff establishes [the] classification, it is [then] necessary to identify a 'similarly situated' class against which the plaintiff's class can be compared." *Id.* (citing *Attorney Gen. v. Irish People, Inc.*, 684 F.2d 928, 946 (D.C. Cir. 1982)).

24

Only after identification of a classification does the court proceed to "[t]he next step [and] determine the level of scrutiny." *Id.* (alterations and internal quotation marks omitted). "[I]f a law neither burdens a fundamental right nor targets a suspect class," it need only "bear[] a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 632 (1996). Such review requires that a "classification . . . be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320 (1993).

Plaintiffs argue the UHA creates several privileged classes exempt from compliance with the roster: (1) people who move into the state, (2) people who have out-of-state family, (3) law enforcement personnel, (4) "curios" or "relics" as defined by statute, (5) people involved in movie or television production and (6) guns with certain CLIs. Pls.' Mot. at 18–19. Because persons in these classifications, in contrast to the general population, need not comply with the UHA, plaintiffs argue there is disparate treatment. *Id.* Plaintiffs do not claim any classifications are suspect or quasi-suspect but assert the law infringes the fundamental Second Amendment right to keep and bear arms. *Id.* at 16–17. They thus argue strict scrutiny is proper and summary judgment on this claim warranted. *Id.* at 17–18.

For his part, defendant contends as a threshold matter that plaintiffs have failed to identify distinct classifications that the statute treats disparately. Def.'s Mot. Summ. J. ("Def.'s Mot.") at 19, ECF No. 55. Further, according to defendant, plaintiffs are neither similarly situated to any properly identified class nor subject to disparate treatment. *Id.*; Def.'s Opp'n at 10–11. Even were equal protection review proper, he continues, the UHA neither burdens a fundamental right nor targets a suspect or quasi-suspect class. Def.'s Mot. at 19; Def.'s Opp'n at 11. Defendant thus concludes the law is subject to only rational basis review, and summary judgment should be granted in his favor. Def.'s Mot. at 19; Def.'s Opp'n at 11.

### 1. Curios, Relics, and CLIs

The court first finds that "curios" or "relics" and guns with certain CLIs are not subject to equal protection. The Equal Protection Clause guarantees only "that all persons similarly situated . . . be treated alike," *City of Cleburne*, 473 U.S. at 439; it "relates to equality

between persons as such," *McGowan v. Maryland*, 366 U.S. 420, 427 (1961). Thus, as plaintiffs here claim disparate treatment of objects, not persons, the argument fails. The pertinent provisions do not treat persons disparately. They classify certain types of guns as exempt or define guns with certain CLIs as "safe" but apply the exemptions and definitions equally and identically to all persons. *See* Cal. Penal Code §§ 32000(b)(3), 32010(d)(1)–(2), 16380.

### 2. Incoming Residents, Out-of-State Family, and Movie Production

The court also finds that the UHA does not treat (1) people who move into the state, (2) people who have out-of-state family, or (3) people involved in movie or television production differently from other persons. Plaintiffs argue that because "unrostered guns are permitted by private importation or as intra-family gifts," "[t]he roster . . . privileges people who move into the state[] or who have family out-of-state [sic]." Pls.' Mot. at 18. However, California residents, including those who have no out-of-state family, are not prevented from possessing unlisted guns, receiving them as intra-family gifts from in-state relatives, or bringing them into the state for noncommercial purposes. The law thus exempts specific types of transactions without regard to the persons involved. *See* Cal. Penal Code § 32000(a) (punishing "any person in [California] who manufactures or causes to be manufactured, imports into the state for sale, keeps for sale, offers or exposes for sale, gives, or lends any unsafe handgun"); *id.* law revision commission comments (2010) (noting "exception for infrequent transfer of handgun between members of same immediate family").

Similarly, plaintiffs protest the "exceptions for movie and television production." Pls.' Mot. at 19. However, the law states only that it "shall not apply to . . . [t]he sale loan or transfer of any semiautomatic pistol that is to be used solely as a prop during the course of a motion picture, television or video production by an authorized participant therein," without dictating who may or may not be such a participant, Cal. Penal Code § 32110(h). Equal protection is concerned with "law [being] applied in a discriminatory manner or impos[ing] different burdens on different classes of people," *Freeman*, 68 F.3d at 1187;

/////

1  *McGowan*, 366 U.S. at 427, a condition that does not obtain here.  Equal protection analysis is

2  not triggered by this provision either.

3              3.  Law Enforcement

4              Plaintiffs' assertion that the UHA treats law enforcement personnel differently,

5  is, however, persuasive.  Whereas the law's prohibitions apply to "any person in this state" who

6  engages in specified actions, *see* Cal. Penal Code § 32000(a), transactions involving "sworn

7  members" of law enforcement personnel "for use in the discharge of their official duties" are

8  exempt, *id.* § 32000(b)(4).[13]  This provision results in disparate treatment because exempting a

9  group of people from compliance with the UHA "imposes different burdens on different classes

10 of people." *Freeman*, 68 F.3d at 1187.  That said, active law enforcement personnel and

11 laymen are not similarly situated to plaintiffs.

12             "Differen[ces] in fact," *Rinaldi*, 384 U.S. at 309, exist between law enforcement

13 personnel and laymen.  Law enforcement personnel shoulder a duty to ensure public safety and

14 thus assume different responsibilities, risks, and rights.  *See Silveira v. Lockyer*, 312 F.3d 1052,

15 1089 (9th Cir. 2002) (finding it "manifestly rational for . . . peace officers to possess and use

16 firearms more potent than those available to the rest of the populace in order to maintain public

17 safety"), *abrogated on other grounds by Heller*, 554 U.S. at 592.  These differences are directly

18 "relevan[t] to the purpose for which classification is made" in the UHA, namely, public safety.

19 *Rinaldi*, 384 U.S. at 309.  Accordingly, plaintiffs have not "identif[ied] a 'similarly situated'

20 class against which the plaintiff[s]' class can be compared." *Freeman*, 68 F.3d at 1187.  Equal

21

22             [13] The UHA does not apply to:

23             The sale or purchase of a handgun, if the handgun is sold to, or
               purchased by, the Department of Justice, a police department, a
24             sheriff's official, a marshal's office, the [California] Department
               of Corrections and Rehabilitation, the California Highway Patrol,
25             any district attorney's office, any federal law enforcement
               agency, or the military or naval forces of this state or of the
26             United States for use in the discharge of their official duties.
               This section does not prohibit the sale to, or purchase by, sworn
27             members of these agencies of a handgun.

28 Cal. Penal Code § 32000(b)(4).

protection analysis is, therefore, not triggered by the law enforcement exemption. *Id. But see Silveira*, 312 F.3d at 1088–89 (rejecting, under rational basis review, equal protection challenge to California gun law's disparate treatment of off-duty and retired peace officers and laymen).

        The court grants summary judgment on the equal protection claim in favor of defendant.

V.    <u>CONCLUSION</u>

        For the reasons set forth above:

1.    Plaintiffs' motion for summary judgment, ECF No. 61, is DENIED; and

2.    Defendant's motion for summary judgment, ECF No. 55, is GRANTED.

        IT IS SO ORDERED.

DATED:  February 25, 2015.

_____
UNITED STATES DISTRICT JUDGE